## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

### Case No.: 21-1050

THOMAS ANDERSON, NATHAN BEMENT, RICHARD BORJA, MARLON BRAZELL, JAMES BREITSPRECHER, LORA BAUER, GARY CAIN, AMY CAMP, DAVID CATALA, KEVIN CAMPBELL, ANGELA COLE, DENNIS COLE, JOHN CRONIN, NICHOLAS DECKER, PAUL DELL'AIRA, TAMI DUCHAMP, MARTIN FECK, MICHAEL FOLK, REBECCA GRISWOLD, CHAD JAMES, KEVIN JARNIGAN, FIRMAN JENSEN, ROBERT KAPPA, TAMMY KROPP, LISA LALKOWSKI, CAROL LEVY, KENNETH LOCKE, SUSANNE LOUGH, SYLVIA MCCONNELL, JOSEPH MILLER, DAVE MORGAN, JOHN MORRIS, PETER MATSHULAT, RONALD MCKENZIE, GAVIN MCCRARY, BRENDA MARSTON, MICHELE MILLER, DARRIN NARDI, ROBERT NEAL, JACKIE PANERO, MICHAEL PARRISH, RUSSELL OAKES, PAUL ROZELL, WILLIAM RAMOS, MATTHEW ROBBIN, TODD SHEFFLER, TIANA SHELTON, TORY SIMS, RANDY SIKORA, JOHN SULLIVAN, MARK SMITH, DOUG TURNER, VIVIANA DELLA VECCHIA, TODD VAUPEL, HOLLY WOLFE, CHRISTOPHER WOODIN, RALPH WITT, WILLIAM WRIGHT, KEVIN ZWEIRKO, TOM FLOYD, MICHAEL HILLEBRAND, SHAUN KLEBOLD, THAD KRUPA, CHRISTINE LOWRY, STEVE MATACIA, FRANK QUINTAS, RICHARD SHERLOCK, ROGELIO SOTO, DAWN SWANSON, YADIRA SWART, CHARLES SNYDER, PAMELA TASSONE, SHAQUIRA TUCKER, and JAMES ZIETLOW,

      Plaintiffs,

  v.

UNITED AIRLINES, INC., a Delaware Corporation,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES AND
## <u>DECLARATORY AND INJUNCTIVE RELIEF</u>

COMES NOW, Plaintiffs, Thomas Anderson, Nathan Bement, Richard Borja, Marlon Brazell, James Breitsprecher, Lora Bauer, Gary Cain, Amy Camp, Kevin Campbell, David Catala, Angela Cole, Dennis Cole, John Cronin, Paul Dell'Aira, Nicholas Decker, Tami Duchamp, Martin Feck, Michael Folk, Rebecca Griswold, Chad James, Kevin Jarnigan, Firman Jensen,  Robert Kappa, Tammy Kropp, Kenneth Locke, Lisa Lalkowski, Carol Levy, Susanne Lough, Sylvia McConnell, Joseph Miller, Dave Morgan, John Morris, Peter Matschulat, Ronald McKenzie, Gavin McCrary, Brenda Marston, Michele Miller, Darrin Nardi, Robert Neal, Jackie Panero, Michael Parrish, Russell Oakes, Paul Rozell, William Ramos, Matthew Robbin, Todd Sheffler, Tiana Shelton, Tory Sims, Randy Sikora, John Sullivan, Mark Smith, Doug Turner, Viviana Della Vecchia, Todd Vauple, Holly Wolfe, Christopher Woodin, Ralph Witt, William Wright, Kevin Zweirko, Tom Floyd, Michael Hillebrand, Shaun Klebold, Thad Krupa, Christine Lowry, Steve Matacia, Frank Quintas, Richard Sherlock, Charles Snyder, Rogelio Soto, Yadira Swart, Dawn Swanson, Pamela Tassone, Shaquira Tucker, and James Zietlow, files this complaint against Defendant, United Airlines Inc., a Delaware corporation ("United") seeking damages, declaratory, and injunctive relief, and states:

2

## NATURE OF ACTION

1. This is a civil action against United Airlines Inc., ("United") for civil penalties and injunctive relief pursuant to the unconstitutional and life-endangering vaccine mandate issued by United and the actions preceding the enactment of this mandate.  The United States Constitution, the U.S Civil Rights Act of 1964, ("Title VII"), and other laws establish that neither the federal government nor private employers can force an individual to receive any inoculation without their informed consent; especially a vaccination known to cause injury and even death. United consistently acted in lockstep with the widely publicized goals of the state – especially the Biden administration. Whether forced upon by incentive or threat, United as a strictly private entity has ceased to exist and has become a State Actor as evidenced herein.

2. United, as a State Actor, intentionally effected and set in motion a series of events designed to cause Plaintiffs and other employees harm including: physical, psychological, emotional, public humiliation, open segregation, and discrimination; while United fostered a toxic, corporate culture and environment. The actions taken by United were explicitly prohibited by law; yet United, with the state providing both the mantle of authority and overhead cover, knowingly

and flagrantly shirked both law and decency to help achieve a singular, State objective: universal COVID-19 vaccination.

3. Under the guise of care, United used numerous tactics to reach the governments' goal including dissemination of false data, suppressing truthful information, discriminatory incentives, manipulative coercion, and even actual threats. These vaccines present many, documented dangers and have proven to cause numerous harms, including death. The CDC managed, yet grossly underreported VAERS (Vaccine Adverse Effects Reporting System) database, along with similar databases worldwide corroborate these numerous dangers.

4. The long-term effects of the COVID-19 vaccines remain unknown, especially those regarding potentialities and consequences specific to aeromedical, physiological particularities. United recklessly utilized torturous, coercive, manipulative, and inhumane tactics to force inoculation of its workforce to fulfill their role as the enforcement arm for the state's illegal objective. With the government playing a complicit role in these actions, holding both United common stock and a $1.5 billion loan, United enthusiastically acted in concert with the state to achieve its universal, inoculation objective in order to repay the large debt owed to the government to avoid State punishment, and receive State favors.

As such, United flagrantly denied rights afforded to Plaintiffs and all employees by U.S. laws, as well as, international laws. United conspired with government agencies and other entities to willfully inflict pain, suffering, and potentially death upon the Plaintiffs and other United employees.

5. Plaintiffs plead the Court for justice for the harms perpetrated by United in the form of damages, declaratory relief, and injunctive relief, according to the law including the United States Constitution, the U.S. Civil Rights Act, (Title VII), Nuremberg Code, and others for Defendants' unlawful practices and premeditated life-endangering conduct. Due to the egregious nature of these offenses, and considering the Defendant's blatant disregard for Plaintiffs' constitutional and international rights, Defendant's contempt for rule of law, actualized by planned offensive actions, and considering the harms United committed and premeditatively caused, Plaintiffs seek their day in court; actual damages in the sum of salaries that would be earned until natural retirement of approximately four-hundred and nine million, two-hundred thousand dollars ($409,200,000); general damages as the court awards; and punitive damages of two-million dollars ($2,000,000) per Plaintiff be awarded to the Plaintiffs.

## PARTIES

**Plaintiffs - Employees of United Airlines, Inc.**

6.  Plaintiffs are all employees of Defendant, United Airlines, Inc. ("United") who have been subjected to United's invasive, discriminatory, reckless, unlawful, and unbridled mandates. Plaintiffs have not been inoculated with gene therapies or the Covid vaccines at issue and do not want to be; or alternatively, have been coerced into taking it or against their will. Plaintiffs have either had the virus SARS-CoV-2 ("SARS2") and/or COVID-19 ("Covid"); subsequently recovered; have natural immunity; have natural antibodies; or maintain sincere, religious beliefs that are prohibited from being discriminated against.

**Defendant - United Airlines, Inc. ("United")**

7.  United Airlines, Inc. is a large, major American airline headquartered at Willis Tower in Chicago, Illinois. United operates a large domestic and international route network with a fleet of roughly 834 aircraft and approximately 67,000 employees.

8.  United is the employer of the Plaintiffs-employees; and is an employer engaged in an industry affecting commerce under Section 201(2)(B)(i) of GINA, 42

U.S.C. § 2000ff(2)(B)(i), which incorporates by reference Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

9. United is also a "person" and State Actor under 42 U.S.C. § 1983[1]; and otherwise amenable to the counts in this complaint including Crimes Against Humanity and Violations of Nuremberg.

## JURISDICTION & VENUE

10. This Court has jurisdiction under 28 U.S.C. §1331 as this case arises under federal law and the United States Constitutions; chiefly the Fifth, Ninth, and Fourteenth Amendment of the United States Constitution, U.S. CONST. AMENDS. V, IX, XIV; 42 U.S.C § 1983; and under 28 U.S.C §1332 as the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs and between citizens of different states.

11. Jurisdiction specifically exists here also as this action is premised on violations of the Genetic Information Non-Discrimination Act, 42 U.S.C. §2000ff, et seq. (or "GINA"); 42 USC § 12112; those claims seeking declaratory and

---

[1] United is a state actor as shown in: *Flagg Bros. v. Brooks*, 436 U.S. 149, 164 (1978*); Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972); *Lugar v Edmondson Oil Company Inc.*, 457 U.S. 922 (1982); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985); *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179 (1988); *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001).

injunctive relief pursuant to 28 U.S.C. §§2201-02[2]; claims under 28 U.S.C §1350 (Alien Tort Statute) via 28 U.S.C. §1331[3]; and the Court's inherent authority and equitable powers which includes the recognition and enforcement of international laws, treaties, or declarations[4].

12.  Venue is proper under 28 U.S.C. §1391(b)-(e) because substantial parts of the acts or omissions giving rise to the claim occurred in this district; United regularly operates its business and flights throughout this district; has a large workforce in this district's airports; and many Plaintiffs reside within same.

---

[2] *Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction.").

[3] While 28 U.S.C §1350 expressly permits claims to be brought by aliens, it was referenced in context with §1331 for the proposition that similar allegations must be capable of being averred by Plaintiffs because to deny §1331 jurisdiction would provide non-citizens with more rights in federal courts than United States citizens (emphasis added). *See Xuncax v. Gramajo*, 886 F.Supp. 162, 178 (D.Mass.1995) (citing *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *Mushikiwabo v. Barayagwiza*, No. 94 CIV. 3627(JSM), 1996 WL 164496, *2 n. 1 (S.D.N.Y.1996) ("Although the TVPA does not itself confer jurisdiction, the Court has subject matter jurisdiction over the TVPA claims under 28 U.S.C. § 1331, the general federal question jurisdiction statute.").

[4] *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 725 (2004) referencing *Sabbatino*, 376 U.S., at 423, 84 S.Ct. 923 ("It is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances"); *The Paquete Habana*, 175 U.S., at 700, 20 S.Ct. 290 ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination"); *The Nereide, 9 Cranch* 388, 423, 3 L.Ed. 769 (1815) (Marshall, C.J.) ("[T]he Court is bound by the law of nations which is a part of the law of the land"); *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (recognizing that "international disputes implicating ... our relations with foreign nations" are one of the "narrow areas" in which "federal common law" continues to exist).

**COMMON FACTS**

## I.  THE PANDEMIC LEADING TO OPERATION WARP SPEED

13. On January 29, 2020, the White House Coronavirus Task Force was established to oversee and coordinate the Trump Administration's response to COVID-19. On January 31, 2020, as a result of confirmed cases of COVID-19, HHS Secretary Azar determined that a public health emergency existed as of January 27, 2020, pursuant to §319 of the PHSA, 42 U.S.C. § 247d et seq. On February 04, 2020, the Public Readiness and Emergency Preparedness Act (PREP) was invoked.

14. By mid-March 2020, the "novel coronavirus", SARS-CoV-2, which can cause the disease, COVID-19, had spread worldwide and wreaked havoc on the United States' healthcare, economy, and overall well-being. A national emergency was declared on March 13, 2020; which was followed by the Coronavirus Aid, Relief, and Economic Security Act ("CARES"), H.R. 748, was introduced in Congress, and signed by President Trump[5].

15. While SARS-CoV-2 was called 'novel', it was not an entirely new virus – just a new strain of coronavirus that resides in both humans and animals. SARS2 behaves like SARS-CoV that emerged in China in 2002 which justifies why it was

---

[5] https://www.govtrack.us/congress/bills/116/hr748

classified and named as such. SARS-COV-2 has the same genetic structure, uses the same host cell receptor to begin the infection cycle, and causes the same disease as SARS-CoV in humans. Research scientists have studied SARS-CoV for the last 17+ years. *See* affidavit of epidemiologist, Dr. Jennifer Smith, attached as **Ex. A**. Since SARS-COV-2 emerged, much has been learned about it including that it is not nearly as deadly as first thought.

16. Alarmingly, the most novel aspects of the SARS-COV-2 virus and Covid disease were the federal and state governments' responses. On May 15, 2020, President Trump and his administration announced the "Operation Warp Speed" initiative – a public-private partnership intended to facilitate and accelerate the development, manufacture, and distribution of a Covid vaccine. Operation Warp Speed was enacted and permitted coronavirus vaccines to be developed for Emergency Use Authorization ("EUA") faster than any other vaccine in our nation's history – with never-before-seen unbridled, lack-of accountability and disregard for process, safety, efficacy, and regulation.

17. Operation Warp Speed was initially funded with about $10 billion from the CARES Act. According to the Department of Health and Human Services, the primary goal of Operation Warp Speed was to "produce and deliver 300 million

closes of safe and effective vaccines with the initial doses available by January 2021, as part of a broader strategy to accelerate the development, manufacturing, and distribution of COVID vaccines, therapeutics, and diagnostics[6]." Subsequently, at least eight (8) companies were chosen for funding through Operation Warp Speed, including J&J (through a subsidiary called Janssen Biotech Inc.), Moderna, and AstraZeneca.

18.   Separately, Pfizer and BioNTech partnered to develop a Covid vaccine. On July 22, 2020, an advance-purchase order of $2 billion with Pfizer was placed to manufacture 100 million doses of their Covid vaccine for use in the United States when authorized by the FDA; and then on December 23, 2020, the administration announced The United States had ordered an additional 200 million more doses.

## II.   FEDERAL REGULATORY REGIME FOR LICENSING AND EMERGENCY USE AUTHORIZATION ("EUA")

### A.   FDA Vaccine Licensing and Approval

19.   The Food, Drug & Cosmetic Act ("FDCA") generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until the FDA has approved the

---

[6] Explaining Operation Warp Speed, U.S. Dep't of Health & Hum. Servs. (Nov. 10, 2020), available at https://www.nihb.org/covid-19/wp-content/uploads/2020/08/Fact-sheet-operationwarp-speed.pdf.

drug or biological product as safe and effective for its intended use. 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C. § 262(a).

20. Coincidingly, 42 U.S.C. § 262(a)(2)(C)(i)(I) requires approval of biological products and proven demonstration they are "safe, potent, and pure." *See also* 21 C.F.R. § 601.2(a). No such requirements are mandated for EUA products.

21. A vaccine is both a drug and a biological product and therefore subject to regulation under both the FDCA and the Public Health Service Act ("PHSA"). *See* 21 U.S.C. § 321(g); 42 U.S.C. § 262(i)(1).

22. Pursuant to Section 351(a) of the PHSA, 42 U.S.C. § 262(a), the FDA has the authority to approve the sale and manufacture of vaccines and other biologics like the Comirnaty Vaccine.

23. The biologics application addresses not only the safety and efficacy of the product, but also covers specific labeling and manufacturing requirements, including the manufacturing location, process, and storage requirements. EUA products are subject to much lower standards, than those required for licensed products, and they are exempt altogether from certain marketing and manufacturing requirements.

B.  "Interchangeable" Biological Products under the PHSA

24. "Interchangeable" and "interchangeability" are specifically defined terms in Section 351 of the PHS Act, 42 U.S.C. § 262[7], in relation to a "reference product,"[8] which is a biological product licensed under Section 351(a) of the PHSA. 42 U.S.C. § 262(a)[9].

25. For the purposes of determining "interchangeability," the "reference product" must be an FDA-licensed product; in this case, the FDA-licensed Pfizer, Comirnaty Vaccine. But the "interchangeable" product, the EUA BioNTech Vaccine, must be the subject of a later-filed "abbreviated" application under 42 U.S.C. § 262(k). There is, however, no indication, that any such application was ever filed by BioNTech, much less reviewed or approved by the FDA.

---

[7] "Interchangeable" and "interchangeability" are defined as a "biological product" that "may be substituted for the reference product" by health care providers. 42 U.S.C. § 351(i)(3). To meet the standards in 42 U.S.C. §262(k)(4) ("Safety standards for determining interchangeability"), the "interchangeable" or substitute biological product (i) must be biosimilar to the reference product and (ii) and "can be expected to produce the same clinical result as the reference product in any given patient." 42 U.S.C. § 262(k)(4).

[8] "Reference product" is defined as "the single biological product licensed" under 42 U.S.C. § 262(a) "against which a biological product is submitted" under 42 U.S.C. § 262(k). 42 U.S.C. § 351(i)(4).

[9] These definitions and related provisions were enacted as part of the Biologics Price Competition Act of 2009, which "amends the PHSA and other statutes to create an abbreviated licensure pathway," under Section 351(k) of the PHSA, 42 U.S.C. § 262(k), "for biological products shown to be interchangeable with an FDA-licensed biological reference product," licensed under Section 351(a) of the PHS Act, 42 U.S.C. § 262(a). *See generally* FDA, et al., Considerations in Demonstrating Interchangeability with a Reference Product: Guidance for Industry (May 2019), available at: https://www.fda.gov/media/124907/download (last visited Sept. 15, 2021).

C.   Emergency Use Authorization Laws and FDA Regulations

26. The FDCA authorizes the FDA to issue an EUA for a medical drug, device, or biologic, where certain conditions have been met. As relevant here, these are that HHS Secretary has declared a public health emergency that justifies the use of an EUA, 21 U.S.C. § 360bbb-3(b)(1), and the FDA finds that "there is no [1] adequate, [2] approved, and [3] available alternative to the product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3).

27. There are significant differences between licensed vaccines and those subject to EUA that render them "legally distinct."

28. First, the requirements for efficacy are much lower for EUA products than for licensed products. EUAs require only a showing that, based on scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A).

29. Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B).

14

30. Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations (subject to the override procedures for service members described below). *See, e.g., Doe v Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004) ("Rumsfeld II") (granting injunction against DOD anthrax vaccine mandate for EUA vaccine).

31. The public health emergency declaration that justifies the use of an EUA for a product "shall terminate upon the earlier of … a change in the approval status" of the EUA product. 21 U.S.C. § 360bbb-3(b)(2)(A)(ii). Thus, the approval, or licensing, of a vaccine for a given indication terminates the EUA for that vaccine. The requirements for licensing and emergency use authorization are mutually exclusive; the same product—or same vial of vaccine—cannot be concurrently subject to an EUA and licensed for the same indication or use, under distinct regulatory regimes[10].

---

[10] *See, e.g., Genus Med. Techs. LLC v. FDA*, 994 F.3d 631 (D.C. Cir. 2020) (holding that the FDA's determination that it could choose to regulate a product as either a drug or a device, or both, as arbitrary and capricious and exceeding its statutory authority).

D.   Informed Consent Requirements for EUA Products

32. The FDA's grant of an EUA is subject to informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of the product." FDCA § 564(e)(1)(A)(ii)(III); 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).[11] The FDA imposes and enforces the "option to accept or refuse" condition by requiring distribution to potential vaccine recipients a Fact Sheet that states, "It is your choice to receive or not receive [the vaccine]." *See* fact sheets attached as **Ex. B**.

E.   FDA Emergency Use Authorizations for COVID-19 Vaccines

33. The FDA issued EUAs for Pfizer, Moderna, and J&J – the PfizerBioNTech Covid Vaccine on December 11, 2020[12], a week later the Moderna Vaccine[13], and most recently the Johnson & Johnson Vaccine[14] (collectively "vaccines").

---

[11] The norms of informed consent has been "firmly embedded" in U.S. law and FDA regulations for nearly 60 years. *Adullahi v. Pfizer, Inc.*, 562 F.3d 163, 182 (2nd Cir. 2009). Congress first enacted this requirement in 1962 drawing on the Nuremberg Code and the Helsinki Declaration, "which suggests the government conceived of these sources' articulation of the norm as a binding legal obligation." *Adullahi*, 562 F.3d at 182 (citation omitted). Informed consent requirements are a cornerstone of FDA rules governing human medical experimentation. *See, e.g.*, 21 C.F.R. §§ 50.20, 50.23-.25, 50.27, 312.20, 312.120 (2008); 45 C.F.R. §§ 46.111, 46.116-117.

[12] Pfizer-BioNTech Vaccine FAQ, FDA, bit.ly/3i4Yb4e (last visited August 27, 2021).

[13] Moderna, About Our Vaccine, bit.ly/2Vl4lUF (last visited August 27, 2021).

[14] EUA for Third COVID-19 Vaccine, FDA, bit.ly/3xc4ebk (last visited August 27, 2021).

34. For the vaccines, the FDA implemented the "option to accept or refuse" condition described in Section 564(e)(1)(A)(ii)(III) in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient. Each Fact Sheet includes the statement that it is your choice to receive or not receive the vaccine.

F.   <u>BioNTech Vaccine EUA Expansion</u>

35. The requirements for licensing and emergency use authorization are mutually exclusive. The same product—or same vial of vaccine—cannot be concurrently (a) subject to an EUA **and** (b) licensed for the same indication or use, under distinct regulatory regimes. Yet that is precisely what the FDA has done by: (1) simultaneously licensing Comirnaty Vaccine and re-issuing the EUA for the BioNTech Vaccine for the same indication (individuals 16 years or older); (2) re-issuing and expanding the existing BioNTech Vaccine EUA for children of 12-15 years of age and permitting the licensed Comirnaty Vaccine to be used for this group; and (3) finding that the EUA BioNTech Vaccine and licensed Comirnaty Vaccine can be used "interchangeably" and may be substituted for each other.

36.  First, the approval of Comirnaty should have automatically terminated the EUA for that use. *See* 21 U.S.C. 360bbb-3(b)(2)(A)(ii). The FDA chose to ignore this statutory requirement.

37. Second, to grant an EUA, or extend an existing EUA, the FDA must find that there is no alternative that is (1) adequate, (2) approved, and (3) available. 21 U.S.C. § 360bbb-3(c)(3). All three must be required. Comirnaty is approved and presumably adequate, so the FDA's EUA re-issuance and expansion is based on that fact that the licensed vaccine is "not … available" in sufficient quantities. *Id*. at 5 n.9. "Not available" is a binary requirement; an alternative either is or is not available; there is no room in the statute for the FDA to add a third option – not available "in sufficient quantity" – for the purpose of enabling vaccine mandates. For example, not available in sufficient quantity is not a valid argument and is contrary to directives and statutes.

38. The FDA licensed a product that is not available, and then informed the general public that the EUA-labeled and manufactured product can be used "interchangeably," or substituted, for the licensed product.[15] The FDA provides

---

[15] The FDA BioNTech EUA Expansion letter appears to authorize injection from an EUA-labeled and manufactured vial for the same indications as the licensed product, namely, to individuals 16 years or older pursuant to a mandate; conversely, it would authorize off-label use of Comirnaty

no justification for ignoring and nullifying these express statutory requirements of the FDCA. The FDA's failure to fulfill these statutory requirements denies critical information that must be published by the manufacturer and enforced by the FDA. Withholding that data denies Plaintiffs' rights to informed consent and to refuse the administration of an experimental vaccine.

## III.    FDA COMIRNATY APPROVAL

39. Along with Plaintiffs submissions to United, numerous memoranda have been sent to the FDA and CDC concerning the approval and safety of the vaccines. Doctors from around the world, as well as, scientists, virologists, epidemiologists, and vaccine researchers have flooded the scientific community with data and studies exposing the dangers of these vaccines, the ineffectiveness of them, the unnecessary nature of them, and the suitable, effective, alternative treatments for treating the virus SARS2 and the disease COVID-19. This data alone should have prohibited the re-issuance of the EUA for these vaccines.

A.    <u>FDA Guidance on Testing and Review of COVID-19 Vaccines</u>

40. In June 2020, HHS, FDA, and the Center for Biologics Evaluation and Research ("CBER") issued guidance to vaccine developers on clinical and non-

---

Vaccine manufactured and labeled in compliance with the BLA to be administered to a 12-year-old, an indication for which Comirnaty is not licensed.

clinical testing and the procedures the FDA intended to apply in evaluating and approving COVID-19 vaccines[16].

41. The state managed FDA failed to follow standard procedures nor industry recommendations. The June 2020 Industry Guidance included a number of recommendations that ultimately were not followed, in particular: (1) the inclusion in clinical trials of individuals with previous Covid infections; (2) the inclusion of pregnant women; and (3) the use of clinical trials lasting "**at least one to two years**." The FDA also indicated its intent to follow its standard procedure for clinical trial results to be reviewed by the Advisory Committee.

42. Notably, many of Plaintiffs contentions and concerns above are shared by others evidenced by the Citizen Petition submitted by the Coalition Advocating for Adequately Licensed Medicines on July 23, 2021 in Docket No. FDA-2021-P-0786. ("Citizen Petition"). The FDA *denied* the Citizen Petition on August 23, 2021; which coincidently was the same day the FDA approved Comirnaty.

---

[16] *See* HHS, FDA & CBER, Development and Licensure of Vaccines to Prevent COVID-19: Guidance for Industry (June 2020) ("June 2020 Industry Guidance"), available at: https://www.fda.gov/media/139638/download (last visited October 11, 2021).

B.   Citizen Petition & FDA Response

43. On August 23, 2021, the FDA approved the May 18, 2021, Comirnaty application for individuals 16 years or older (**Ex. C**). Also on August 23, 2021, the FDA re-issued the EUA for the BioNTech Vaccine for individuals 16 years or older and for children aged 12 to 15 years, and expanded the EUA to cover a third "booster" shot for certain groups (**Ex. D**). The FDA Comirnaty Approval and BioNTech EUA Expansion thus licensed a vaccine and continued an existing EUA for the same indication (individuals 16 years or older)

44. The FDA has incorrectly asserted that the EUA BioNTech Vaccine and the conditionally approved Comirnaty Vaccine can be used "interchangeably." As explained above, this statement is contradictory and incorrect insofar as it suggests that an EUA Vaccine, manufactured and labeled in accordance with the EUA, may be treated as a licensed product.

45. Conversely, it submits that the Comirnaty Vaccine can be used for "off-label" uses under the EUA, e.g., for a child under 16 or for a third "booster" dose for which there is no clinical trial data available. The fact United and other agencies have seized on this language to justify mandates indicates that this was the intended outcome. Note, that United issued its vaccine mandate prior to FDA

approval with full confidence the plan would not be derailed by FDA rules, procedures, nor statutes.

46. The FDA appears to acknowledge that the EUA BioNTech Vaccine and the conditionally licensed Comirnaty are not in fact "interchangeable." The Comirnaty Approval Letter approves the sale of Comirnaty Vaccine, as well as, the specific manufacturing facilities, processes, ingredients, storage, and distribution requirements that were not addressed in the EUA. For example, the Comirnaty Approval Letter requires FDA approval for release of Comirnaty lots manufactured in accordance with the terms of the license. Given the differences in manufacturing between EUA and licensed vaccines, the FDA also required BioNTech to identify specific lots of EUA-labeled and manufactured BioNTech Vaccines that BioNTech deemed BLA-compliant for FDA review and release. The identification, however, of these specific lots for FDA review did not occur.

47. The Comirnaty Vaccine is not widely available due to limited supply. This has been affirmed by recent reports[17] and supports the conclusion that the DOD and other employers intend to mandate vaccination using an the EUA vaccine (BioNTech Vaccine), rather than the licensed Comirnaty Vaccine.

---

[17] https://www.oecd.org/coronavirus/policy-responses/access-to-covid-19-vaccines-global-approaches-in-a-global-crisis-c6a18370/ (last accessed October 16, 2021).

C.   Procedural and Substantive Deficiencies in FDA Review and Approval

48. The FDA claims that the Comirnaty Vaccine approval followed its "standard process for reviewing the quality, safety, and effectiveness of medical products,[18]" but this statement is belied by its contemporaneous statements and the deficient process it followed.

49. In its August 23, 2021, press conference, Woodcock conceded that the FDA followed an "unprecedented timeline" in approving Comirnaty's application in just over three months; and did so by skipping, or failing to require, the procedures and clinical trial data needed to assess Comirnaty's safety and efficacy as required by statute and law (emphasis added).[19] This confession statement alone raises questions regarding the scrutiny and safety of these vaccines.  United had access to these statements, yet intentionally ignored them.

a.  FDA Permitted Exclusion of "Special Populations."

50. Neither the BioNTech Vaccine nor the Comirnaty Vaccine has been tested in clinical trials for its safety and efficacy on individuals who have recovered from

---

[18] FDA, *FDA Approves First COVID-19 Vaccine*, (Aug. 23, 2021) ("FDA ComirnatyPress Release"), available at https://www.fda.gov/news-events/press- announcements/fda-approves-first-covid-19-vaccine (last visited Sept. 22, 2021).

[19] Justine Coleman, FDA Grants Full Approval to Pfizer's COVID-19 Vaccine, The Hill (Aug. 23, 2021) (quoting Defendant FDA Commissioner Woodcock), available at: https://thehill.com/policy/healthcare/568980-fda-grants-full-approval-to-pfizers-covid-19-vaccine (last visited Sept. 22, 2021).

Covid. To the contrary, the trials conducted thus far have specifically *excluded* survivors of previous Covid infections[20].  Plaintiffs contend the exclusion was an intentional act allowed by the FDA because such studies would show the futility of the vaccines.  Such studies would reveal how natural immunity is stronger and longer lasting, and would render the vaccines unnecessary. Stated differently: the FDA did not want to include studies of those naturally immune because it would end the symbiotic relationship and fraudulent, unlawful racketeering going on between the Federal Government, Vaccine Companies, and the private sector like United Airlines (emphasis added).

51. In a similar vein, the clinical trials skipped testing for genotoxicity, mutagenicity, teratogenicity, and oncogenicity testing; and did not include participants from and/or provide sufficient data for other "special populations" such as those with autoimmune disorders, hematological conditions, children, and the elderly. Plaintiffs contend these were also intentionally excluded because the results of the study would have revealed how the vaccines cause injury or death among these persons. Stated differently, it appears that the FDA wanted a vaccine with which universal inoculation could be achieved.  The FDA broke its own rules,

---

[20] *See* Fabio Angeli, SARS-CoV-2 vaccines: Lights and Shadows, EUROPEAN J. OF INTERNAL MEDICINE 2021;88:1-8.

procedures and statues in order to get this vaccine "approved," but it did not want to allow the revelation of the terrible side effects and the death the vaccine caused. It is not unreasonable to conclude that the FDA intentionally conspired with other agencies, drug manufacturers, and private employers like United to effect these harms and deaths upon plaintiffs, and Americans at large.  Instead, the FDA relied solely on rat studies for its approval of Comirnaty for these populations. *See Ex. B* "Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers)," at 14 (Aug. 23, 2021) ("BioNTech/Comirnaty Vaccine Fact Sheet").

 b. *The FDA Relied on Interim Results for Limited and Self- Selected Sample*

52. While the Phase 3 clinical trials included a large and statistically significant number of participants, the full sample trial was truncated in unprecedented fashion. It was only followed for only ***two months.***  Largely, the same trials and participants that were used to grant the initial EUA for the BioNTech Vaccine. The trial was approved regardless of the FDA's recommended period ***of at least one to two years*** as set forth in the June 2020 Industry Guidance referenced above.

53. These truncated trials produced unreliable data. The FDA does not acknowledge, however, that the results of the trials beyond the first two months

are of questionable (or perhaps negligible) validity due to fundamental methodological errors that infected all trial results and undermine any conclusions that could have been drawn from them. As the axiom goes, "bad data in, bad data out" – which proved to be the case here and appears it was intentional.

54. Pfizer failed to maintain test group integrity as required by FDA procedures and statutes.  In its May 18, 2021 application[21], which included interim six-month safety and efficacy data for Phase 3 clinical trials, Pfizer- BioNTech explained that study participants were given the option to be "unblinded" –to learn whether they had taken the experimental BioNTech Vaccine or the placebo – and if they had taken the placebo, to take the BioNTech Vaccine. As a result, roughly only 7% of study participants were still unaware of which shot they had been given after six months.  This "unblinding" transcended what should have been a randomized, controlled clinical trial into an observational, "let's just see what happens" with no informed consent as required by Federal and International law.  Accordingly, the FDA's statements that the Comirnaty approval was based on "randomized, controlled, blinded ongoing clinical trial of thousands of

---

[21] *See* Stephen J. Thomas, MD, Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine, medRxiv Preprint (July 28, 2021), available at: https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1.full.pdf.

individuals," is misleading at best. With stakes so high, there is no room for ambiguity.

    *c.  The FDA's Abdications of their Duties and Ongoing Failure to Act is Intentional*

55. Despite there having been thousands of deaths and serious injuries self-reported through VAERS and the Medicare system that is run by the Government, and over two million two-hundred thousand (2,200,000) adverse reactions to the vaccines reported to the WHO[22], the FDA has willfully, or with reckless disregard, ignored or chose to not follow its own industry guidance and historical, standards of practice which Plaintiffs avers can seemingly only be for nefarious purposes.

56. The Federal Government and companies like United used and abused the unlawful licensing or "approval" of Comirnaty to sanction vaccine mandates and invariably the PCR test, masks policies, and vaccine passports to further their objectives.

57. Notably, for an EUA approval, there must be no alternative, effective treatments available for use against the disease. There are now well-studied, safe and reliable alternatives to vaccination for prevention and treatment of COVID-19, including, but not limited to Ivermectin, Methylprednisolone, Fluvoxamine,

---

[22] http://www.vigiaccess.org/ (searching covid-19 vaccine)

27

Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids, monoclonal antibodies, and other accessible therapies. As a treating physician, Dr. Edwards states: "Multiple published studies as well as me and my colleagues' clinical experience shows that there are exceedingly effective early outpatient therapies for Covid that can reduce hospitalization and mortality rates by 80-90%, even in an unhealthy, high-risk population." *See* affidavit attached (**Ex. E**) whose opinion is supported by Dr. McCullough's regimen (**Ex. F**):

> A combination of medications, supported by the Association of American Physicians and Surgeons, for a minimum of five days and acutely administered supplements used…with suspected and or confirmed COVID (moderate or greater probability) has proven effective…. [and] has resulted in an ~85% reduction in hospitalization and death in high-risk individuals presenting with Covid

**Table 3: COVID Treatments**

| Agent (drug) | Rationale |
| --- | --- |
| Zinc | Inhibits SARS-CoV-2 RNA synthesis |
| Hydroxychloroquine 200 mg po bid | Inhibits endosomal transfer of virions, anti-inflammatory |
| Ivermectin (200 mcg/kg) usual dose nuclear12 mg po qd x 3 days | Attenuates importin á/â-mediated transport of SARS-CoV-2 into nucleus |
| Azithromycin 250 mg po bid | Covers respiratory bacterial pathogens in secondary infection |
| Doxycycline 100 mg po bid | Covers respiratory bacterial pathogens in secondary infection |
| Inhaled budesonide, Dexamethasone 8 mg IM | Treats cytokine storm |
| Folate, thiamine, vitamin B-12 | Reduce tissue oxidative stress |
| Intravenous fluid | Intravascular volume expansion |

58. This information above has been shunned, suppressed, or censored by United and other government entities.  For instance, the use of Ivermectin was rejected by the FDA despite having significantly more peer reviewed studies (forty-four (44); and thirty-two (32) double-blind clinical trials showing substantially higher efficacy than FDA promoted treatments like Pfizer's Remdesivir. Ivermectin was commonly described as an anti-parasitic drug for horses rather that the truth about its efficacy as an anti-viral prophylaxis. Remdesivir on the other hand, was discontinued amid its trials after many deaths, but was approved FDA treatment for Covid, causing kidney failure, which develops into pneumonia, and deaths.

59. Markedly too and germane to United, who is promoting and mandating the vaccine, prior to FDA approval, ***no manufacturer is allowed to promote or make claims about an unapproved drug***, biological agent (vaccine), or device to health care providers or consumers/patients per §505 of the FD&C Act, 21 U.S.C. 355[23]. Given United CEO Scott Kirby's ("Kirby") statements, it would appear that either: the drug manufactures disseminated critical drug facts prior to approval to United, or, United used unreliable information sources regarding drug facts when

---

[23]*See*   https://www.fda.gov/files/drugs/published/Marketed-Unapproved-Drugs----Compliance-Policy-Guide.pdf

they initiated their universal inoculation campaign. And if a manufacturer was granted an EUA but did not receive FDA approval, *no EUA vaccine manufacture is allowed to communicate any claims regarding the indications, safety, or efficacy of an un-approved EUA product (vaccine) to health care providers, consumers, or patients*, with the exception of minimal information such as press releases from an EUA manufacturer. Yet United made claims about efficacy, safety, and side-effects of the EUA vaccines.

60.  Under an EUA, *education of healthcare providers and American citizens (patients) is <u>exclusively</u> delegated to the CDC* (Center for Disease Control and Prevention), per HHS Delegation of Authority of section 564A(e) of the FDCA. The CDC is permitted to create and issue, and government stakeholders to disseminate, special emergency use instructions (EUI)[24] (also referred to as fact sheets for recipients of medical countermeasure (MCM) and for health care professionals) about the FDA-approved conditions of use for such MCMs before a chemical, biological, radiological, or nuclear ("CBRN") event occurs. *See* FDA and CDC memorandum of understanding[25] to facilitate creation of EUI.

---

[24]https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-dispensing-orders#eui
[25] https://www.fda.gov/about-fda/domestic-mous/mou-225-16-008

61. It is hard to imagine an issue that could be more "controversial" than the imposition of vaccine mandates that would preclude at least a third of Americans like Plaintiffs from participating in the Nation's economic and social life. The FDA avoided or manipulated its obligations under the FDCA and the APA to explain its decision, and to provide the public with an opportunity to comment on a matter of such momentous importance to the health and constitutional rights of hundreds of millions of U.S. citizens. United enthusiastically endorsed, if not cooperated with agencies that appear to have misled Plaintiffs and other employees to achieve a singular state goal of universal inoculation with these vaccines.

**IV.     THE EUA VACCINES OR MORE APTLY CALLED GENE THERAPIES**

62.  The vaccines are terribly ineffective against Covid virus and its variants. The FDA issued EUAs for Pfizer, Moderna, and J&J – the PfizerBioNTech Covid Vaccine on December 11, 2020[26], a week later, the Moderna Vaccine[27], and most recently the Johnson & Johnson Vaccine[28]. Consistent between all manufactures, these vaccines *cannot prevent infection* from the SARS-COV-2 virus. They *cannot prevent the transmission* of the SARS-COV-2 virus. They *cannot prevent death* as a

---

[26] Pfizer-BioNtech Vaccine FAQ, FDA, bit.ly/3i4Yb4e (last visited August 27, 2021).
[27] Moderna, About Our Vaccine, bit.ly/2Vl4lUF (last visited August 27, 2021).
[28] EUA for Third COVID-19 Vaccine, FDA, bit.ly/3xc4ebk (last visited August 27, 2021).

result of the SARS-COV-2 virus. That was never their intent. This necessarily means the vaccines cannot prevent the Covid disease. This is supported by the affidavits attached and CDC Director Michelle Walensky when on August 06, 2021, in a CNN interview she was clear: "Our vaccines are working exceptionally well. They continue to work well for delta with regard to severe illness and death…*But what they can't do anymore is prevent transmission*."

63. The vaccines are not vaccines in the traditional sense, they are instead, gene therapy. The Covid Vaccines employ novel technology, namely, mRNA delivered via nanolipids. These vaccines are produced from gene therapy molecular platforms whose safety and efficacy has not been fully assessed. This is unlike all other vaccines where there is a set amount of antigen or a live-attenuated virus is injected into the body to allow one's natural immunity apparatus to develop natural antibodies to the antigen or virus.

64.  Two of the 'vaccines' use mRNA to encode the spike protein of the SARS-CoV-2 virus and are the first of this type of approach to be granted EUA status for human use. The third (Janssen/J&J) is a recombinant, virus vector vaccine using a human adenovirus type 26 virus that expresses the SARS-CoV-2 spike protein. Essentially, these vaccines simulate the antibody the body might naturally make.

65.  As explained by Dr. Jennifer Smith (Ex. A), these 'vaccines' harness the

power of basic biology to produce the spike

protein of SARS-CoV-2. Messenger RNA

(mRNA) is genetic material that tells your

body how to make proteins. The central



dogma of molecular biology states that DNA makes RNA which makes proteins.

Through the processes of transcription (DNA→RNA) and translation (RNA→

protein), information from genes (genetic information) is used to make

proteins. Some of the proteins that are formed from the genetic information are

needed to fight diseases.

66.  Dr. Smith's explanation aligns with FDA's own Peter Marks M.D., PH.D.,

Director of the Center for Biologics Evaluation and Research of FDA who states:

> The active ingredient or component in the 3 FDA
> authorized used Covid vaccines is a piece of genetic
> material that leads the body to briefly make a protein
> that's normally found on the surface of the virus that
> causes Covid. [29]

67.  Some of the ingredients in these vaccines are not safe for use in humans.

As outlined above, EUA use is not the same as an FDA approval; nor are the laws,

---

[29] https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/covid-19-vaccines#basics (last visited September 7, 2021).

rules, and regulations that govern same. For instance, Pfizer, Moderna, and J&J do not have to disclose the contents of what is contained in the vaccines. This is particularly alarming considering Lieutenant Colonel Theresa Long ("LTC Long") stated in her sworn statement that one of the primary ingredients of the Lipid Nanoparticle delivery system is "ALC 1035." Under the OSHA HCS regulations (21 CFR 1910), it includes several concerning warnings regarding ALC 1035 including: to "seek medical attention if it comes into contact with your skin; "if inhaled and if breathing is difficult, give cardiopulmonary resuscitation; and evacuate if there is an environmental spill." LTC Long also noted:

> I have not taken significant time to delineate the risks of other COVID 19 Vaccines other than the Safety Data Sheet of Moderna's key ingredient, SM-102 (attached as Exhibit C). Suffice it to say that SM-102 is significantly more dangerous than the Pfizer ALC 3015 and it appears that the DOD is not actively acquiring or distributing this IND/EUA. If the DOD were *to undertake use of the Moderna vaccine, one can expect a much higher Serious Adverse Event and fatality rate give that SM-102 carries an express warning "Skull and Crossbones"* characterized under the GHS06 and GHS08.  In other words, *this Moderna ingredient is deadly*…
>
> My assessment is that ALC 0315 is a known toxin with little study, *specifically restricted to "research only "and effectively has no prior use history*, with the SDS designation of (GHS02), listed as H315 and H319, in other words, hazardous if inhaled, ingested or in contact with skin and a health hazard with the

designation (P313). ***A review of the SDS outlines that it is not for human or veterinary use***…

68.  And both the Comirnaty (Pfizer) package insert and Moderna Fact Sheet for Recipients and Caregivers list *polyethylene glycol* as one of the vaccine primary ingredients.[30] Polyethylene glycol is the active ingredient in antifreeze. Injecting antifreeze into the human body is not advised.  The SDS for polyethylene glycol states that it is ***not advised for use in drugs or food***[31].

69. According to the FDA, there is insufficient data to know whether the Covid Vaccines actually prevent asymptomatic infection or prevent transmission of SARS-CoV-2, the virus that causes COVID-19. Recent data from the U.S.[32] and abroad suggest that they do not prevent either. The protection offered from the BioNTech Vaccine drops off significantly over time, particularly after the six-month period on which the FDA relied in conditionally approving the Comirnaty Vaccine. For example, recent and well-publicized studies from Israel found that the BioNTech Vaccine's effectiveness decreased from over 90% to 39% after six

---

[30] https://www.fda.gov/media/144638/download;_https://www.fda.gov/media/151707/download
[31] https://www.fishersci.com/store/msds?partNumber=AC418040010&productDescription=POL YETHYLENE+GLYCOL+1450+1KG&vendorId=VN00032119&countryCode=US&language=en
[32] See Catherine M. Brown, DVM, et al., Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough available at:
https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w#

months for infections and 40.5% for symptomatic cases[33]. Plaintiffs are not aware of any studies that contradict these studies and the reason Israel is already requiring a third booster shot (and is considering a fourth)[34].

70. At the September 17, 2021 FDA Advisory Committee meeting to consider approval of booster shots, Sara Oliver MD, MSPH presented an overview of studies demonstrating the rapidly declining efficacy of the Pfizer-BioNTech vaccine, in the United States and abroad[35]. Several U.S. studies found that the efficacy of Covid vaccines dropped from over 90% to as 42% (with a median of roughly 65%) over an up to six-month period, with the steepest drops found in the studies with the longest study periods; the only study limited to the Pfizer-BioNTech vaccine got the low score of 42%.55 Dr. Oliver also presented studies finding a steep decline in efficacy 15%-35% for the pre-Delta vs. the Delta variant. Id. She also presented international studies showing even sharper decreases in

---

[33] Israel Ministry of Health Presentation (July 23, 2021), available at: https://www.gov.il/BlobFolder/reports/vaccine-efficacy-safety-follow-up committee/he/files_publications_corona_two-dose-vaccination-data.pdf (summarizing six-month efficacy data for Pfizer-BioNTech vaccine in Israel); see also Rory Jones & Dov Lieber, Pfizer COVID-19 Vaccine Is Less Effective Against Delta available at: https://www.wsj.com/articles/pfizer-covid-19-vaccine-is-less-effective-against- delta-infections-but-still-prevents-serious-illness-israel-study-shows-11627059395.

[34] *See* Rosella Tercatin & Maayan Jaffe-Hoffman, COVID-19 Boosters Expanded to 40 Years Old and Up, JERUSALEM TIMES (Aug. 20, 2021), available at: https://www.jpost.com/health-science/covid-israel-registers-600-serious-patients- 3rd-vaccine-to-be-expanded-677144.

[35] https://www.fda.gov/media/152243/download

efficacy in countries such as Qatar where the Delta variant was prevalent at an earlier date. *Id.*

71. Relevant safety data and efficacy statistics are still unreliable.  Notably, clinical trials for these vaccines are scheduled to continue through 2023 to 2025; and because these gene therapies have only been used by the public for less than a year, it is impossible to assess or know the safety and efficacy of these vaccines, their necessity, and whether their benefits outweigh the risks in even intermediate timeframes.

## V.   COVID-19 HEALTH RISKS ARE NOT APPLICABLE TO EVERYONE

72. The mortality risk for those infected with SARS-COV-2 who can cause Covid is not the same for everyone. Older patients and those with comorbidities are at higher risk for death or serious health complications, while younger and healthier patients face a vanishingly small risk. The CDC's best estimate of the infection fatality rate for people ages 18-49 years is under 0.06% (34,171 deaths out of 60,461,355 cases), meaning that young adults have a 99.94% survivability rate.

73. Markedly, none of the Plaintiffs are members of any demographic group at an elevated risk of serious illness or death from SARS-COV-2 or Covid. To the

contrary, most Plaintiffs are required to have annual or semi-annual physicals in order to stay "fit for duty" or perform their jobs for United Airlines.

74. Reinfection of Covid among naturally formed antibodies is almost nil. According to the World Health Organization's ("WHO") numbers, as the current number of confirmed cases worldwide is approximately two-hundred thirty-three million (233,000,000). If reinfection was possible in even one percent (1%) of them, the world would have witnessed roughly 2.3 million second and third reinfection cases, with many requiring hospitalizations. However, no such large number of reinfections, have come to clinical/hospital attention anywhere in the world[36]. This same data shows a significant, sharp decline in Covid cases within the last seven (7) days approaching seventeen percent. *Id*.

## VI.   NATURAL IMMUNITY

75. Substantial research establishes that a COVID-19 infection creates immunity to the virus at least as robust, durable, and long-lasting as that achieved through vaccination. Many experts maintain that natural immunity far surpasses immunity gained through vaccination by as much as 23 times more effective.

---

[36] https://covid19.who.int/ (last visited October 1, 2021)

76. If persons like Plaintiffs have had natural exposure and recovery, then there is no scientific or medical reason for United to require them to get the vaccine, continue PCR testing, or wear masks (collectively referenced as United's "mandated practices"). This is supported by government data, published studies, treating physicians, and other experts.

A. Israeli Study

77.  Notably, a study conducted in Israel (the "Israeli Study"), one of the most vaccinated countries on Earth, is the most recent – with data collected through August 14, 2021 – and the "largest real-world observational study comparing natural immunity," gained from COVID-19 infection, and "vaccine-induced immunity" from the BioNTech Vaccine[37]. The Israeli Study concluded that: "**natural immunity confers longer lasting and stronger protection against infection**, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2" compared to BioNTech vaccine immunity. *Id*. Specifically, fully vaccinated individuals with no previous infections had a "statistically significant

---

[37] "After conducting a retrospective observational study comparing: (1) SARSCoV-2-naïve individuals who received a two-dose regimen of the BioNTech/Pfizer mRNA BNT162b2 vaccine, (2) previously infected individuals who have not been vaccinated, and (3) previously infected and single dose vaccinated individuals a two-dose regimen of the BioNTech/Pfizer mRNA vaccine, SARS-CoV-2-naïve vaccinees **had a 13.06-fold** (95% CI, 8.08 to 21.11) increased risk for breakthrough infection with the Delta variant compared to those previously infected." https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf

13.06-fold (95% CI, 8.08 to 21.11) increased risk for breakthrough infection [with the Delta variant] as opposed to reinfection (P<0.001)" of those previously infected. *Id*. With respect to symptomatic disease, the fully vaccinated had a "27.02-fold risk (95% CI, 12.7 to 57.5) symptomatic breakthrough infection as opposed to reinfection (P<0.001). *See Id*. Accordingly, there is an approximately 4:1 ratio of fully vaccinated to unvaccinated people being admitted to hospitals and expiring from Covid in Israel.  It is the vaccinated who are at the greatest risk of infection, sickness, and death according to the Israeli Study.

B.  <u>Cleveland Clinic Study</u>

78. A five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System previously infected with SARS-COV-2 found that none of the 1,359 previously infected subjects who remained unvaccinated were reinfected with the virus despite being surrounded by the virus and Covid disease in the hospital[38].

79. The study examined the rates of SARS-COV-2 infection in vaccinated and unvaccinated individuals which showed that "those previously infected who did not receive the vaccine had lower rates of SARS-CoV-2 infection than those

---

[38] https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2.full (visited October 1, 2021)

previously infected who did receive the vaccine, *thereby providing direct evidence that vaccination does not add protection to those who were previously infected…;*" and the study concluded "individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID vaccination…" Clearly, United Airlines is either woefully misinformed, or they are intentionally reporting erroneous and deceptive information.  This is the same information that the Biden administration continues to report which further implicates United as a State Agent under the Biden administration. This begs the question where is Kirby getting his data or information from; and why is both United and the Biden administration so adamant and persistent about getting its employees and all America inoculated?

C.  Longitudinal Study

80. Natural immunity responses to mutated forms of COVID is further supported by the results of a longitudinal analysis of 254 patients over eight months[39]. This study found that SARsS-CoV-2 infection produces "broad and effective immunity" that "may persist long-term in recovered COVID-19 patients." Thus, natural immunity is robust and effective.

---

[39] Kristen W. Cohen, et al., Longitudinal Analysis Shows Durable and Broad Immune Memory after SARS-CoV-2 Infection with Persisting Antibody Responses and Memory B and T Cells, CELL REPORTS MEDICINE 2, 100354 (July 20, 2021), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8253687/ (last visited Sept. 22, 2021).

D.  Expert Opinions

81. The information above coupled with Dr. McCullough's expert opinion further demonstrates why Plaintiffs should not be subjected to United's unlawful mandated practices. *See* attached affidavit as Ex. F. On June 03, 2021, the CDC reported the fewest number of cases since the beginning of the Covid pandemic in March 2020[40]. *Id* at 4. Using an objective, mathematical formula, Dr. McCullough demonstrates how the United States has achieved herd immunity roughly four (4) months ago – which naturally would include Plaintiffs. *Id*.

82.  Dr. Smith's opinion aligns with the information above: "If someone has immunity from natural infection, *under no circumstances would it make sense for them to get a vaccine*… Active immunity (i.e., natural exposure and recovery) *is always better and stronger than passive immunity* like through the vaccines/gene therapies." *See* Ex. A at 14. Since persons like Plaintiffs have immunity and/or have naturally formed antibodies immunity, then they are past the point of infection; and even if 100% of the population is vaccinated, the virus will spread. *Id*. at 15.

83.  Notably, none of the Plaintiffs are members of any demographic group at an elevated risk of serious illness or death from SARS-COV-2 or Covid. To the

---

[40] https://www.axios.com/coronavirus-cases-infections-vaccines-success-fa7673a1-0582-4e69-aefb-3b5170268048.html

contrary, most Plaintiffs are required to have annual or semi-annual physicals in order to stay "fit for duty" or perform their jobs for United Airlines.

## VII.   COVID VACCINE FUTILITY AND DANGERS WITH DATA

84. Every week, more and more data is coming out that reports these vaccines do not work as advertised and seemingly do more harm than good.

85. For instance, on October 8, 2021, Singapore's Ministry of Health[41] reported a major increase in COVID breakthrough cases and deaths despite having 85% of their citizens vaccinated. As of October 08, 2021, 1,564 individuals were hospitalized with COVID with 41 in the ICU.  This is among a population which is 85% fully vaccinated.



---

[41] Ministry of Health available at: https://www.moh.gov.sg/news-highlights/details/update-on-local-covid-19-situation-(8-oct-2021)

*See* https://covid19.who.int/region/wpro/country/sg

86. Likewise, despite having its third and fourth booster shots, the number of rising cases and deaths is growing significantly as seen in the World Health Organization Israel Case graph  below (current as of October 4, 2021):



*See* https://covid19.who.int/region/euro/country/il

87. COVID-19 case data from Maine and Vermont, two (2) of the most heavily vaccinated states in the U.S., suggests that vaccinated individuals are likely still catching and transmitting COVID; and contributing to case numbers with the State of Vermont[42] at 72% and Maine[43] at 69% as of October 04, 2021. And as John Hopkins University admits, even with high numbers of COVID vaccinations: "We

---

[42] https://coronavirus.jhu.edu/region/us/vermont
[43] https://coronavirus.jhu.edu/region/us/maine

are unlikely to eradicate COVID-19 or even to get it to the level of something like measles in the U.S.[44]"

88. The information and data gathered on COVID-19 vaccines shows the vaccinations not work, but they are causing more harm than good as reflected from the September 17, 2021, OpenVaers.com data:



The total safety reports in VAERS for all vaccines up to 2019 was 16,320. The total safety reports in VAERS for COVID Vaccines alone through September is 726,963. Based on the VAERS information above, there are 15,386 Covid vaccine deaths and 66,642 hospitalizations reported for the COVID vaccines (Pfizer, Moderna, JNJ). By comparison, from 1999, until December 31, 2019, VAERS received 3167 death

---

[44] https://publichealth.jhu.edu/2021/what-is-herd-immunity-and-how-can-we-achieve-it-with-covid-19

45

reports (158 per year) for all vaccines combined. Thus, the Covid mass vaccination is associated with at least a 40-fold increase in annualized vaccine deaths reported to VAERS.

89. Notably also, a 2011 report by Harvard Pilgrim Healthcare for DHHS[45] showed that fewer than 1% of all vaccine adverse events are reported to VAERS, suggesting the actual number of Covid-vaccine deaths and permanent disabilities is likely much higher. This is supported by the World Health Organization's number whereby over *two million two-hundred thousand* (2,200,000) adverse reactions to the vaccines have been reported to the WHO[46] including:

> Blood and lymphatic system disorders (89696); Cardiac disorders (109471) Congenital, familial and genetic disorders (1200); Ear and labyrinth disorders (74271); Endocrine disorders (3037); Eye disorders (81511); Gastrointestinal disorders (457755); General disorders and administration site conditions (1354618); Hepatobiliary disorders (4414); Immune system disorders (31105); Infections and infestations (150015); Injury, poisoning and procedural complications (107481); Investigations (299972); Metabolism and nutrition disorders (50527); Musculoskeletal and connective tissue disorders (651320); Neoplasms benign, malignant and unspecified (cysts and polyps) (3284); Nervous system disorders (959323); Pregnancy, puerperium and perinatal conditions (4967); Product issues (3659); Psychiatric disorders (104931); Renal and

---

[45] Harvard Pilgrim Health Care, Inc. Electronic System for Public Health Vaccine Adverse Events Reporting System *AHRQ* 2011.
https://www.nvic.org/CMSTemplates/NVIC/Pdf/FDA/ahrq-vaers-report-2011.pdf
[46] http://www.vigiaccess.org/ (searching covid-19 vaccine)

> urinary disorders (17832); Reproductive system and breast disorders (87539); Respiratory, thoracic and mediastinal disorders (234945); Skin and subcutaneous tissue disorders (305368); Social circumstances (15476); Surgical and medical procedures (19741); Vascular disorders (120206)

Additionally, a U.S. healthcare data analyst with access to Medicare/Medicaid data provided sworn testimony in a July 19, 2021, lawsuit[47] **that the number of deaths occurring within just 3 days of injection with the COVID vaccines is at least 45,000.  There is no reasonable alternate cause for these deaths – these vaccines are killing Americans.**  This data is compulsory and verified, ergo more accurate than VAERS.

90. An FDA Advisory Committee Hearing on the Covid Vaccine occurred on September 17, 2021[48] to discuss the safety of the vaccines. FDA panelist Steve Kirsch, Executive Director of the COVID Early Treatment Fund testified that the Covid vaccines kill more people than they save presenting the following slide:

---

[47] *America's Frontline Doctors et al. Plaintiffs vs Xavier Becerra*, Secretary of the U.S. Department of Health and Human Services.  Civil Action No. 2:21-cv-00702-CLM.  In the United States District Court for the Northern District of Alabama. Plaintiffs Motion for Preliminary Injunction. Filed 07/19/2021.

[48]  https://www.youtube.com/watch?v=WFph7-6t34M

And Dr. Joseph Fraiman, MD testified at the September hearing saying, he could not assure a nurse associate who is 30 that the vaccines are safer than catching the virus is for a healthy woman her age.

91. Notably, emerging data from Israel, one of the most heavily vaccinated countries in the world, illustrates *that hospitalizations and deaths are primarily the vaccinated*. Dr. Kobi Haviv, Israel's center for respiratory care director reported on August 07, 2021, that 85-90% of new hospitalizations are vaccinated individuals and that 95% of severe cases are vaccinated individuals[49].  This data indicates that vaccinated people are 4-times more likely to get Covid, get very sick, or even die than the unvaccinated.

---

[49] https://13news.co.il/?utm_source=Reshet&utm_medium=bar_nivut_elyon_new13

92. The vaccines do not work as advertised; reducing those statements made by the government, manufacturers, and United from gross misrepresentations of material facts to outright fraud in order to induce and coerce Covid-19 inoculation.

THE SCALE OF THE COVID-19 INJECTION

# EFFICACY LIE

| | What they told you it did | What it actually does |
|---|---|---|
| | THE MARKETING LIE | THE LANCET STUDY |
| Jab Type | Relative Risk Reduction | Absolute Risk Reduction from Jab |
| Pfizer/BioNtech | 95.03% | 0.84% |
| Moderna (NIH) | 94.08% | 1.24% |
| Janssen | 66.62% | 1.19% |
| AstraZeneca/Oxford | 66.84% | 1.28% |

Source: www.thelancet.com/journals/lanmic/article/PIIS2666-5247(21)00069-0/fulltext
For more information please visit: doctors4covidethics.org

## VIII.    UNITED'S UNLAWFUL MANDATES AND OTHER PRACTICES

A. COVID-19 Vaccination Mandate

93. On August 06, 2021, United's CEO Scott Kirby ("Kirby") announced all employees would be required to receive a Covid vaccine within five weeks of the FDA granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first (**Ex. G**). United's pronouncement states in part:

> **United Team** -
> Throughout the pandemic, we have been direct and candid with you about the steps we've taken to keep you and our customers safe from COVID. In the earliest days of the pandemic, the outcome of those decisions was uncertain because we had so little data about how the disease was spread and how people were

affected. Over the last nine months though, we have learned a lot about this disease, including how vaccines are - by far - the most effective way to protect people from COVID. In fact, we know now that an unvaccinated person is about 50 times more likely to be hospitalized for COVID than a vaccinated person and nearly 300 times more likely to die.

Those stats are incredibly compelling and led us to an important decision about your safety: This fall, every U.S.-based United employee will be required to receive a COVID vaccine and upload their vaccination record to Flying Together.

**Timing for COVID Vaccine Requirement**
Here's how it will work: All U.S.-based United employees will be required to upload a vaccine card showing you have received two doses of the Pfizer or Moderna vaccine (or one dose of the J&J vaccine) five weeks after the FDA has announced it has fully approved a COVID vaccine or five weeks after September 20th, whichever comes first. So, the latest potential deadline for meeting this requirement is October 25th. However, according to media reports, the FDA is likely to announce its full approval for the vaccine early next month, so the earlier timeline is more likely.

For those employees who are already vaccinated - and for those employees who get vaccinated and upload their records to Flying Together before September 20th - we'll offer an additional day of pay. (United pilots and flight attendants who have already received union negotiated compensation for uploading their vaccine records are not eligible. Officers at United, 100% of whom have uploaded their vaccination cards, are also ineligible for this benefit.)

**Another Industry-Leading COVID Safety Measure**
Since day one of the pandemic, you've been on the frontline - at our airports and on board our aircraft - taking care of our customers and one another. And to keep you safe, we've taken

industry-leading action, including becoming the first airline to mandate masks for employees, the first to introduce customer COVID testing and contact tracing, and the first (and still only) to run our HEPA filtration systems during the entire boarding and deplaning process.

And after the FDA issued "emergency-use authorizations" for the vaccines - where every piece of data collected to date confirms these vaccines are safe and highly effective - we proactively promoted the benefits of vaccination to our employees, helped thousands of you get vaccinated at our airport clinics and required vaccinations for new employees and those of you flying positive space for international travel.

At the start of the year, we said it was the right thing to do for United Airlines, and for other companies, to require vaccines for employees. In the past few weeks, you've likely read about actions by federal, state and local governments, Fortune 100 companies, higher education institutions and health care groups to require vaccinations. And more than 50 medical groups now support these kinds of requirements including the American Medical Association, the American Academy of Pediatrics and the American Public Health Association.

**Nothing More Important Than Your Safety**
We know some of you will disagree with this decision to require the vaccine for all United employees. But, we have no greater responsibility to you and your colleagues than to ensure your safety when you're at work, and the facts are crystal clear: everyone is safer when everyone is vaccinated…

So, here's the bottom line: If you're unvaccinated today, please check out the vaccine finder on Flying Together, schedule an appointment and upload Your vaccination card. The vaccine is widely available, free and fully covered by your United health insurance plan. And if you've already been vaccinated but haven't

uploaded your information, please do it now on Flying Together to be eligible for an additional day of pay.

94. United and Kirby proclaim its purpose is for increased safety; yet (a) United does not mandate any passenger flying on its planes or interacting with its staff to be vaccinated; (b) does not mandate vaccination of employees from other countries to be vaccinated, even though Plaintiffs and their colleagues work and come in contact with United (and others) crews from the United States; (c) does not mandate vaccination of regional airline partners that fly United customers on shorter routes that feed United's mainlines; and (d) does not mandate vaccinations for pilots from other airlines allowed to ride in the "jump seat" of the aircraft (in the cockpit) with United flight officers. All the while, United has relaxed requirements for flight attendants wearing gloves and eye protection during the COVID-19 pandemic, and the company no longer ensures the "deep" cleaning of aircraft after each flight as it did at the outset of the pandemic.  It appears that the vaccine mandate and the relaxed requirements for flight attendants and aircraft cleaning are counterintuitive if the health of United employees was the primary goal behind the vaccine mandate.

95. When the FDA "approved" Comirnaty on August 23, 2021, United employees were to receive at least the first dose of the vaccine by September 27,

2021. Then, Employees were required to upload a copy of their vaccination record to a United database called Flying Together by September 27, 2021. Those employees who did not upload a copy of their vaccination record showing a Covid vaccination will be terminated.

96. Coincidingly, which occurred even prior to the mandate, employees were required to carry a "vaccine passport" to show their vaccination status depending on their route and schedules. In other words, whether someone had a Covid vaccine determined or dictated whether the employees could work or travel interstate in the United States or internationally worldwide. For instance, United has implemented restricted segments of Argentina, Brazil, Chile, Columbia, India, and Peru as outlined in pilot bulletin number 21-175. Airport destination in these countries have been reserved *only for those Pilots who are vaccinated*. Pilots are required to be fully vaccinated to fly to these destinations or the trip they are on, per LOA 21-02, those scheduled to fly these routes who are unvaxed will be taken off their schedule with no pay. United then added further restricted segments per LOA 21-02 on September 02, 2021, to include: Aruba, Bahamas, British Virgin Islands, Costa Rica, Curacao, France, French Polynesia (Tahiti), Greece, Guam,

Ireland, Israel, Italy, Netherlands, Nicaragua, Panama, Portugal, Puerto Rico, Saint Martin, S. Africa, Spain, Switzerland, United Kingdom, and the US Virgin Islands.

97.  To induce compliance, United even colluded with unions. For instance, in the letter of agreement ("LOA") between United and The Air Line Pilots in the service of United Airlines, Inc. as represented by The Air Line Pilots Association, International ("ALPA"), it states that United and ALPA "seek to incentivize Pilots to become fully vaccinated against COVID…" The agreement continues stating those who are fully vaccinated within the manufacturer's recommended time frame shall be provided Add Pay… [and] "a new hire Pilot shall have 30 days after the Pilot's date of hire in order to complete the first (1st) dose in the vaccination process and be eligible for Add Pay in accordance with this Agreement, unless vaccination has become a requirement of the new hire Pilot's employment."

> Pilots who receive a COVID booster dose necessary to maintain status as fully vaccinated shall receive one (1) hour of Add Pay for the first (1st) such booster during the effective period of this Agreement. A Pilot who utilizes sick leave to take the COVID booster dose (including any post-dose period mandated by the FAA) shall not be eligible to receive such Add Pay.

Coincidingly, United is also requiring on-going booster shots in order to maintain "fully vaccinated" status despite the fact that the safety of multiple injections with the Covid vaccines is unknown[50].

B.  The EUA PCR Test

98. According to the National Institute of Health's Genome Research Institute ("NHGRI"), the polymerase chain reaction ("PCR Test" or "Test") test is a common laboratory technique used in research and clinical practices to amplify or copy small segments of genetic material.[51]" PCR was invented in the 1980s and is now used in various ways including DNA fingerprinting, diagnosing genetic disorders or detecting bacteria or viruses like in this case, SARS-COV-2/COVID-19. *Id*. As noted by Dr. Smith, genetic testing means a test that analyzes DNA, RNA, or chromosomes for purposes such as the prediction of disease or vertical transmission risks; for monitoring, diagnosis, or prognosis; and for forensics, cloning, and genome projects for mapping genes, and DNA sequencing. *See* Ex. A.

99. United and employers nationwide have and continue to require employees to take the PCR test for SARS-COV-2/Covid-19 detection; and the practice Plaintiffs are challenging. Notably, the PCR Test is considered a medical

---

[50] https://www.scribd.com/document/513565062/FDA-2021-P-0521-0001-attachment-1
[51] https://www.genome.gov/about-genomics/fact-sheets/Understanding-COVID-19-PCR-Testing

procedure and under EUA for Covid testing. Therefore, like the EUA guidelines for the vaccines, the PCR Test requires each recipient's informed consent and the right to refuse which United does not afford Plaintiffs or their colleagues.

*i. How it Works*

100. Accord to the NHGRI, COVID-19 testing uses a modified version of PCR called quantitative polymerase chain reaction (qPCR):

> This method adds fluorescent dyes to the PCR process to measure the amount of genetic material in a sample. In this instance, healthcare workers measure the amount of genetic material from SARS-CoV-2.

> The testing process begins when healthcare workers collect samples using a nasal swab or saliva tube. The SARS-CoV-2 virus, which is the pathogen that causes COVID-19, uses RNA as its genetic material. First, the PCR is converted from single-stranded RNA to double-stranded DNA in a process called reverse transcription. The two DNA template strands are then separated.

> Primers attach to the end of these strands. Primers are small pieces of DNA designed to only connect to a genetic sequence that is specific to the viral DNA, ensuring only viral DNA can be duplicated (right). After the primers attach, new complementary strands of DNA extend along the template strand. As this occurs, fluorescent dyes attach to the DNA, providing a marker of successful duplication. At the end of the process, two identical copies of viral DNA are created. The cycle is then repeated 20-30 times to create hundreds of DNA copies corresponding to the SARS-CoV-2 viral RNA. *See* note 51.

*ii.  Explanation of Results and the PCR Test's Futility*

101. As explained by the NHGRI:

> A positive result happens when the SARS-CoV-2 primers match the DNA in the sample and the sequence is amplified, creating millions of copies. This means the sample is from an infected individual. The primers only amplify genetic material from the virus, so it is unlikely a sample will be positive if viral RNA is not present. If it does, it is called a false positive.

> A negative result happens when the SARS-CoV-2 primers do not match the genetic material in the sample and there is no amplification. This means the sample did not contain any virus.

> A false negative result happens when a person is infected, but there is not enough viral genetic material in the sample for the PCR test to detect it. This can happen early after a person is exposed. Overall, false negative results are much more likely than false positive results. *Id*

102. As noted by Dr. Robert Shmerling, MD Harvard Medical School, the true accuracy of the PCR tests are uncertain and made available by EUA which means the usual, rigorous testing and vetting has not occurred[52]. This also means EUA guidelines similar to the vaccines apply; which necessitate that Plaintiffs be provided informed consent and the right to refuse which United does not afford Plaintiffs or their colleagues.

---

[52] https://www.health.harvard.edu/blog/which-test-is-best-for-covid-19-2020081020734

103. A positive COVID-19 PCR test means that SARS-CoV-2 is present; but as noted by Dr. Smith, if persons (i.e., Plaintiffs) test positive for SARS-COV2, that does not necessarily mean they are infectious or contagious. And as explained by the NHGRI, a negative result could either mean the sample did not contain any virus or that there is too little viral genetic material in the sample to be detected.

104. Notably, there is no point-of-care test to be able to tell which "variant" a person has. *See* Ex. A. In other words: neither doctors, hospitals, and certainly not United Airlines can discern whether people have the original SARS-COV2 virus, the "Delta" variant, or any other variant. *Id.*

105. In fact, on July 23, 2021, the FDA announced that the CDC PCR test for COVID-19 ***has failed its full review***; and after December 31, 2021, CDC will withdraw the request to the FDA for EUA of the CDC 2019-Novel Coronavirus (2019-nCoV) Real-Time RT-PCR Diagnostic Panel[53].

106.  The PCR test is invasive and uncomfortable as a nasopharyngeal swab is shoved up their nasal cavities to collect the genetic material needed to run the Test and remarkably inaccurate. The PCR test policy is discriminatory in nature. United is using it as a disincentive to coerce Plaintiffs and their colleagues into

---

[53] https://www.cdc.gov/csels/dls/locs/2021/07-18-2021-lab-alert-FDA_Revokes_EUA_Curative_SARS-CoV-2_Assay_1.html

taking the vaccine. That is, those who are vaccinated do not have to take the PCR test whereas Plaintiffs and their colleagues do. Since the PCR test is ineffective, it appears United's primary goal is not the health of United employees.

C. <u>Masks</u>

107.  On or about April 24, 2020, United Flight Attendants were mandated to wear face masks.  They and were only given a limited supply of masks. (20 or so) Masks were not readily available because they were originally being stockpiled for those in the healthcare industry. This policy was implemented just after the true peak of the "15 days to flatten the curve."

108. On January 04, 2021, United posted the following internal communication to Plaintiffs and the other employees stating: "Some things we know today – like how the vaccine works to protect you and others against the spread of COVID. But some things are still unknown, like vaccine distribution plans by state and what that means for United employees. But there are two things we know for sure: employees are strongly encouraged to get vaccinated and they will be able to do so at no charge. Additionally, we're working with government leaders around the world to advocate for access to the vaccine for

airline employees." As early as January, 2021, United was encouraging employees to take one of the untested, novel EUA gene therapies.

109. On May 05, 2020, United imposed a mask mandate for its passengers and flight crews, personnel working in United's offices, and personnel at the Training Center in Denver, Colorado. The discriminatory mask policy expressly states that "unvaccinated individuals or employees without a digital Vaccine Pass through Flying Together: Must always wear a face mask except when actively eating or drinking." *See* e.g., policy attached as **Ex H.**

110. In a directive sent to Plaintiffs and other United employees, it explicitly describes discriminatory, mask-wearing conduct for the unvaccinated: "You may remove your mask only when you are actively eating or drinking and you must put your mask back on in between bites and sips. To the extent possible, please only eat or drink outdoors or in rooms alone or when socially distanced from others. Failure to comply with this mask requirement is subject to disciplinary action as outlined in the mask policy in the Working Together Guidelines." In respect to those working areas including hangars, United required that in all outdoor areas or when working in a hangar, masks/face coverings are not

required. Those employees who are not fully vaccinated and cannot socially distance from others are encouraged to wear a mask or face covering.

111.  Not only is the mask policy facially discriminatory, but United's alleged purpose or justification for its implementation is not supported by medicine or science. At that time, cloth or surgical masks were permissible, however, as noted in a National Center for Biotechnology Information, U.S. National Library of Medicine study: "while surgical masks provide a barrier against large respiratory particles, they are ineffective at providing protection from smaller particles. Surgical masks also do not prevent leakage around the mask when the user inhales. Therefore, surgical masks are ineffective and do not provide enough protection when performing direct care for patients with COVID.[54]"

112.  The effectiveness of masks in stopping the spread of SARS-COV-2 and/or Covid is unsupported by scientific data; and studies have shown that wearing a mask for extended periods of time can actually be injurious to overall health. Likewise, the masks United forces its employees to wear do not serve a compelling interest of preserving public health because they cannot prevent infection or transmission of SARS-COV-2 or Covid. This is confirmed even by Dr. Anthony

---

[54] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7831687/

Fauci who in an email to former HHS Sylvia Burwell on February 5, 2020, affirmed

that masks are unnecessary and as studies show effectively futile:

> Masks are really for infected people to prevent them from
> spreading infection to people who are not infected rather than
> protecting uninfected people from acquiring infection…The
> typical mask you buy in the drug store is not really effective at
> keeping out virus, which is small enough to pass through the
> material.

And roughly one month later in an interview with 60 Minutes stated:

> Right now in the United States, people should not be walking
> around with masks…There's no reason to be walking around
> with a mask…When you're in the middle of an outbreak,
> wearing a mask might make people feel a little bit better…And,
> often, there are unintended consequences — people keep
> fiddling with the mask and they keep touching their face.

113. In fact, over a decade's worth of scientific studies (hyperlinked)

regarding masks' use and their efficacy concluded they do not prevent the spread

of illnesses like the cold or flu:

> In 2009, the American Journal of Infection Control
> concluded "face mask use in health care workers was not
> demonstrated to provide benefit in terms of cold symptoms or
> getting colds."

> A year later, a study in Epidemiology and Infection
> entitled "Face masks to prevent transmission of influenza
> virus: A systematic review" found that "none of the studies
> reviewed showed a benefit from wearing a mask, in either
> health care workers or community members in households."

In 2012, <u>researchers published a study called</u> "The use of masks and respirators to prevent transmission of influenza: a systematic review of the scientific evidence" and found "There were 17 eligible studies. … None of the studies established a conclusive relationship between mask/respirator use and protection against influenza infection."

In 2016, <u>a study in the Canadian Medical Association Journal</u> "found no significant difference between N95 respirators and surgical masks in associated risk of (a) laboratory-confirmed respiratory infection, (b) influenza-like illness, or (c) reported work-place absenteeism."

A <u>2019 study in the Journal of the American Medical Association determined</u> that "among outpatient health care personnel, N95 respirators vs medical masks as worn by participants in this trial resulted in no significant difference in the incidence of laboratory-confirmed influenza."

And even a study <u>published in the Journal of Evidence-Based Medicine on February 12, 2020</u>, a month before America's COVID panic set in, concluded that "there were no statistically significant differences in preventing laboratory-confirmed influenza, laboratory-confirmed respiratory viral infections, laboratory-confirmed respiratory infection, and influenza-like illness using N95 respirators and surgical masks."

114. Aside from masks' inability to thwart SARS-COV-2 particles, additionally, commercial aircraft at United are equipped with HEPA (High Efficiency Particulate Air) filters which means:

The airflow "mirrors the laminar airflow of an operating room with no or minimal crossover of air streams," says Dr. Bjoern Becker of the Lufthansa Group of airlines. "Air is

pumped from the ceiling into the cabin at a speed of about a yard per second and sucked out again below the window seats. About 40 percent of a cabin's air gets filtered through this HEPA system; the remaining 60 percent is fresh and piped in from outside the plane. "Cabin air is completely changed every three minutes, on average, while the aircraft is cruising," says Becker. Officially, certified HEPA filters "block and capture 99.97 percent of airborne particles over 0.3 micron in size," says Tony Julian, an air-purifying expert with RGF Environmental Group. The efficiency of these filters, perhaps counterintuitively, increases for even smaller particles. So while the exhaled globs that carry SARS-CoV-2 can be quite small, HEPA filters effectively remove the vast majority from the air.[55]

115. The unlawful, discriminatory mask practices continued when on September 30, 2021, United implemented a new mask policy whereby "N95 or KN95 Masks are Required." As shown below, this latest policy not only illustrates the unequal treatment between the vaxed and unvaxed, but also serves to harass unvaccinated employees, segregate people, publicly humiliate unvaccinated employees, and to expose United's disgust for the illegitimate and actual, punitive purpose of the religious accommodation approval process later described:

---

[55] Hyperlink: https://www.nationalgeographic.com/travel/article/how-clean-is-the-air-on-your-airplane, et. al (last visited October 3, 2021).

Dear employee,

As we await the outcome of the litigation regarding our implementation of the reasonable accommodation process (RAP) around COVID-19 vaccination, two things remain unchanged: our commitment to the safety of all of our employees and our belief that our vaccine policy saves lives.

In the interest of keeping our customers and employees safe, **effective October 2, we will require any unvaccinated United employee to wear an N95 or KN95 mask at all times and in all United locations, including outdoors and on aircraft.**

If you don't own an N95 or KN95 mask, United will supply you with N95 or KN95 masks at your location for your shift. Look for additional details on where you can pick up a mask before October 2. Please note that you will be required to provide your own N95 or KN95 mask for personal travel purposes.

As a temporary accommodation for our vaccination policy, you must wear your mask at all times in all United locations, including outdoors and on aircraft (this includes for personal or business travel). You may remove your mask only when you are actively eating or drinking and you must put your mask back on in between bites and sips. To the extent possible, please only eat or drink outdoors or in rooms alone or when socially distanced from others. Failure to comply with this mask requirement is subject to disciplinary action as outlined in the mask policy in the Working Together Guidelines.

Learn more about vaccination on the COVID-19 site on Flying Together.

Thank you for all you continue to do to take care of our customers and one another.

116. Presently, those who are unvaccinated are not even permitted to take their masks off outside so long as they are on United property; which means these employees cannot even step outside to remove their mask to get fresh air. Forcing employees to wear these N95 masks for 10+ hour shifts cause among other things: nausea, light headedness, brain fog, and severe headaches. Since wearing masks do not serve a necessary business interest or any purpose for that matter, it can be reasonably concluded that these United policies' sole purposes are to discriminate, harass, and coerce employees into compliance.

117. In light of all the studies showing the strength of natural immunity, anti-bodies, and the ineffectiveness of vaccines; as well as, the futility of masks as it relates the prevention and transmission of Covid, the only reason United is

imposing the latest mask mandate above is penal and malicious in nature, as studies show that:

> Wearing masks for a prolonged amount of time can causes physiologic and psychologic burdens and can decrease work efficiency. Activity cannot be performed as long or as efficiently while wearing masks as compared to when masks are not worn. Additionally, the timeframe that an activity can be sustained is decreased when wearing masks and PPE. Prolonged use of mask can lead to headache, nasal dryness, epistaxis, dryness of eyes, adverse skin reactions such as rashes, acne, and itching from mask use[56].

### D.  Vaccine Passports and Futility of Practices

118. United is requiring Plaintiffs and their colleagues to show proof of vaccination which among other things, violates Plaintiffs' rights to privacy, equal protection, and freedoms to work/travel because their schedules and routes are dependent upon their status and possession of a vaccine passport. This unlawfully abridges the commerce clause and police powers of states; and United cannot avoid liability or culpability simply because they have "Inc." behind their name. *See* Texas Governor Abbott's Executive Order GA40 signed October 11, 2021; *see also* Florida Governor DeSantis's legislation regarding vaccine passports[57].

---

[56] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7831687/
[57]   https://www.flgov.com/2021/05/03/governor-ron-desantis-signs-landmark-legislation-to-ban-vaccine-passports-and-stem-government-overreach/

119. The institution of immunity/vaccine passports, just like the Covid-19 Vaccines, PCR Test, and Mask, are scientifically meaningless and futile.

120. There are no legally permissible FDA-licensed (approved) vaccines to prevent infection with SARS-CoV-2. Since these vaccines are Emergency Use Authorized, they cannot be made compulsory: "When Dr. Amanda Cohn, the executive secretary of the CDC's Advisory Committee on Immunization Practices, was asked if Covid-19 vaccination can be required, she responded[58] that under an EUA, "vaccines are not allowed to be mandatory. So, early in this vaccination phase, individuals will have to be consented and they won't be able to be mandatory." Cohn later affirmed that this prohibition on requiring the vaccines applies to organizations, including hospitals[59]." Therefore, if Federal law and the CDC expressly prohibits forced inoculations, then United cannot require these passports as it is effectively just a talisman or guise to coerce Plaintiffs and their colleagues into compliance.

121. Additionally, the data is clear that those who had been infected with SARS-CoV-2 and developed disease will have immunity[60] and therefore it is

---

[58] https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf
[59] https://www.fda.gov/media/143982/download
[60] https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19)

medically irrelevant to vaccinate them[61] or require a vaccine passport. There is also a big difference between total antibodies and neutralizing antibodies. Neutralizing antibodies are those antibodies which specifically bind to the virus and prevent infection. While it is unknown whether the protection or meaning what type of antibodies is considered protective or if cell-mediated immunity is the measure of protection, studies show that with SARS antibodies maxed out 3 to 4 weeks after infection and declined to undetectable by 6 years. With MERS another coronavirus similar to SARS-CoV-2, neutralizing antibodies remained at 3 years after infection. And from a practical end, if for some reason a person who had COVID-19 would like to receive the vaccine, while vaccine supply remains limited, people with documented SARS-CoV-2 infection should temporarily delay vaccination. In addition, if a person with COVID-19 received antibody therapy or convalescent plasma as part of treatment vaccination should be deferred for 90 days[62].

122. Also, contrary to Kirby's beliefs, those who have had an allergic reaction after a dose of COVID-19 vaccine or those who have an allergic reaction to any component of the vaccine should not receive a second dose of the vaccine. The number of adverse events and deaths being reported after vaccination continues

---

[61]https://science.sciencemag.org/content/371/6529/eabf4063.

[62] https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html

to climb with over 778,683 and over 16,310 deaths after vaccination to date in the U.S. alone (https://www.openvaers.com/covid-data). There is also limited safety data for those vaccinated who have weakened immune systems due to HIV infection of autoimmune conditions, cancer survivors, pregnant women, women who want to become pregnant, and those individuals must consult with a physician for recommendations on receiving the COVID-19 vaccine. Finally, the vaccine is not authorized for use in adolescents (16 years and younger). Instituting a vaccine passport policy be discriminatory for those populations for which vaccination is contraindicated when marginalized groups struggle to get access[63].

123. Finally, and as noted throughout, the vaccine does not prevent infection of SARS-CoV-2 or the Virus Covid-19; and over the last few years there have been devastating effects of implementation of stay-at-home orders, school closures, and physical distancing. The health benefits of social distancing measures are obvious, with a slower spread of infection reducing the risk that health services will be overwhelmed; but may also prolong the pandemic and the restrictions adopted to mitigate it rendering the passports futile anyway. In turn United's institution of a vaccine/immunity passport merely furthers the divide of health disparities and

---

[63] https://www.cdc.gov/vaccines/covid-19/info-by-product/clinical-considerations.html

impact those already hardest hit by mitigation efforts; and is really just another way to force and coerce Plaintiffs and their colleagues into taking the vaccine.

## IX.   UNITED'S   UNLAWFUL   INCENTIVES,   PROMOTIONS,   AND MISINFORMATION / DISINFORMATION CAMPAIGNS

124. Notwithstanding the overwhelming and alarming amount data and studies showing these Covid-19 vaccines are harmful and even deadly, United has and continues to unlawfully promote, incentivize, and make intentionally fraudulent/false or grossly negligent statements of fact about the SARS-COV-2 virus, Covid, and the gene-therapy vaccines.

125. United is solely advocating and promoting the vaccine as a solution which not only are they not legally permitted to do, but they are not even attempting to address other solutions such as work culture and policies to ensure that high risk employees and those who are sick or symptomatic can stay/work from home without incurring undue financial hardship, without being disparaged, and without fear of reprisal and termination

126. For instance, on May 24, 2021, "incentives" to take the Covid vaccine. This "incentive" was significant; and the amount of pay was based on when the first shot was obtained.  On a sliding scale, the amount could be as much as $4,500. This incentive is facially coercive, discriminatory, and potentially even criminal.

127. The cases and deaths presented to Plaintiffs and all United's employees to justify the push to vaccinate the pilots are inaccurate; and it is widely known the PCR tests oftentimes produce false positives. United has and continues to intentionally circulate misinformation about the experimental vaccines, or gene therapies; and the status of the fight against Covid to further coerce its employees to succumb to the vaccines reach its goal of 100% of its workforce inoculated.

128. United has and continues to intentionally or with reckless disregard proffer misinformation and/or disinformation like the unsubstantiated, fallacious, claims and statistics in the mandate announcement (Ex. G) like:

> Over the last nine months though, we have learned a lot about this disease, including how vaccines are - by far - the most effective way to protect people from COVID. In fact, we know now that an unvaccinated person is about 50 times more likely to be hospitalized for COVID than a vaccinated person and nearly 300 times more likely to die. Those stats are incredibly compelling and led us to an important decision about your safety: This fall, every U.S.-based United employee will be required to receive a COVID vaccine and upload their vaccination record to Flying Together.

Meanwhile, treating physicians and experts in the field like Dr. McCullough attest:

> It is my opinion that SARS-CoV-2 causes an infection in humans that results in robust, complete, and durable immunity, and is superior to vaccine immunity which by comparison has demonstrated massive failure including over 10,000 well-documented vaccine failure cases as reported by the CDC before tracking was stopped on May 31, 2021. There are no studies

71

demonstrating the clinical benefit of COVID vaccination in COVID survivors and there are three studies demonstrating harm in such individuals. Thus, it is my opinion that the COVID vaccination is contraindicated in COVID survivors many of whom may be in the student population

129.  Vaccinated people can transmit the Covid virus. In the Spring of 2021, United Airlines informed Training Center employees that vaccinated employees were no longer required to wear masks within the Training Center; but unvaccinated employees must wear masks at all times (unless actively eating or drinking). This is despite the fact that both vaccinated and unvaccinated people can transmit the virus. The CDC found that vaccinated people infected with the delta variant can carry detectable viral loads similar to those people who are unvaccinated.   This means the vaccinated are just as infectious as the unvaccinated. The CDC recommends masks for both groups[64], yet United only required unvaccinated employees to endure the harassment and wear masks.

130. United violated employee's health privacy. Another discriminatory policy required anyone not wearing a mask is to carry and produce their vaccination card to prove their mask exemption status to anyone who requests proof. Unvaccinated individuals not wearing a mask are subject to disciplinary

---

[64] https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w

action up to and including termination. As a matter of fact, and law, this is overt, discriminatory treatment directed toward an employee for a medical issue; by forcing the unlawful disclosure of private, medical information.

131. On August 06, 2021, United announced a vaccine mandate for all its employees, including Plaintiffs. The mandate required all employees to be vaccinated no later than five (5) weeks after FDA vaccine approval, or five (5) weeks after September 20, 2021, whichever comes first. Employees not vaccinated by October 25, 2021, will be terminated. United's mandate is absolute insomuch as there is no alternative for periodic testing, mask wearing, or social distancing. Even employees who have already had Covid and still enjoy immunity from the disease were lumped into this irresponsible mandate. In short, United is telling its employees to "take the jab to keep your job." And while United portrays the notion they are willing to accommodate those for religious and health reasons, as outlined further below, there is no real meaningful option as unpaid leave without benefits is, by any other name, terminated or fired.

132. These vaccine, PCR, and mask mandates are peculiarly speculative given on February 03, 2021, Kirby stated in an interview with the Economic Club of Chicago that, "If you're gonna be anywhere around other people, an airplane is

literally the safest place you could be… That's why the study we did with the Defense Department, you know, essentially concluded it's almost impossible to get covid on an airplane." Publications and advertisements, including a safety video presented aboard United aircraft, used the term, "near zero percent chance," with regard to getting Covid aboard an airplane.

133. Notably, United touts its vaccine mandate is aimed at increased safety and espouses to care for the health and well-being of its employees. Meanwhile, Plaintiffs have first-hand knowledge of vaccinated co-workers who have experienced vaccine-related injuries and side effects like brain fog, neurological disorders, vision impairment, and stroke. Despite United being aware of these work-related injuries emanating from the vaccine, United continues to unlawfully promote the vaccines with misinformation and disinformation.

134. United has been complacent and dilatory in adhering to its own "covid-safety protocols," including failure to consistently notify employees when covid exposure has occurred.  In some cases where employees were notified of covid exposure, the employees were not asked to quarantine, and told to report to work when they felt fit.

135. United has implemented a system whereby those who are vaccinated ("vaxed") are treated more superior and afforded more opportunities than the unvaccinated ("unvaxed") even though both can catch and spread the disease. Disproportionate, unequal treatment between the vaxed and unvaxed includes better opportunities in the following areas: job security, wage increases, flight schedules (see image below), mask privileges, employee benefits, and even having to present ID badge photos each time an employee logs into the company's "Flying Together" portal stating their vaccination status. This discrimination is patently unlawful and completely based upon vaccination status.

136. United's discriminatory practices serve similar purposes as United's misinformation and/or disinformation campaign – to force inoculation and renounce Plaintiffs' beliefs.

137. United has and continues to make intentionally false or grossly negligent statements of fact about the SARS-COV-2 virus, Covid, and the gene-therapy vaccines to Plaintiffs and their colleagues – which also includes the public disclosure of private, confidential, health information which is not being maintained according to law and proper standards of care. Unvaccinated employees are patently exposed and publicly humiliated via mask requirements.

Vaccinated employees are corporately rewarded with better opportunities. United policy and statements, designed to scare and coerce, openly implicate unvaccinated employees for maltreatment. For instance, in the mandate notice Kirby contends:

> ➢ Over the last nine months though, we have learned a lot about this disease, including how vaccines are - by far - the most effective way to protect people from COVID.

> ➢ In fact, we know now that an unvaccinated person is about 50 times more likely to be hospitalized for COVID than a vaccinated person and nearly 300 times more likely to die.

> ➢ Here's how it will work: All U.S.-based United employees will be required to upload a vaccine card showing you have received two doses of the Pfizer or Moderna vaccine (or one dose of the J&J vaccine) five weeks after the FDA has announced it has fully approved a COVID vaccine or five weeks after September 20th, whichever comes first.

> ➢ For those employees who are already vaccinated - and for those employees who get vaccinated and upload their records to Flying Together before September 20th - we'll offer an additional day of pay.

> ➢ And after the FDA issued "emergency-use authorizations" for the vaccines - where every piece of data collected to date confirms these vaccines are safe and highly effective - we proactively promoted the benefits of vaccination to our employees, helped thousands of you get vaccinated at our airport clinics and required vaccinations for new employees and those of you flying positive space for international travel.

> But, we have no greater responsibility to you and your colleagues than to ensure your safety when you're at work, and the facts are crystal clear: everyone is safer when everyone is vaccinated…

138. On August 25, 2021, Kirby stated:

> The FDA has now given full approval to the Pfizer vaccine, which means our vaccine requirement goes into effect on Sept. 27.  I recognize that some of you will disagree with this requirement, but we made it to protect the health, safety, and lives of everyone who works here.  Each week, we continue to lose colleagues to COVID…and the one thing they have in common is that everyone we've lost in the last 2 months was unvaccinated.

Further noted by the news outlet "Axios"[65], "For me, the fact that people are 300 times more likely to die if they're unvaccinated is all I need to know…"The more companies that do it, the harder it will be to not require it." Axios continued stating, "Kirby became emotional when he told Axios about the dozens of United employees who had died from COVID — and 100% of them are unvaccinated."

139. United's vaccine mandate even violates the vaccine manufacturer's instructions. While manufacturing statistics adverse to settled medicine/science, VAERS data, Plaintiffs' physicians, and the doctors' affidavits attached, Kirby's requirement that United's employees be vaccinated carte-blanche without due

---

[65]https://www.axios.com/united-airlines-ceo-scott-kirby-vaccine-mandate-employees-b258f84b-7831-419c-b502-95f24f198707.html (last visited September 25, 2021).

regard for each employees' individual needs contradicts even the vaccine manufactures' own fact sheets. *See* (Ex B) attached as a composite. For example, Pfizer's sheet expressly states that persons should tell the administrator of the vaccine of specific medical conditions like whether they have myocarditis, are immunocompromised, or if they have received another COVID vaccine; and explicitly has a section titled "Who Should Not Get the Vaccine" to include persons who "had a severe allergic reaction after a previous dose of this vaccine" or those who "had a severe allergic reaction to any ingredient of this vaccine." United, however, is mandating that all its employees be vaccinated irrespective of their employees' underlying conditions or the manufacturer's warnings.

140. United endangered employees with further modified vaccine / gene therapy mandate instructions. In early September 2021, United changed which vaccines could satisfy the requirements of its policy and the timeliness of the administration of each shot. All U.S.-based, United employees were required to upload records showing they have received a full course of *any* emergency use World Health Organization ("WHO") approved vaccines which include: Pfizer/BioNTech, Moderna, Johnson & Johnson/Janssen, AstraZeneca/Oxford, Covishield, Sinopharm-B, and Sinovac. A full course is two (2) doses of a two-dose

vaccine or one (1) of a single dose vaccine – employees no longer need to pass the additional 14-day "fully vaccinated" status to meet United's requirements. This contradicts Moderna's own fact sheet: "If you receive one dose of the Moderna COVID Vaccine, you should receive a second dose of the same vaccine 1 month later to complete the vaccination series." This new policy recklessly places United employees' health at risk.

141. And while Kirby contends that "every piece of data collected to date confirms these vaccines are safe…"; notably significant is that *he never states the sources or studies from where he derives these alleged facts or information*. All these data points are openly available to Kirby and do not require sophistication beyond the capabilities of United to discern. These data points clearly illustrate dangers; and many dangers are actualized in these vaccines.  Either United is inept at gathering pertinent data before making statements and policies, ignorant regarding what defines danger or adverse effects, or United premeditatedly chose to ignore enormous amounts of data and maliciously manufactured the data they released, entirely to coerce 100% employee inoculation.

142. Similarly, while Kirby contends that "vaccines are - by far - the most effective way to protect people from COVID" and that "we know now that an

unvaccinated person is about 50 times more likely to be hospitalized for Covid than a vaccinated person and nearly 300 times more likely to die;" this patently contradicts Moderna's own fact sheets that states: "The…Vaccine *may* prevent you from getting Covid… *may* not protect everyone…is an unapproved vaccine that *may* prevent COVID… [and] *there is no FDA-approved vaccine to prevent COVID*." It is unreasonable to support the idea suggesting Kirby's statement is grounded anywhere on actual fact regarding these statistics.

143. And concerningly, along with the information, studies, and data proffered above there are the affidavits of Dr. Edwards, Dr. McCullough, and the sworn statement of Lieutenant Colonel Long ("LTC Long") which all attest not only are the vaccines dangerous generally, but pose specific risk to the airline industry[66]. *See* LTC Long's affidavit attached as **Ex. I**

144. And while the vaccine manufacturers have apparently been delegated the jobs of the government agencies responsible for enforcing the laws of informed consent as evidence in the fact sheets like J&J's: "It is your choice to receive or not

---

[66] N.B. Even the LoA between United and the Pilots (**Ex. J**) in service at United as represented by the Air Line Pilots Association, International ("ALPA") seems to acknowledge their awareness of the these issues: "If a Pilot suffers a medical-document adverse reaction to COVID vaccination that prevents the pilot from exercising the privileges of a First- Class Medical Certificate, the Company shall provide Company-paid drops until such time as the Pilot is able to exercise the privileges of a First-Class medical Certificate. Such period shall not exceed ninety (90) days."

receive the Janssen [Vaccine]. Should you decide not to receive it, it will not change your standard medical care" – Kirby and United on the other hand are not giving its employees a meaningful option. United has removed all choice from United employees who want to work.

145. United is advancing an unlawful political narrative and clearly not a health agenda as evidenced in part by the fact that United does not disclose:

- o The known and potential, serious risks associated with the vaccines.
- o That the employee assumes all risk associated with the vaccine.
- o That the long-term adverse effects are unknown.
- o Emerging evidence and data as to the vaccine's lack of effectiveness.
- o Multiple mRNA injections per year will likely be required – the safety of which is unknown.
- o Vaccinated individuals can still catch and spread COVID.
- o The fact that sick people – irrespective of their vaccination status- are the ones most likely to spread the virus.
- o Those employees who have been injured by the vaccine.
- o That COVID is treatable and has a survival rate of >98% for all age groups, co-morbidities, races, special populations and socio-economic classes combined (generally comparable to the flu at 99% or tuberculosis at 92% or community acquired pneumonia)[67]

---

[67] CDC COVID Data Tracker.  https://covid.cdc.gov/covid-data-tracker/#datatracker-home
COVID crude mortality ratio (the number of reported deaths divided by the reported cases) as of September 17, 2021:
 666,440 deaths ÷ 41,593,179 cases = 0.016 x 100 = 1.6% died
 100 – 2% = 98.4% survived.

146.  United's requirement is suspect at best and appears nefarious given their unwillingness to assume liability for any short or long-term harms or deaths this gene therapy / vaccine mandate can cause. This is especially concerning since the vaccine manufactures have no liability for vaccine injuries or deaths. Vaccinated individuals who suffer one of the numerous adverse effects cannot apply for the U.S. National Vaccine Injury Compensation Program and the U.S. Countermeasures Injury Compensation Act does not adequately compensate those who are injured (this program rarely pays, caps payout, only covers vaccine injuries manifesting within one year of injection).

147. United's failure to assume liability also suggests that United does not have full confidence in the vaccine's safety despite its glowingly supportive statements. This concern is buttressed by the fact that United's own Flight

---

CDC. Estimated Influenza Illnesses, Medical Visits, Hospitalizations and Deaths in the United States – 2017-2018 Influenza Season.  Available from:
https://www.cdc.gov/flu/about/burden/2017-2018.htm
Flu crude mortality ratio (the number of reported deaths divided by the reported cases):
 6100 deaths ÷ 45,000,000 cases = 0.0013 x 100 = 0.13% died
100 – 0.13% = 99.8% survived

CDC Tuberculosis in the United States 2020.
https://www.cdc.gov/nchhstp/newsroom/docs/factsheets/TB-in-the-US-508.pdf
542 deaths ÷ 7,163 cases = 0.08 x 100 = 7.5% died
100-7.5% = 92.4% survived.

Community Acquired Pneumonia
https://pubmed.ncbi.nlm.nih.gov/29020164/

Operations Manual was revised on July 30, 2021. Previously not included, "Pilot Incapacitation" procedures have been added so the threat or awareness of a sudden pilot incapacitation has been identified by United and detailed procedures have been prepared. "Post Flight Requirements" have changed to accommodate suspected issues during the flight, which indicates United's awareness of the risks, dangers, and harms the vaccines present, but are indifferent to their employees taking the same risks.

148.   And while United espouses to be champions of their employee's health and safety, they have been complacent in adhering to their own "covid-safety protocols" including the failure to notify their own employees when they have been exposed to Covid. Instances have occurred where employees were notified of covid exposure, but the employees were not asked to quarantine and told to report to work if they felt fit. This exemplifies an overarching disregard for employee health, and for the health of the traveling public. Additionally, employees from other airlines, who are not vaccinated, can ride a "jump seat" on a United flight[68]. Meanwhile, United employees are ironically forced to be

---

[68] N.B. On August 25, 2021, the International Association of Machinists and Aerospace Workers (IAM) – Distrast 141, sent a statement to its members regarding United Ground Express (UGE). UGE is a wholly-owned subsidiary of United Continental Holdings, Inc., and controlled by United's CEO, Scott Kirby. Strangely, Kirby informed UGE employees, (employees who work

vaccinated to fly aboard United's own aircrafts or lose their job. It is not unreasonable to conclude that, with regard to these examples, employee health is not United's or Kirby's priority.

149. Other instances of United's disinformation and misinformation is apparent like on August 17, 2021, when United posted an internal, data update on cases which made the following false, unsupported claims: "Fully vaxed people make up as few as 0.1% of those hospitalized with Covid; Fully vaxed people are less infectious than unvaccinated people and; Serious side effects from vaccine are extremely unlikely." Per the FDA's own VRBPAC PowerPoint presentation, slide 16, dated October 22, 2020[69], it acknowledges numerous, possible serious adverse events that can result in permanent injuries, autoimmune diseases, chronic diseases, disabilities, and death from the Covid vaccines.

---

directly with United Airlines employees at bases such as DEN, EWR and ORD), that UGE employees are not required to be vaccinated, as a condition of employment yet United's are; and there is no existing plan for a covid-testing regime for UGE employees. Additionally, United Airlines' Express Carriers have not implemented a vaccine mandate either.  Due to its "hub and spoke" system, United Airlines mainline and its Express Carriers, are interchanging passengers as well as deadheading and non-revenue employees who are not required to be vaccinated.
[69] https://www.fda.gov/media/143557/download

Even if other sources of information are ignored, the VAERS data *alone* sufficiently establishes that very serious side effects from the vaccine are more common than "extremely unlikely;" and certainly not "safe."

150. On August 27, 2021, Kirby sent an email to the entire company saying:

> A study released by the CDC earlier this week noted unvaccinated people are at least 29 times more likely to be hospitalized with COVID than vaccinated people…And as Scott shared in his latest "Straight from Scott," we continue to lose members of the United family to COVID – and in the last two months the one thing they have in common is they were unvaccinated. All U.S.-based United employees (including Guam, Puerto Rico) are required to upload their vaccination records to Flying Together by Sept. 27, 2021.

## X.   UNITED'S VIOLATIONS OF TITLE VII

151.  Title VII of the Civil Rights Act of 1964, as amended makes it unlawful for an employer to discriminate against an employee on the basis of religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless

85

an employer demonstrates that he is unable to reasonably accommodate an employee's…religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). An employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees so long as they do not incur undue hardship[70]; and prohibits United from retaliating against an employee for their beliefs.

152. Plaintiffs and many of their colleagues have sincere, religious beliefs that they should not be inoculated with the Covid vaccines. Plaintiffs share common beliefs with other Christians like that life is sacred and a gift from God; and that these vaccines alter the human cell by disrupting God's designed immune system with a synthetically engineered mRNA, spike protein. As previously noted, these vaccines are not vaccines in any traditional definition, but rather gene therapies, which alter cell behavior at the micro-cell biological level. These vaccines change the DNA and RNA functions within the cell, and thereby modify the genetic make-up. Some of these Plaintiffs maintain that they do not believe it permissible to fundamentally change the genetic design that God imparted within them.

---

[70] *See Eversley v. Mbank Dallas*, 843 F.2d 172, 175 (5th Cir. 1988). "Undue hardship" exists, as a matter of law, when an employer is required to bear more than a de minimus cost." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 272-73 (5th Cir. 2000) citing *Transworld Airlines, Inc. v. Hardison*, 432 U.S. 63 at 84 (1977); *Brener v. Diagnostic Center Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982).

153. As fetal tissues were integral in the vaccines' development, this also violates many Plaintiffs' sincerely held religious beliefs. By way of further explanation, in their early development, fetal tissues were used to test that the mRNA worked as intended; ergo, but for the use of fetal tissue, the vaccines would not exist. As uncovered in Congressional investigations and hearings[71], bio-procurement companies sold fetal tissues; and numerous actors within the abortion industry had committed systemic violations of same. In short, Plaintiffs do not believe they should support or engage in a practice that relates to, or could reward an industry where the fetal tissues from unborn, human children have been monetized.

154. Other beliefs shared by Plaintiffs common with other Christians[72] submitted which demonstrate their sincerity and why Plaintiffs maintain they have the right to opt out of United's vaccine mandated include: (i) Vaccination is not morally obligatory so therefore, such decision must be voluntary; (ii) The Lord is all powerful and can protect and heal them if that is His will;  (iii) there is a general moral duty to refuse the use of medical products, including certain

---

[71] *See* Select Investigative Panel of the Energy & Commerce Committee, FINAL REPORT (Dec. 30, 2016); Majority Staff Of S. Comm. On The Judiciary, 114TH CONG., Human Fetal Tissue Research: Context And Controversy, S. DOC. NO. 114-27 (2d Sess. 2016).
[72] *See* other Christian beliefs in the U.S. District Ct. for District of Colombia; Case 1:21-cv-02484

vaccines, that are produced using human cells lines; (iv) a person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Christian moral teachings; and (v) a Christian is morally required to obey his or her sure conscience.

155. Regardless, however, of the perceived veracity of these beliefs, employees may hold their sincere religious beliefs.  This right, a freedom of religion, or freedom therefrom, is irrespective of United's employer-mandate; because Title VII forbids United to arbitrate between which beliefs, customs, or practices are acceptable, and those which are not.

156. The Federal laws above are as clear as were Kirby's intentions never to comply with them as evidenced by his statements like "very few people would get through the medical and religious exemption process" and warned that Plaintiffs and their colleagues "ought to be very careful about requesting accommodations." Kirby has outright threatened employees warning that should they seeking accommodations, they are "putting their jobs on the line."  This clearly violates the spirit of Title VII and demonstrates United's malicious intent, egregious actions, and total contempt for the law with regard to accommodations via Title VII.

157. In addition to Kirby's expressed threats, United applied various other forms of veiled coercion and pressures like in early-September when United sent postcards to Plaintiffs and their colleagues who had not yet provided proof of vaccination. The postcards were sent in *unopened* envelopes (violation of privacy) to those employees who had not uploaded evidence of vaccination in bold text: "Unvaccinated employees without a reasonable accommodation will be separated from United."

i. *United's Accommodation Request System*

158. Allegedly to foster compliance with Title VII, United created its "Help Hub" link for accommodations – an online system to request accommodations from United's vaccine mandate. Plaintiffs and their colleagues were given the option to request accommodations based on religious beliefs or medical reasons through United's Reasonable Accommodation Process ("RAP").

159. While this would appear consistent with the regulations detailed under Title VII, United's process, however, diverges from the law as it provides a binary option: Employees were *not* permitted to seek *both* a religious and medical accommodation; while other possible accommodations available were not allowed through the HelpHub link. Effectively, United was unlawfully forcing its

employees to barter with their Federally protected and Constitutional rights rending United's practices violative of both as a matter of law.

160. Notably, United required Plaintiffs to submit their accommodations by August 31, 2021. After that date, however, no subsequently submitted accommodation requests would be permitted nor submitted. In other words, any employee who determines that he or she has a religious basis for not receiving the vaccine after August 31, 2021, is left without a vehicle to request an accommodation. Employees in this latter category were without choices other than to receive the vaccine or be terminated.

ii. *United's Response to Accommodation Requests*

161. As employees began submitting RAP requests, United followed up with those who sought religious or medical exemptions with probing questions seeking to determine the legitimacy of their beliefs and conditions in derogation of Federal law. Notably, these same inquiries also unlawfully shifted the burden from the employer back upon the employee.

162. For instance, questions were asked like: "Are you aware if any vaccines or medications you have previously received were created, researched, tested or otherwise involved the use of stem cells?" and if so, "please explain why receiving

such vaccines or medications were not a violation of your sincerely held belief."

Other questions included: "What about your religious belief prevents you from

getting the COVID vaccines, but not taking other types of medicine?"; "Have you

received vaccinations in the past"; and "Do you currently take or have you taken

medications of any kind (over the counter or prescription)?" Title VII clearly and

strictly prohibits employers from qualifying sincere religious beliefs, yet United

disregarded the rights of their employees and the rule of law by questioning

employees in this manner.   This action of questioning plaintiffs and other

employees was calculated, manipulative, and contemptuous.  This action further

illustrates United's contempt for the law.

163. Furthermore, United did not apply the same standards to everyone who

sought accommodation approval. For example, some employees were required to

provide additional information like medical certifications from their treating

physicians or letters from members of their clergy while others were not. This

demonstrated United was favoring certain religious beliefs and medical

conditions over others.

164. United required responses from employees in unreasonable deadlines.

When requiring third-party, documents or certifications, response time demands

were unrealistic.  Most commonly amongst plaintiffs, United required responses in 3 days, most of the time over the weekends and holidays. Concerned they would not submit the documents timely, employees asked, via the Help Hub whether the 3-day window meant, "3 working days," if they applied to only workdays (or include holidays/weekends). No responses nor answers were provided to plaintiffs regarding these inquiries. Without exception, United became silent whilst plaintiffs and employees endeavored in earnest to comply with unlawful demands. The Help Hub would not alert Plaintiffs and their colleagues when additional information was requested; and in fact, they stopped receiving email notifications when updates were available, causing many to miss United's artificially imposed deadlines for providing additional requested information.

165. As employees' genuine questions in effort to comply were met with silence, Plaintiffs contend this was by design and for the sole purpose of deeming Plaintiffs requests "late." In turn, Plaintiffs and their colleagues were forced to try and "solve" these issues themselves – oftentimes while in the air. Plaintiffs and other employees using the RAP attempted in earnest to help United facilitate reasonable accommodations, but it appears United was not itself acting in earnest with regards to employee accommodation requests.

166. United did not engage with Plaintiffs utilizing the RAP earnestly as demonstrated by the malevolent, mean-spirited, unprofessional, and under-handed harassment tactics; evidencing United's distain for those seeking lawful exemptions. United's efforts were a ruse to appear to be complying with the law; as evidenced by Kirby's contemptuous comments describing employees like Plaintiff as "all of a sudden deciding 'I'm really religious.'"

167. On or about September 9, 2021, United began "granting" requests for accommodations stating that for any accommodation request granted, those employees who sought same would be placed on indefinite, unpaid leave starting October 2, 2021, with no benefits. This was no accommodation at all but another name for fired.

168. United never provided any "accommodated" employee or Plaintiff with a date by which they can return to work; and stated this period of unpaid leave may last up to 72 months. Plaintiffs were then told that any employee whose accommodation request was denied must receive the vaccine by September 27, 2021, or be terminated; which was recently extended through October 15, 2021.

169. To make matters worse, United then discriminated within an already unlawful process between customer-facing employees and non-customer facing

employees. For those customer-facing (i.e. pilots and flight attendants), the unpaid leave is to last until the risk of Covid is low enough that United deems safe or until the pandemic "meaningfully" subsides. For non-customer-facing employees (i.e., technicians), the unpaid leave is slated to last an undefined time until the "details and logistics of mitigation measures" are worked out which may include testing mandates, discriminatory mask policies, and requiring unvaccinated employees to wear vaccine identification badges – similar to the gold-stars those in camps had to wear in the 1930's Germany.

170.  Plaintiffs and their colleagues were never meaningfully considered for accommodations, and those exemptions granted were essentially the same as being "terminated in place" by being placed into an unpaid medical leave or unpaid leave of absence for a time when United determines the Pandemic is no longer a threat. This status is unreasonable, open ended, punitive, and retaliatory in nature to all employees who do not choose to be vaccinated. This forced many employees to rescind their accommodation requests out of a fear of lost income, deny their own sincerely held religious beliefs, and get a vaccine. Based on previous comments, corporate scare-tactics, discrimination, segregation, public humiliation, and unlawful coercion, it appears that was Kirby's intent all along.

94

iii.  *Where is the Department of Labor or EEOC?*

171. The U.S. Equal Employment Opportunity Commission's ("EEOC") website[73] states, "the EEO laws, including the ADA and Rehabilitation Act, continue to apply during the time of the COVID-19 pandemic…" and as noted by the U.S. Department of Health and Human Services, "the civil rights protections and responsibilities of these federal laws apply even during emergencies. They cannot be waived.[74]"

172. That said, however, the EEOC has taken the position that they do not and will not interfere with or prevent employers from following the guidelines and suggestions made by the CDC or state/local public health authorities about steps employers should take regarding COVID-19:

> *The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services (HHS) Food and Drug Administration (FDA) for the administration of three COVID-19 vaccines. These three vaccines were granted Emergency Use Authorizations (EUA) by the FDA. It is beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach. Individuals seeking more information about the legal implications of EUA or the FDA approach to vaccines can visit the FDA's EUA page[75].*

---

[73] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#A

[74] https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/guidance-long-covid-disability/index.html#footnote7_36mgn6l

[75] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K

173. Such proposals from these agencies and/or outright commands or orders from the Biden administration, however, do not comport with the law and include the exact, unlawful employment practices Plaintiffs and their colleagues complain about in this complaint.

174. United's actions flagrantly violate numerous provisions of the Constitution and Federal laws including Title VII, Genetic Information Non-Discrimination, and ADA which Kirby loudly and publicly boasts; meanwhile, the Department of Labor and the EEOC (referenced hereinafter together as "EEOC") have not taken any legal actions much less made public statements condemning these patently unlawful employment practices. For these reasons and those outlined below, Plaintiffs are not required to first seek recourse via the EEOC prior to bringing their discrimination and/or employment claims averred below.

175. Chiefly, irreparable harm will result from the delays associated with exhaustion of administrative remedies. As noted throughout the complaint, millions of people have been hurt and thousands have been killed due to the Covid-19 vaccines that United are mandating Plaintiffs and their colleagues take. Furthermore, the affidavits and sworn statements attached demonstrate that not only can these vaccines cause injury generally speaking, but the gene therapies

pose specific harms to Plaintiffs and those working in the airlines industry. In turn, waiting 180 days for the process to complete or the receipt of a right to sue letter is not a viable option as irreparable harm is imminent not just for their jobs; but for their lives. *See* www.eeoc.gov/what-you-can-expect-after-you-file-charge

176. Additionally, the EEOC lacks the institutional capacity to resolve the particular types of issues presented given there are millions of employees across the United States who seek to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all the claims and the Courts' intervention is needed. Also, the EEOC does not have the authority to address the constitutionality of all the claims associated with the employment practices at issues and does not possess the institutional knowledge or authority to redress those matters germane to health, safety and welfare. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile; or useless and inadequate to redress Plaintiff's employment issues and to prevent the irreparable harms.

## XI.   UNITED IS A STATE ACTOR OR ARM OF THE GOVERNMENT

177.  As mentioned in the Introduction, the Federal Government or the Biden Administration has effectively delegated its authority to the private sector[76] and

---

[76] *See e.g., West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975).

sought companies like United to do its bidding for them. This is apparent when United gave its employees an unconscionable ultimatum[77]: choose between their jobs which afford them the ability to feed, clothe, and house their families – or – take an experimental, novel, (untested) life-threatening gene therapy/vaccine, for a disease widely known to have a very high survivable rate and for which effective, alternative treatments now exist.

178. The State has acted in concert with United and publicly supported its private mandate since the Biden administration cannot legislate a public one. Plaintiffs contend that United's mandate was preconceived; with its purpose to effectuate the Federal government's will and be the large, corporate example so other big employers follow suit. United and Kirby are engaged in a quid-pro-quo arrangement whereby United is enforcing the agenda the Federal government knows it cannot legislate. Stated differently, the government is able to acquire what it always wants – more power – through the imposition of private-employer mandates. In exchange, the Biden administration is lining the pockets of big corporations and their executives like United and Kirby through policy or pecuniary gain; at the expense of their own employees' and Americans' lives.

---

[77] N.B. This ultimatum violates numerous provisions of the U.S. Constitution; as well as, federal and international laws including crimes against humanity as outlined in the Counts below.

179.  Plaintiffs' suppositions are supported by statements and actions taken by both United and the Federal Government. For instance, there have been numerous, private (and public) meetings between Kirby and President Biden's administration as evidenced by Kirby's statements during an interview with the Economic Club of Chicago stating:

> We're going to need government regulatory support to enact kind of the rules of the road. And we're spending a lot of time with the administration… [the] key to opening parts of the economy that are closed are vaccine passports. If you're gonna be anywhere around other people, an airplane is literally the safest place you could be… That's why the study we did with the Defense Department, you know, essentially [it] concluded it's almost impossible to get covid on an airplane.

or at the Aspen Ideas Festival[78]:

> An airplane is the safest place you can be and be around other people. When asked, "Will United ever require a vaccine proof?" Kirby answered: "I don't think United Airlines on our own will; certainly not in the United States, but I think governments around the world are going to require it, so if you're… Kathleen and the kids and I are going to Europe this summer, if you're going to Europe they require you to have a vaccine, or in a lot of cases you're having to – if you don't wanna quarantine you gotta have a vaccine."

> During this same interview, Kirby was asked, "would you like the government or airline industry to have one rule on that (meaning vaccines)?" Kirby replied, "Uh, ya know, I like government, for international travels, to have a rule for vaccinations because –

---

[78] https://www.aspenideas.org/sessions/flying-smart

mostly because – it's the only way we're gonna get it – get it open.  But beyond that, I was supportive of a rule to require masks early in the pandemic, but I don't personally think it's necessary anymore."

180. These meetings, requests for government support, comments, and co-opted studies indicate a close working arrangement between Kirby/United and the State – the kind of working arrangement necessary to inculcate United as a State actor and co-conspirator with the Government.

181. More evidence United's conduct is fairly attributable to the State is apparent when on August 23, 2021, President Biden urged "if you're a business leader, a non-profit leader, a state or local leader who has been waiting on full FDA approval to require vaccinations, I call on you now to do that. Require it [vaccine]."[79] Notably, however, The United States Congress, the Federal Court system, the White House, and the U.S. Postal Service are exempt from the President's vaccine mandates. Then, on August 30, 2021, President Biden referenced United's CEO, Scott Kirby ("Kirby") and urged other companies to

---

[79]https://www.nbcnews.com/politics/white-house/biden-calls-private-companies-issue-vaccine-requirements-n1277470

"follow his lead" and "require your employees to get vaccinated *or face strict requirements*."[80]

182. This quickly escalated when on September 09, 2021, President Biden oligarchically made a public announcement that all staff of U.S. private-sector entities with 100 or more employees will be required to be fully vaccinated or tested regularly – which was slated to roll out in the weeks[81] that followed. Ironically, the same day, Vice-President Harris stated the following in a meeting with Texas, Mississippi, Kentucky, and New Mexico abortion providers regarding the recent controversial legislation out of Texas [The Texas Heartbeat Act]:

> The president and I are unequivocal in our support of Roe v. Wade, and the constitutionality of Roe v. Wade, and the right of women to make decisions for themselves with whomever they choose about their own bodies. And needless to say, the right of women to make decisions about their own bodies is not negotiable.
>
> When people are able to make choices without government interference for themselves in terms of their well-being and the well-being of their family in consultation with whomever they may choose, we are a stronger society[82].

---

[80]https://www.usnews.com/news/national-news/articles/2021-08-30/more-companies-mandate-covid-19-vaccines-for-employees-but-is-it-enough-to-make-a-difference

[81]https://www.reuters.com/legal/government/biden-vaccine-mandate-will-test-us-workplace-regulator-2021-09-13/

[82] https://www.breitbart.com/politics/2021/09/09/kamala-harris-on-pro-life-texas-law-u-s-stronger-when-people-make-health-choices-without-government-interference/

By logical extension – the same constitutionality should be applied to allow employees to make their own decisions about their own bodies without government interference.

183. And as stated by the New York Times on October 06, 2021:

> Mr. Biden said in September that he would use the full force of his presidency to push some 80 million American workers to be vaccinated against the coronavirus, reaching into the private sector to mandate that all companies with more than 100 workers require vaccination or weekly testing. He ordered the Occupational Safety and Health Administration to draft a new rule that would make those requirements enforceable, a process that White House officials said at the time would take at least three or four weeks.

184. Notably significant, however, is that as of the filing of this complaint, **President Biden's vaccination mandate presently does not formally exist** – it was merely a press statement of something the President said he was going to do but never has. This is buttressed by the fact that no mandates of the like have been sent to the Office of Information and Regulatory Affairs for approval; and The White House, the Occupational Safety and Health Administration (OSHA), and the Department of Labor have not released any official guidance for the alleged mandate. In short, there is no executive order or official mandate on the books or legally in effect – *just the perception of a mandate* via press statements and

102

broadcast[83] which are not legally binding or in effect. Even if that guidance comes

at a later date, it is clear that United knowingly took these unlawful actions while

they were illegal in anticipation of promised follow-on state goals and guidance.

185. Indeed, as stated by Pullman[84] in The Federalist:

> To impose the public perception of a mandate, the Biden administration is following an unusual rule-making process it also employed earlier this year, called an emergency temporary standard (ETS). The spring ETS rule took nearly six months to issue. Meanwhile, companies are telling reporters their vaccine mandates will have at the latest December deadlines. (…that's four months after Biden's non-existent mandate was proclaimed. According to OSHA, an ETS takes up to six months to go into effect *after* the initial mandate is issued in the Federal Register — which, again, for the proclaimed 100-employee mandate hasn't happened yet.) Using the ETS procedure instead of normal federal rule-making processes both allows the Biden administration to push its demands faster and without any public input or requirement of responding to public input, which is normally required of even legally laughable federal rule-making like this one would be. That is part of why ETS rules have been overwhelmingly overturned in courts.

186. And while no *actual* mandate is in force, the public's belief one is has and

continues to have a *real* impact on Plaintiffs and Americans[85] nationwide. Plaintiffs

---

[83] N.B. The mandate was all over the news prior to President Biden's announcement; and upon information and belief, Plaintiffs contend that numerous cable, digital, and social media outlets like CNN, Facebook, and Google are liable and co-conspirators which Plaintiffs intend to address in the future.

[84] *See* Joy Pullman's "Joe Biden's Vaccine Mandate Doesn't Exist…" Available at: https://thefederalist.com/2021/10/07/joe-bidens-vaccine-mandate-doesnt-exist-its-just-a-press-release/ (Last visited October 7, 2021).

[85] Akin to the SARS2/Covid pandemic to induce inoculation.

and millions of Americans felt added pressure and stress; quit their jobs; and/or succumbed to inoculation operating under the impression taking a Covid vaccine would be inevitable to provide for their families.

187. Coincidingly, this perceived mandate furthers the Government's objectives, emboldens United, and had real impacts on other, private corporations as well. As correctly observed by Bruce Atkinson in a letter published by the Wall Street Journal on October 05, 2021:

> The mandate's nonexistence shields the Biden administration from legal challenges that may ultimately restrict the Occupational Safety and Health Administration's authority. Yet the mandate is still effective at compelling industries and companies into compliance, as it leaves room for any eventual issuance to target noncompliant entities. This implied cudgel is particularly effective on industries and companies that are dependent on federal spending or the goodwill of federal regulators. The nonexistent mandate also allows so-inclined state and local governments and companies to issue their own mandates, seemingly in lockstep with Washington. The Biden White House has been well-served by presenting a nonexistent mandate as a done deal. WSJ Article Hyperlinked

188.  And recently, on September 19, 2021, Margaret Brennan from CBS News interviewed Kirby[86] where he further demonstrated a clear nexus between United's employment practices to the States' policies, initiatives, and objectives.

---

[86]  https://www.cbsnews.com/news/transcript-united-airlines-ceo-scott-kirby-on-face-the-nation-september-19-2021/

Kirby is not only aware of the intentions and future actions to be taken by the Biden administration, but intimating he knows United will be "rewarded" or compensated via the American, taxpayer dollar by doing the administrations' bidding of mandating the vaccines. Kirby knew the State was going to propose mandates, and took action even before the Biden announcement:

> KIRBY: Well, there are a lot of people that work in the airports that don't yet have a vaccine requirement, though the administration's role is going to ultimately take care of that. But one of the things that's important when you're traveling on an airplane, particularly once you're on the airplane, it's really the safest place you can be because the airflow on an airplane, the safest place you can be indoors. And so, wear your mask in the airport. That's a rule. And- and before long, we'll have everyone in the airports vaccinated thanks to the administration's order.

> KIRBY: …The Delta variant has obviously caused a downturn in travel, it's particularly business travel. A lot of offices were expecting to be open again in September, and the Delta variant has pushed those opening dates back a few months. My guess is it will now be January. It appears that we've peaked in cases. Let's hope that that's the case. Let's hope that as we continue to get more people vaccinated, we really can get back to normal across the country. But the demand recovery is really- has probably been pushed back to January.

> MARGARET BRENNAN: When it comes to data and science, Dr. Scott Gottlieb, the former FDA commissioner, has argued that the Biden administration's travel restrictions that they've kept in place on Europe, on India and China, other countries, they don't really work. *Have they given **you** a timeline on when those restrictions will be lifted*?

KIRBY: *They haven't given **us** a timeline specifically, but they do talk to **us** a lot,* and I think they're just trying to take a cautious approach and really put safety first as they go through the crisis. And given the case rates in Europe and the US are similar in the high vaccination rates higher in Europe, actually. I'm hopeful that we'll get those borders, particularly to Europe, open soon, but they're following the data and the science. But we hope that- that as- as cases come down, that that's something that will happen soon.

MARGARET BRENNAN: I want to ask you about some of what's being debated here on Capitol Hill. There are two huge bills, one of them, this $1.2 trillion infrastructure plan, it's got funding in airports included into the package. How necessary is it and *how would **you** want that money to be programmed? What do **you** need it for*?

KIRBY: Yeah, so I am very supportive of the entire infrastructure package, as is most of the business community. It's a great opportunity to invest in America coming out of- out of this crisis. At airports, you know, you can fly around and see the airports…

MARGARET BRENNAN: So, you're for the 1.2. When it comes to the $3.5 trillion spending bill, there's also some climate change related provisions tucked into it. We talked about that with Sen. Sanders. But for you in private business, is it just so expensive to make some of these changes on your own that you need American taxpayers to provide tax credits and to provide incentives for private businesses to go green?

KIRBY: *Well, particularly for the climate change initiatives, we do need government support, really to fund the investment.* If you look at solar and wind, 20 years ago, they couldn't compete with coal or natural gas, and today it's cheaper. *That's because the government provided credits to give certainty to invest in the industry, **and that's what we need for things like sustainable aviation fuel**.* This really is an opportunity in America to drive investment, drive the next generation of great jobs

that can be green, but also great jobs, great technology that we can export around the world.

MARGARET BRENNAN: So, for you, the benefit outweighs the risks here of spending that much money.

KIRBY: Well, the climate change elements are a part of the $3.5 trillion so the climate change elements in particular, *and I don't know 100% of what they are*, **but the ones I do know about, I'm very supportive of and hope that they pass either in this bill or somewhere else**.

189. Along with fiscal benefits, United is garnering esteem, prestige, and public recognition from The White House as reflected on its official webpage[87]:

> After United Airlines announced its vaccination requirement, more than half of its unvaccinated employees went out and got vaccinated with weeks left to go before the deadline… All told, these efforts—and countless other Administration initiatives and policies—have resulted in over 175 million fully vaccinated Americans. But there are still nearly 80 million Americans eligible to be vaccinated who have not yet gotten their first shot.

> The President's plan will reduce the number of unvaccinated Americans by using regulatory powers and other actions to substantially increase the number of Americans covered by vaccination requirements—these requirements will become dominant in the workplace. In addition, the plan will provide paid time off for vaccination for most workers in the country.

190. The government has provided the requisite mantle of authority that has enabled and enhanced the power of the harm-causing "employer." That authority,

---

[87] https://www.whitehouse.gov/covidplan/#vaccinate

transcends United from a private to a state actor. The government is sufficiently involved to treat United's conduct at issue as State action since the State created the legal framework governing the conduct. This is further demonstrated when the Labor Department's Occupational Safety and Health Administration (OSHA) has been tasked to be in-charge of formulating and enforcing Pres. Biden's new "rules" via an emergency temporary standard (ETS). This new ETS is supposed to supplement the ETS adopted in June 2020, which initially applied only to those in the health care industry. On or about September 10, 2021, the Senior Advisor at OSHA encouraged employers to implement the vaccination and testing programs immediately in advance of the ETS to make employers like United better positioned to comply once implemented and enforced; avoid the penalties as referenced above[88].

191. Notably too, the fact that OSHA, the agency that monitors workplace safety and compliance, is not requiring adverse event recordings is a red flag. This transparent neglect, lack of enforcement, and accountability nefariously masks vaccine adverse events and does not facilitate employer/employee rights to be fully informed regarding risks when making vaccine decisions. As it stands then,

---

[88]https://www.natlawreview.com/article/prepare-now-new-osha-emergency-temporary-standard-covid-19

United is effectively serving as its own, self-regulating employment and health agency; and doing the work of a state actor through its conduct (or neglect) when enforcing President Biden's orders or OSHA's "rules."

192. During a *Live and Let's Fly*[89] event, where Kirby and President Biden met via a virtual medium, President Biden stated:

> The tipping point for me was seeing the statistics that 97% of the people in the hospital are unvaccinated and over 99% of the deaths are amongst the unvaccinated. That implies you are 300 times more likely to die if you are unvaccinated than if you are vaccinated. And once you have those statistics in your mind, at least for me as a leader, there simply was no choice but to do the right thing for safety. A few weeks from now, this is going to be something that's widespread across the country because it's really just a basic safety issue.

Kirby has taken an active role in trying to convince other companies to follow suit; and this meeting with Pres. Biden was seen and overtly presented to all viewers as a "reward" to Kirby for his actions and vaccine mandates ahead of his peers.

193. Kirby boasts his achievements in a September 2021 interview[90]:

> On Wednesday morning's edition of Squawk on the Street, LeBeau interviewed Kirby about the airline's firing of 593 workers as it works to comply with the vaccine and testing mandate that President Joe Biden announced earlier this month.

---

[89] https://liveandletsfly.com/united-airlines-ceo-biden-meeting/
[90] https://www.msn.com/en-us/news/us/watch-united-ceo-sure-seems-cheerful-saying-i-feel-bad-for-firing-593-workers-who-refused-vaccine/ar-AAOXTmH

"You have 97 percent compliance, 97 percent of your employees saying they're getting at least one shot. They'll be fully vaccinated in the next couple of weeks if they aren't already. And yet you're going to have to fire 593 workers," LeBeau said, and asked, "What are your thoughts about having to cut those workers?"

*A decidedly cheerful Kirby began by saying "Well, look, I'm really proud and gratified that the United team, excluding the people that have applied for religious or medical accommodation, over 99 percent got vaccinated. It proves that vaccine mandates do work, and that you can get a huge percentage of your workforce vaccinated."*

He went on to say that "I feel bad for the 593 people, the less than one percent, that are going to leave. But we were focused on doing the right thing for United Airlines. And it's great to have this in the rearview mirror for us and the ability to just move forward now."

Kirby was also asked what the business impact would be of losing those workers, and not having the 2,000 or so who have applied for exemptions on the front lines. "You know, there's no impact," Kirby said. "In fact, it's quite the opposite at United Airlines. It's such a small percentage. And we planned and prepared for this that we're now able to, you know, confidently run a strong operation."

These comments clearly inculcate United as a state actor by enforcing government initiatives, but rhetorically begs the question, "does Kirby believe himself to be an 'other' in the administration and taking an active role in their decisions?"

194. As Federal legislation mandating vaccination would be transparently repugnant to the United States Constitution, the institutionalization, enforcement, and compliance apparatus are being implemented by surrogate, private

employers like United to do the government's bidding and forcing its employees to take a Covid vaccine. The Federal government is counting on the private sector and states to do their proverbial, dirty work for them; and **are actually compelling United's actions** using big carrots (i.e., new grants or programs guised as loans) and big sticks (i.e., fines) to accomplish their objective. By way of non-limiting examples, carrots include monetary incentives like those listed on the CDC's website[91], "applicants may search for applicable *funding opportunities* at Grants.gov" or remarkably via the Whitehouse website which outright acknowledges[92] 2 CFR § 200.203 provides "*for discretionary grants and cooperative agreements…*" *See also* 45 CFR § 75.205; 45 CFR § 75.203; 45 CFR § 75.458; 45 CFR § 75.309; 45 CFR § 75.309; 45 CFR § 75.407; 45 CFR § 75.328(b), 45 CFR § 75.330; 45 CFR § 75.341, 45 CFR § 75.342; 45 CFR § 75.501, 45 CFR § 75.512; 45 CFR § 75.202, 45 CFR § 75.203; 45 CFR§ 45.381; 45 CFR § 75.320(d)(2). The sticks or disincentives include strongarm fines and penalties for violating the Biden-proposed mandate which range from $13,653 for a 'serious' violation to a penalty of $136,532 for a

---

[91] https://www.cdc.gov/grants/public-health-emergencies/covid-19/flexibilities-available-applicants-recipients/index.html

[92] https://www.whitehouse.gov/wp-content/uploads/2021/03/M_21_20.pdf

'willful' violation. *See* 29 C.F.R. § 1903.15(d), 86 Fed. Reg. 2964 (Jan. 14, 2021)[93].  It is reasonable to surmise that Kirby functioned as an insider, while corporately endorsing and implementing a policy consistent with the Biden administrations' universal inoculation objective through United Airlines.

195. Significantly, the Federal Government allocated approximately 4.7 trillion dollars[94] in Covid relief; and "the U.S. government *has coalesced government agencies, international counterparts, academia, nonprofit organizations and pharmaceutical companies* to develop a coordinated strategy for prioritizing and speeding development of the most promising vaccines. In addition, *the federal* **government *has made investments*** *in the necessary manufacturing capacity at its own risk,* **giving companies confidence that they can invest aggressively** in development and allowing faster distribution of an eventual vaccine.[95]"

196. Important to note, United was facing financial ruin in early 2020 as a result of sudden decrease in air travel and restricted flights to and from several countries. United subsequently received *at least* $5 billion in total aid with roughly

---

[93]https://www.natlawreview.com/article/prepare-now-new-osha-emergency-temporary-standard-covid-19

[94] https://www.usaspending.gov/disaster/covid-19?publicLaw=all

[95] https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained

$3.5 billion as a direct grant and $1.5 billion as a loan. And the Treasury Department also acquired millions of warrants in United Airlines. Quite literally then, the government has a direct, fiduciary interest in United via the Treasury Department with the purchase of millions of common stock shares in the airline[96] (*See e.g.* filings with SEC on April 23, 2020; September 30, 2020; January 20, 2021; and April 30, 2021). And the state, whose singular goal was universal inoculation, held another $1.5 billion over United in the form of a loan.  In essence, the US government owned a very significant portion of United and could thereby closely participate during and influence United decision making, strategic planning, and employee policy making – including the mask policies and gene therapy / vaccine mandates. This "interest" in United taken by the Government, and United's indebtedness to the State further implicate United as a State actor.

197. Just recently, when Kirby was asked if it was "inevitable that passengers will be mandated to get vaccine?" in an interview[97] he replied, "*I've heard others in the administration just yesterday* (Sept. 15th, 2021) *talking about mandates for travel.* They have a good point. *The most efficient way of doing that is through employer*

---

[96] https://www.reed.senate.gov/news/releases/reed-warrants-are-warranted-and-will-ensure-taxpayers-get-a-healthy-return-when-airline-recovery-eventually-takes-off
[97] https://thehill.com/policy/transportation/aviation/572541-united-airlines-ceo-says-employees-exempt-from-vaccine-wont-be

*mandates…we'll follow whatever the government tells us to do.* We need to get the whole country and the world vaccinated to rebound air travel." And on October 06, 2021, on an interview with MSNBC[98], Kirby touted that 99.7% of the employees and how "only 232 [were] in termination process."

198. Aside from the transparent violations of privacy, Kirby's intentions were on full display regarding the religious or medical accommodation: United was never going to accept them. Kirby also gave instructions and guidance to other employers just as President Biden had; and demonstrated that he had insight into the administration's upcoming agenda further indicating United's is a state actor:

> It's a phenomenal outcome and mandates work. The key is do it [mandate]. Do it with a short fuse. Don't let the debate drag on for a long time – we did it in less than eight (8) weeks from announcement until finishing. You talk to your employees and say 'this is the deal, you have a choice to make' – don't be wishy washy don't waffle about it – and when you do that, 99.7% of employees get vaccinated… If we can do it anyone can do it….
>
> What they [Government] have said, and I agree with, is its far more efficient to get everyone vaccinated at one point of contact through their workforce. And these new requirements from the government are going to be really powerful. Because it proves that if you put a mandate in place, they work. We've proven that; and the Government is going to require it in the workforce which means the vast

---

[98] https://www.msnbc.com/stephanie-ruhle/watch/united-airlines-ceo-on-vaccine-requirements-for-workers-mandates-work-122889285617

> majority of the people are going to be vaccinated not because they are required to do it on an airplane but because they are required to do it through the workforce. It's just a much more efficient way to get the country vaccinated which is ***really the goal of the administration***…
>
> I'm grateful and glad our competitors… are coming along and going to do the same thing [and] I'm encouraging all employers to do the same thing.

199. The interview concluded Kirby contending it was the "unvaccinated" who were causing others' deaths which is wholly inconsistent with science and medicine, but it completely consistent with similar statement made by the Biden administration, including Biden himself- the State.

## XII.   OBSERVED DANGERS IN THE WORKPLACE

200. Plaintiffs have knowledge of vaccinated co-workers who have experienced vaccine-related injuries and side effects. Several plaintiffs detail situations where co-workers present uncharacteristically strange symptoms after taking the vaccine including brain fog or a lack of cognitive clarity, neurological disorders or uncharacteristic "quirkiness", vision impairment, and an extremely serious situation where a "Pilot Monitoring" had to take control of the aircraft

from the "Pilot Flying" who became incapacitated during flight. United is aware of these situations, but has refused to disclose these instances and possible injuries to its employees or flying public. Plaintiffs' firsthand knowledge of these vaccine-related injuries amplify the stress being experienced by United employees who question the vaccine mandate as they are essentially telling Plaintiffs to ignore the vaccine side-affects they have and continue to witness with their own eyes.

201. United has intentionally, or with reckless disregard for public safety, adversely affected air travel in the US. While all departments at United serve an important purpose in creating an enjoyable travel experience, several departments are especially critical to the actual safety of flight: Aircraft Maintainers, Flight Dispatchers, and the Aircraft Pilots. Plaintiffs in these three (3) critical duties positions experience heightened–stress and agitation resulting from workforce segregation created by United's vaccine mandate. This policy has created a more stressful and dangerous work environment across the entirety of United. This diminished environment is negatively impacting the performance of all United employees, but it is foolish and reckless to take actions that could cause Maintainers, Dispatchers and Pilots to perform at sub-optimal levels. The very safety of almost 2.4 million passengers each day depends on superior performance

by these three (3) disciplines. These policies and mandates negatively affected the safety of air travel.

202.   Plaintiffs have first-hand knowledge of and have witnessed an increase in stress-related mistakes and errors occurring at the workplace in these critical areas due to the increased stress load that the vaccine mandate has caused among those reluctant to take the vaccine and those who were forced to take it when they otherwise would not have. This is supported by United's own safety data or Flight Operations Quality Assurance data ("FOQA"). The FOQA data objectively shows that since the onset of Covid, there was an increase in the pilot "error rate." Also, prior to flight, pilots are required to brief numerous items. Previously not included in these briefings but later added due to the known error rate was amended to include "personal threats" which incorporates the novel, Covid-induced stress and the over-reaching mandate.   Additionally, as a result of the segregation, discrimination, public humiliation, threats, and coercion, additional tension between co-workers result in more "human errors."   United has all but de-humanized their unvaccinated employees to such an extent that jokes regarding the unvaccinated abound.   September 27th was tauntingly regard as "V-day" by employees whilst berating unvaccinated employees about the looming "leave

without pay" ultimatum. This type of derision between segregated groups derives directly from the United corporate policy and the disgusting culture that Kirby allowed (and even fostered) to grow-up at United.

203. This is not speculation but supported by United's own safety data or Flight Operations Quality Assurance data ("FOQA"). The FOQA data objectively shows that since the onset of Covid, there was an increase in the pilot "error rate." Also, prior to flight, pilots are required to brief numerous items. Previously not included in these briefings but later added due to the known error rate was amended to include "personal threats" which incorporates the novel, Covid-induced stress and the over-reaching mandate.

204. The United vaccine mandate intensified these stress factors and has been an ongoing safety concern. It has severely impacted and increased the Pilots' "personal threat" stress since many pilots do not want to take the vaccine. Many struggle with the ultimatum of losing their livelihoods if they refuse to take the vaccine and hope they won't have a side-effect. The result of this dilemma is reflected in the number of employees and pilots who have taken sick leave after the personal threat was incorporated into the briefing.

205. Plaintiffs and their colleagues have brought these safety concerns to United's attention. There are numerous reporting systems available to Plaintiffs and other co-workers.  Most of these systems are managed by United. Rather than taking measures to address reported safety concerns, United has refused to take substantive, corrective action or definitively retract its unlawful, universal vaccination mandate.

## XIII.    COVID VACCINE PERILS SPECIFIC TO THE AIRLINE INDUSTRY

206.  Plaintiffs' personal fears of taking the vaccine and their concern for the public is warranted; particularly working in the airline industry for reasons including those outlined in Dr. Edward's (Ex. E), Dr. McCullough's (Ex. F), and Lieutenant Colonel Theresa Long's (Ex. I) statements attached.

207.  For instance, Dr. Edward's attests (Ex. E):

In my expert medical opinion, *subjecting airline pilots to the emergency use authorized Covid gene therapy injections would subject them to a greater risk of harm than any benefit*. The above opinion is based on the following:

i.  Pilots are vigorously screened and monitored for health problems, and are generally regarded as extremely fit and healthy. So, they are at a very low risk for developing significant complications from an acquired infection with Covid.

ii.  Multiple published studies as well as me and my colleagues' clinical experience shows that there are exceedingly effective early

outpatient therapies for Covid that can reduce hospitalization and mortality rates by 80-90%, even in an unhealthy, high-risk population.

iii.  The full benefit of the vaccine is still not well established as we are still very, very early in the clinical trial phase and there are multiple early indicators that the current dominant Delta variant is not susceptible to being covered by the vaccine.

iv.  A full understanding of the safety data and the probability of adverse reactions is still very difficult to estimate based off the fact the control group from the original study have now all received the vaccine, the FDA and CDC have not held any briefings to update clinicians, and we are relying on a self-reporting system that was relatively unknown to healthcare workers initially, is very cumbersome to use, is reportedly 2 months behind on data entry, and historically has been known to only report 1-10% of adverse reactions.  *But, despite all of that, there are still more deaths reported to VAERS, in excess of 12,000 now, than all other vaccines combined over the previous 2 decades. Many of the adverse outcomes and deaths are related to blood clotting problems, including stroke, heart attack, and pulmonary embolism.  It is well established that airline travel, due to altitude and prolonged sitting, is a risk factor for blood clotting problems.*

v.  Lastly, the fact that pilots are responsible for the lives of the crew and passengers onboard their aircraft, there is even more of burden of proof on the individual or entity who is attempting to mandate the pilots be subjected to take part in the is clinical trial of Covid vaccine to prove that the benefit clearly outweighs the risk and that there are no viable alternatives.  It is my very firm and sincere opinion that this standard has not been met by the mandating entities.

208.  Excerpts from Dr. McCullough's affidavit include (Ex. F):

I believe within a reasonable degree of medical certainty that the COVID vaccine(s) are not safe generally; and particularly dangerous for airline pilots. It is my belief based on a reasonable degree of medical certainty that the vaccine could cause the death of airline pilots and that their lives are in danger should they be administered the vaccine and travel at high altitudes. I believe within a reasonable degree of medical certainty that the data upon which United Airlines has based its mandate upon is flawed and/or inaccurate; and imposing this vaccine is not only dangerous and could cause harm to the pilots, but to their passengers and the public-at-large.

I have seen and examined adolescent patients with post-COVID myocarditis which typically occurs two days after the injection, most frequently after the second injection of mRNA products (Pfizer, Moderna).

The US FDA has given an update on the JNJ vaccine concerning the risk of cerebral venous sinus thrombosis and thrombosis with thrombocytopenia in women ages 18-48 associated with low platelet counts. This complication causes a variety of stroke-like syndromes that can involve the cranial nerves, vision, and coordination.  Blood clots in the venous sinuses of the brain are difficult to remove surgically and require blood thinners sometimes with only partial recovery.  In some cases, special glasses are required to correct vision and these young adults can be expected to miss considerable time away from school undergoing neurological rehabilitation. Because this risk is not predictable no woman under age 48 under any set of circumstances should feel obliged to take this risk with the JNJ vaccine.  Such catastrophic neurologic thrombotic events could occur in pilots on duty during flight.

Additionally, the US FDA has an additional warning for Guillen-Barre Syndrome or ascending paralysis for the JNJ vaccine which is not predictable and when it occurs can result in ascending

paralysis, respiratory failure, the need for critical care, and death. Not all cases completely resolve, and some vaccine victims may require long term mechanical ventilation, or become quadra- or paraplegics.

To my knowledge, there are no studies that demonstrate the clinical benefit of COVID vaccination in COVID survivors or those with suspected COVID illness or subclinical disease who have laboratory evidence of prior infection… Thus, it is my opinion that the COVID vaccination is contraindicated in COVID survivors many of whom may be in the student population.

It is my expert medical opinion that it is not good research or clinical practice to widely utilize novel biologic therapy (mRNA, adenoviral DNA COVID vaccines) in populations where there is no information generated from the registrational trials with the FDA, specifically COVID survivors, suspected COVID-recovered, pregnant or women who could become pregnant at any time after investigational vaccines; and especially pilots. In my expert medical opinion, the risks associated with the investigational COVID vaccines far outweigh any theoretical benefits, are not minor or unserious, and many of those risks are unknown or have not been adequately quantified nor has the duration of their consequences been evaluated or is calculable.

Therefore, in my expert medical opinion, the Emergency Use Authorization and administration of COVID vaccines for pilots creates an unethical, unreasonable, clinically unjustified, unsafe, and poses an unnecessary risk to the pilots of the United States of America. Likewise, in my medical expert opinion, the mandatory, administration of COVID vaccines in pilots creates unnecessary risk to pilots, flight crew, and the airline passengers of the United States of America.

209. And as stated by LTC Long[99], whose list of credentials include a residency in Aerospace and Occupational Medicine at the United States Army School of Aviation Medicine; trained by the Combat Readiness Center at Ft. Rucker as an Aviation Safety Officer and in the Medical Management of Chemical and Biological Causalities at Fort Detrick and USAMIIRD; board-certified in-flight Aerospace Medicine; recently functioned as a medical and scientific advisor to an Aviation training Brigade that sought to identify risk mitigation strategies and bio statistical analysis of SARS- Cov-2 ("Covid 19") infections in both vaccinated and unvaccinated Soldiers; and whose responsibilities include the certification of the health, mental and physical ability, and readiness of nearly 4,000 soldiers on flight status attests (Ex. I):

> Military aviators are a subset of the military population that has to meet the most stringent medical standards to be on flight status… Literature has demonstrated that natural immunity is durable, completed, and superior to vaccination immunity to SARs-CoV-2. mRNA vaccines produced by Pfizer and Moderna both have been linked to myocarditis, especially in young males between 16-24 years old,2 The majority of young new Army aviators are in their early twenties. We know there is a risk of myocarditis with each mRNA vaccination. We additionally now know that vaccination does not necessarily prevent infection or

---

[99] N.B. Lieutenant Colonel Long's affidavit was not drafted specifically for this case but in support of a motion for a preliminary injunction in a separate proceeding as a whistle blower under the Military Whistleblower Protection Act, Title 10 U.S.C. § 1034.

transmission of SARs-CoV-2. Therefore, individuals fully vaccinated with mRNA vaccines have at least two independent risk factors for myocarditis after vaccination. Additional booster shots add more risk. It is impossible to perform a risk/benefit analysis on the use of mRNA as counter measures to SARs-CoV-2 without further data. Use of mRNA vaccines in our fighting force, presents a risk of undetermined magnitude…

Because vaccination with mRNA increase the risk of myocarditis, a comprehensive screening program should be implemented immediately to identify individuals who have been affected and attempt to mitigate immediate risks and long-term disability… *Compulsory SARs-CoV-2 mRNA vaccination program should be immediately suspended* until research can be done to determine the true magnitude of risk of myocarditis in individuals who have been vaccinated.

210. Plaintiffs have real, substantial, and legitimate concerns about taking one of these vaccines in light of known harms and what is to come in the future. Plaintiffs are facing adverse employment actions or termination simply because they do not want to take an experimental vaccine which has shown can kill, be forced to repeatedly take PCR test which are widely known to be inaccurate, wear their vaccination status on their face with a mask which science has proven cannot block the SARS-CoV-2 virus, or be forced to carry a vaccine passport which cannot serve a legitimate purpose other than to harass, coerces, and further ostracize the employees from United.

124

## COUNT I
### 42 U.S.C. § 2000ff-1(a)(1) and (a)(2)
### *Violations of Title II of the Genetic Information*
### *Non-Discrimination Act ("GINA")*

211. Plaintiffs reallege and incorporate paragraphs 1 through 210 above as though fully set forth in this count.

212. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action.

213. By way of non-limiting examples: (a) the EEOC will not interfere with or prevent employers from following the guidelines or suggestions made by the CDC regarding the protocols employers should take regarding COVID-19, even if such actions blatantly contradict well-settled science/medicine, the Constitution, and specifically germane to the EEOC, unlawful, employment actions. (b) Despite United's and Kirby's flagrant violations of employment law which they publicly boast (other corporations too), neither the EEOC nor any other Federal agency for that matter has condemned or taken any remedial action to stop it. (c) In light of the above coupled with the urgency of recourse needed as literally Plaintiffs' and Americans' lives are in danger, waiting for the EEOC to conclude its investigation and/or the receipt of a right to sue letter is not a viable option as irreparable harm will result from the delays associated with exhaustion of administrative remedies.

(d) The EEOC also lacks the institutional capacity to resolve the particular types of issues presented here given there are millions of employees across the United States seeking to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all the claims timely to avoid to harms outlined in this Complaint necessitating the Courts' intervention. (e) Furthermore, the EEOC does not have the authority to address the constitutionality of all the claims associated with the employment practices at issues and does not possess the institutional knowledge or authority to redress those matters germane to health, safety, and welfare. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile and/or inadequate to redress Plaintiff's claims or to prevent the irreparable harms outlined thus this action and those below are ripe to be heard and adjudicated. *See* paragraphs 171-176.

214. GINA under 42 U.S.C.§2000ff-1(a)(1) prohibits discrimination based on genetic information. Specifically, it is unlawful employment practices for an employer to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee.

215. 42 U.S.C. §2000ff-1(a)(2) prohibits employers from limiting, segregating, or classifying the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee as an employee, because of genetic information with respect to the employee.

216. United is an employer within the meaning of 42 U.S.C. § 2000ff and at all times relevant times, was engaged in an industry affecting[100] commerce[101] and who has at all times material had fifteen (15) or more employees.

217.  Plaintiffs are all employees as defined in 42 U.S.C. § 2000ff.

218. United has and continues to violate 42 U.S.C. §2000ff-1(a)(1) and (a)(2) by discriminating against Plaintiffs and other employees based upon whether they have been inoculated with one of the mandated Covid vaccines.

219. The Covid injections are not 'vaccines' in the traditional sense, but rather Virus-Based Gene Therapies according to the FDA's and CBER's own definition

---

[100] The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959, and further includes any governmental industry, business, or activity. 42 U.S.C.A. § 2000e

[101] The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof. 42 U.S.C.A. § 2000e

as outlined in their August 2015 publication entitled "Design and Analysis of Shedding Studies for Virus or Bacteria-Based Gene Therapy and Oncolytic Products.[102]" As defined and described by the FDA, CDC, Dr. Smith, Dr. McCullough, and even the manufacturers, these vaccines are unequivocally based upon injecting *genetic information* and the changing or manipulation of same.

220. According to the FDA: "Gene therapy products are all products that mediate their effects by transcription and/or translation of *transferred genetic material* and/or *by integrating into the host genome* and that are administered as nucleic acids, viruses, or genetically engineered microorganisms." *Id.*

221. According to the CDC: "Messenger RNA, or mRNA, *is genetic material* that tells your body how to make proteins[103]."

222. According to Dr. Smith (Ex. A):

    a) These 'vaccines' harness the power of basic biology to produce the pathogenic (disease causing) SARS-CoV spike proteins in those who are injected with it. *Messenger RNA (mRNA) is genetic material* that tells your body how to make proteins. The central dogma of molecular biology states that DNA makes RNA which makes proteins. *Through the genetic processes of transcription (DNA→RNA) and translation (RNA→protein), information from genes is used to make proteins.*

---

[102] https://www.fda.gov/media/89036/download
[103]https://www.cdc.gov/coronavirus/2019-ncov/downloads/vaccines/COVID-19-mRNA-infographic_G_508.pdf

b) Upon receiving the first injection of the EUA COVID mRNA, the foreign gene (mRNA) is translated into a SARS-CoV-2 spike protein by the host cells…*The COVID 'vaccines' introduce a gene that encodes for a protein not found in humans…The introduction of a foreign gene into a cell is known as gene delivery. Gene delivery is a necessary step in gene therapy to produce a biological outcome in human subjects.*

c) The spike protein of SARS-CoV-2 interacts with and binds to angiotensin converting enzyme 2 (ACE2), a key component of the renin-angiotensin system to initiate the viral infection cycle. Notably, *ACE2 is regulated by a gene which maps on the X chromosome.*

223. According to Dr. McCullough (Ex. F):

The Pfizer, Moderna, and JNJ vaccines are considered "genetic vaccines", or vaccines produced from gene therapy molecular platforms which according to US FDA regulatory guidance are classified as gene delivery therapies and should be under a 15-year regulatory cycle with annual visits for safety evaluation by the research sponsors. FDA. Food and Drug Administration. (Long Term Follow-up After Administration of Human Gene Therapy Products. Guidance for Industry. FDA-2018-D-2173. 2020. Accessed July 13, 2021, at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/long-term-follow-after-administration-human-gene-therapy-products.

224. According to the AGC Biologics (who partnered with Pfizer to use Plasmid DNA), Nature.com, and the NIH on Genome.gov:

AGC Biologics' Heidelberg Facility to Further Supply Plasmid DNA for COVID-19 Vaccine by David Self on 6/7/21 7:00 AM "The team at Heidelberg is enthusiastically embracing this important project with BioNTech," says AGC Biologics General Manager, Heidelberg, Dieter Kramer. "Every team member has a deep sense of pride in

our COVID-19 teams and we look forward to supporting BioNTech in the production of their mRNA-based COVID-19 vaccine with Plasmid DNA." http://www.agcbio.com/news/agc-biologics-heidelberg-facility-to-further-supply-plasmid-dna-for-covid-19-vaccine

Scientists have taken advantage of plasmids to use them as tools to clone, transfer, and manipulate genes. Plasmids that are used experimentally for these purposes are called vectors. Researchers can insert DNA fragments or genes into a plasmid vector, creating a so-called recombinant plasmid. This plasmid can be introduced into a bacterium by way of the process called transformation. Then, because bacteria divide rapidly, they can be used as factories to copy DNA fragments in large quantities. https://www.nature.com/scitable/definition/plasmid-plasmids-28/

The target spike protein gene is then synthetically manufactured and inserted into in a plasmid, or a small, circular piece of DNA. Plasmids are used in mRNA vaccine production because they are easy to replicate (copy) and reliably contain the target gene sequence. Once a sequence is selected, a new plasmid can be produced within a couple of weeks, allowing new mRNA vaccines to be tested and distributed rapidly. https://www.genome.gov/about-genomics/fact-sheets/COVID-19-mRNA-Vaccine-Production

225. According to Genome.gov: "mRNA acts as a cellular messenger. DNA, which is stored in a cell's nucleus, *encodes the genetic information* for making proteins. mRNA transfers a copy of this genetic information outside of the nucleus, to a cell's cytoplasm, where it is translated into amino acids by ribosomes and then folded into complete proteins."

226. According to Pfizer, Comirnaty contains messenger RNA (mRNA), *a kind of genetic material*[104]; [and] a piece of the SARS-CoV-2 virus's *genetic material* that instructs cells in the body to make the virus's distinctive "spike" protein… and trigger the immune system to learn to react defensively, producing an immune response against SARS-CoV-2[105].

227.  As such, those who have been injected with a Covid vaccine necessarily possess different genetic material or genetic information than those who do not. United's employment practices discriminate or provide unequal opportunities based on an employee's Covid vaccine status is violative of GINA 1(a)(1) & (a)(2).

228.  United unlawfully discriminated and violated GINA when they fired, terminated, or took adverse employment actions against Plaintiffs and other employees because they are not or refuse to be vaccinated. Similarly, United unlawfully discriminates and violates GINA when they fail or refuse to hire (or rehire for some Plaintiffs) employees because they are not vaccinated.

229.  United unlawfully discriminated and violated GINA when they afford better   opportunities   (i.e.,   routes,   schedules,   and   benefits)   and   greater

---

[104] https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine
[105] https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna

compensation to those who are vaccinated than to Plaintiffs and other employees who are not; and requiring those who are unvaccinated to wear masks at certain times, while permitting those who are vaccinated to go without wearing masks.

230. As a direct and proximate result of United's discriminatory practices, Plaintiffs and their colleagues have suffered harms and injury including compensatory damages, future pecuniary losses (where applicable), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

231. Further, as United has engaged in discriminatory practices with malice and/or with such reckless indifference to Plaintiffs' federally protected rights, punitive damages are warranted and expressly sought in accordance with and pursuant to 42 U.S.C §1981(b)(1).

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A. Declares United has violated Title II of the Genetic Information Non-Discrimination Act outlined in 42 U.S.C. § 2000ff-1(a)(1) and (a)(2);

B. Enjoins United and its agents, employees, successors, and all persons in active concert or participation with it, from engaging in discriminatory,

employment policies and practices described above which violate 42 U.S.C. §2000ff-1(a)(1) and (a)(2);

C. Requires United to modify its policies and procedures as necessarily required to bring its employment practices into compliance with 42 U.S.C. §2000ff-1(a)(1) and (a)(2) including vaccination, PCR, and mask practices;

D. Orders that those who were terminated or fired for not being vaccinated or refusing to be vaccinated be reinstated;

E. Orders those who were under duress or coerced into leaving or retirement be reinstated if they so choose;

F. Awards all appropriate monetary relief to Plaintiffs for any and all losses suffered as a result of the conduct alleged including backpay with interest; the value of any lost benefits with interest; compensatory damages for the emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses; and punitive damages where applicable;

G. Awards all reasonable attorneys' fees and costs available under Title II of GINA; including those provided in 42 U.S.C.A. § 1988(b) and (c) and;

H. Any further relief the Court deems just and proper.

## COUNT II
## 42 U.S.C.A. § 2000ff-1(b)
### *Violations of Title II of the Genetic Information*
### *Non-Discrimination Act ("GINA")*

232. Plaintiffs reallege and incorporate paragraphs 1 through 231 as if fully set for in this count.

233. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action. *See e.g.,* paragraphs 171-176; 213 above.

234. Pursuant to 42 U.S.C. § 2000ff-1(b), it is unlawful for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee.

235. As supported by Dr. Smith's affidavit (Ex. A) and NHGRI, PCR is used to amplify small segments of DNA which is genetic material. This is the same sort of test used for forensics, cloning, genome projects for mapping genes and DNA sequencing. Genetic test means a test that analyzes DNA, RNA or chromosomes for purposes of such as the prediction of disease or vertical transmission risks, or monitoring, diagnosis or prognosis. For genetic tests, the first step is extraction of genetic material from a human specimen either through blood, hair, or oral swab.

This is the exact same process used in the PCR test required and requested by United to detect the genetic material of SARS-COV-2.

236.  United has and continues to violate GINA when unlawfully requesting and requiring the genetic information from their employees by mandating they take the Polymerase Chain Reaction test ("PCR") without lawful justification. United violates GINA by requesting and requiring its employees to have their genetic information ("specimen") collected via nasopharyngeal or nasal swab (the swab scrapes cells from inside the nasal cavity which has the genetic material from the person for which the specimen is collected).

237.  United violates GINA when they unlawfully request their employee's vaccination status by asking Plaintiffs and their colleagues about their vaccination status as they are asking for their generic information given the vaccines are gene therapies in violation of GINA. United limits, segregates, discriminates or classifies applicants and current employees in a way that adversely affects the opportunities or status; and otherwise violative of federal law.

238.  As a direct and proximate cause or result of United's requirements and repeated request for PCR test and vaccination status, United employees have suffered harms and injury including compensatory damages, emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

239.  As United has engaged in discriminatory practices with malice and/or with reckless indifference to Plaintiffs' rights, punitive damages are warranted and expressly sought in accordance with and pursuant to 42 U.S.C §1981(b)(1).

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A. Declares United has violated Title II of the Genetic Information Non-Discrimination Act outlined in 42 U.S.C. § 2000ff-1(b);

B. Enjoins United and its agents, employees, successors, and all persons in active concert or participation with it, from engaging in any employment practices or policies which requests or requires genetic information or PCR test;

C. Orders that those employees who were terminated or fired for their failure to provide their genetic information or take a PCR test be reinstated if they so choose or at their discretion;

D. Orders that those employees who were under duress or coerced into leaving or retirement be reinstated if they desire;

E.  Awards all appropriate monetary relief to Plaintiffs for any and all losses suffered as a result of the discrimination alleged including backpay with interest; the value of any lost benefits with interest; compensatory damages for the emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses; and punitive damages where applicable;

F.  Awards all reasonable attorneys' fees and costs available under Title II of GINA; including those provided in 42 U.S.C.A. §1988(b) and (c) and;

G.  Any further relief the Court deems just and proper.

## COUNT III
## 42 U.S.C.A. § 12112(d)(4)
### *Prohibited Inquires and Requests to Medical Procedures and Examinations*

240. Plaintiffs reallege and incorporate paragraphs 1 through 239 as if set forth in this count.

241. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action. *See e.g.,* paragraphs 171-176; 213 above.

242. At all times material, United is an employer and Plaintiffs are employees covered under 42 U.S.C. §12111.

243. United has and continues to violates §12112(d)(4) by discriminating against Plaintiffs and their colleagues by requiring the PCR test which is considered a medical procedure or examination; and which has no bearing or is unnecessary to the performance of their jobs.

244.  United also violates §12112(d)(4) by making unlawful medical inquiries to Plaintiffs and their colleagues regarding their vaccination status; forcing them to carry proof of vaccination and display same when asked; and requiring the submission of their cards or vaccination status on their portal Flying Together; which has no bearing or unnecessary to the performance of their jobs.

245. As a direct and proximate result of United's actions, Plaintiffs have suffered harms and damages including compensatory damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.   Declares United has violated 42 U.S.C.A. § 12112(d)(4);

B.   Enjoins United and its agents, employees, successors, and all persons in active concert or participation with it, from engaging in any employment practices or policies which unlawfully requires its employees to submit to medical examinations or procedures; and/or make medical inquiries about its employees;

C.   Orders those who were terminated or fired for refusing to abide by or acquiesce to United's unlawful request or inquiries be reinstated;

D.   Orders that those who were under duress or coerced into leaving, quitting, or retirement due to United's practices be reinstated if they so choose;

E.   Awards all appropriate monetary relief to Plaintiffs for any and all losses suffered as a result of the discrimination alleged including: backpay with interest; the value of any lost benefits with interest; compensatory damages for the

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses; and punitive damages where applicable;

F.   All reasonable attorneys' fees and costs permitted by statute, including those as set forth in §§2000e-4-9, and all

G.   Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT IV
### Title VII, 42 U.S.C. § 2000e, et seq. ("Title VII")
### *Religious Discrimination*

246.  Plaintiffs reallege and incorporate paragraphs 1 through 245 as if fully set forth in this count.

247. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action.

248. At all relevant times, United has been a corporation continuously doing business throughout the country engaged in an industry affecting commerce within the meaning of Title VII and had at least fifteen (15) employees.

249.  United has mandated that all its employees be fully inoculated with a Covid vaccine or face termination. United's actions have left Plaintiffs with an unconscionable, lawless choice of either taking a Covid vaccine at the expense of their religious beliefs or losing their livelihoods.

250.  As outlined in the complaint, Plaintiffs have sincere, religious beliefs that preclude them from taking the Covid vaccines.

251. Plaintiffs, like many of their colleagues, informed United of those beliefs and requested (or wanted to request) religious accommodations from the vaccine

mandate. Plaintiffs provided United adequate notice of same and submitted religious exemption request in earnest.

252. United violated Title VII when they requested supporting and supplemental information to justify or validate sincere religious beliefs among employees participating in the United RAP program; and only did so for certain beliefs but not others. Per Title VII, United is not authorized to determine which religious beliefs are valid or invalid, and that arbitrary determinations are prohibited. Further, questioning the validity or sincerity of said religious beliefs are violations of Title VII.

253. United refused to engage in meaningful discussion or in the interactive process with Plaintiffs regarding their requests; or conveyed how their refusal to get inoculated would impact United. Rather, United responded to Plaintiffs with questions designed to deter Plaintiffs from exercising their sincere religious beliefs contrary to the purpose of asking for accommodations.

254. United's inquiries into Plaintiffs' and their employees' sincerely-held religious beliefs must genuinely serve United's best interest and business necessity; and must be no broader and no more intrusive than necessary which are not present here. The inquiries were in bad faith and made with no intention to

accommodate as reflected in Kirby's public statements and actions referenced throughout this complaint.

255. United failed to provide Plaintiffs with reasonable accommodations for their sincere, religious beliefs; and instead, discriminated against Plaintiffs with adverse, employment actions. United is effectively seeking Plaintiffs to renounce their religious beliefs for no legitimate reason; as nothing about Plaintiffs' beliefs negatively impact or is necessary or required for their employment.

256. Irrespective of the interactive process, United failed to provide Plaintiffs with reasonable accommodations for their religious beliefs, as indefinite, unpaid leave is not a reasonable accommodation. Instead, indefinite unpaid leave is an adverse employment action. United thereby discriminated against Plaintiffs because of their religious beliefs.

257. United's failure to provide religious accommodations has harmed and will continue to harm Plaintiffs.

258. United intentionally entered the accommodation request process in bad faith and subsequently forced many initial applicants to unconscionably deny their beliefs in order to continue to work at United. Serious psychological and

physiological scars may persist in perpetuity as a result of this malicious bad faith on the part of United.

259. By failing to engage in the interactive process or offer any reasonable accommodation, United's discriminatory actions were intentional and/or reckless and in violation of Title VII.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A. Declares that United's vaccine mandate is facially and/or as applied violative of Title VII of the Civil Rights Act of 1964 by discriminating against Plaintiffs on the basis of their religion;

B. Declares that United has violated Title VII by failing to engage in the interactive process by properly responding to the religious accommodation requests for United's vaccine mandate;

C. Declares United has violated Title VII by failing to provide reasonable accommodations for Plaintiffs' religious beliefs in regard to its vaccine mandate;

D. Declares that United has violated Title VII by retaliating against employees who are engaged in a protected activity by effectively terminating them but calling it something else;

E.  Orders that those employees who were unlawfully terminated, forced to quit, or coerced into retirement be reinstated if they choose;

F.  Issues a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining United from terminating or placing on indefinite, unpaid leave to any employee who has sought a religious basis for seeking an accommodation, and enjoin United from denying arbitrary, untimely requests for a religious exemption;

G.  Awards Plaintiffs damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages;

H.  Awards reasonable attorneys' fees and costs permitted by statute and;

I.  Grants any other relief that the Court deems just, proper, and equitable.

## COUNT V
### U.S.C. §§2201-02
### *Declaratory Judgment for Violation of Separation of Powers*

260. Plaintiffs reallege and incorporate paragraphs 1-259 above as though fully set forth in this count.

261. Pursuant to and in accordance with 28 U.S.C. §§2201-02, and Rule 57, Federal Rule of Civil Procedure, Plaintiffs seeks declaratory and injunctive relief to resolve their actual, active controversies regarding the private-employer mandates and federal mandate looming to be imposed through OSHA. Irreparable harm will result as the mandate is slated to be imposed this month; and every day Plaintiffs' and other employees' harms grow as fear of termination lingers as does the unlawfully coerced inoculation.

262. Private vaccine mandates and Federal mandates imposed by United and like the one proposed by the Biden administration are being imposed by Plaintiffs' employer and enforced through administrative fiat, are in many ways similar to the CDC's eviction moratorium that the Supreme Court recently struck down as exceeding the authority granted to the CDC by enabling statute. Where, as in the CDC eviction moratorium and the proposed OSHA Mandate, "an agency claims to discover in a long-extant statute an unheralded power to regulate a significant

portion of the economy," the Court must "greet its announcement with a measure of skepticism." *See generally Alabama Realtors I*, 2021 WL 1779282, *8. Further, Congress must "speak clearly when authorizing an agency to exercise vast powers of economic and political significance." *Id*., 2021 WL 3783142, at *3.

263. Congress has not enacted any legislation authorizing the Federal Mandate, or granted any agency the authority to enact a federal mandate, nor is there any indication that it intends to do so. This Court must therefore reject the efforts of Defendants to bypass Congress, the States, and the Constitution, to enact by administrative fiat an unconstitutional vaccine mandate.

264. Moreover, the preservation of public health is primarily the responsibility of state and local governments. Authority to enact laws protect public health such as those relating to vaccine mandates and exemptions derive from the states' general police powers reserved under the United States Constitution under the Tenth Amendment which states all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It is the chief source of authority the preservation of public health is primarily the responsibility *of state and local governments* – a tenet of the Constitution dating back more than 130

years establishes that states could exercise the power to protect the "public health, safety, and morals." *Mugler v. Kansas*, 123 U.S. 623, 661 (1887). Indeed, the Constitution under provisions including the Tenth and Fourteenth Amendment principally entrusts "the safety and the health of the people" to the "politically accountable officials of the states to guard and protect" *Jacobson* v. *Massachusetts*, 197 U.S. 11, 38 (1905). While the federal government has limited jurisdiction over public health matters under the Public Health Service Act (42 U.S.C. Ch. 6A), there are currently no mandatory vaccination programs authorized at the federal level nor any regulation germane to the implementation of mandated vaccines during a public health emergency. Assuming arguendo there was, relevant here, Congress "**cannot delegate regulatory authority to a private entity**… Congress, vested with enumerated legislative Powers, Art. I, § 1, cannot delegate its "exclusively legislative" authority at all. *Department of Transp. v. Association of American Railroads*, 575 U.S. 43, 61 (2015) (citations omitted).

265.The principle that Congress cannot delegate away its vested powers exists to protect liberty; and our Constitution, by careful design, prescribes a process for making law, and within that process there are accountability checkpoints. *Id.* citing *INS v. Chadha*, 462 U.S. 919, 959 (1983). If Congress could give its power away to

an entity that is not constrained by those checkpoints, the whole purpose of the Constitution's stubborn, deliberative process could be eclipsed. *"When it comes to private entities, however, there is not even a fig leaf of constitutional justification*…By any measure, handing off regulatory power to a private entity is "legislative delegation in its most obnoxious form." *Id.* at 62 quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Thus, the authority to enact laws protecting public health like mandated Covid vaccines and PCR test *is the responsibility of and belongs to the state and local governments* – United/Kirby cannot supplant a states' duties in maintaining and regulating the health and safety of its citizens. The evidence presented herein proves that President Biden is unlawfully delegating an authority than he himself does not possess to a private employer, for executive actions consistent with his desires.  Put another way: President Biden is trying to give Kirby something he does not have to give, rendering the actions emanating from void - they are repugnant to the Constitution.

266. Contrary to Kirby's belief, President Biden does not have the authority or power to delegate him or any other private entity powers specifically enumerated to another branch or in this case, the general police powers reserved for the States under the Tenth Amendment. *See generally Field v. Clark*, 143 U.S. 649,

692 (1892); *see also Highland Farms Dairy v. Agnew*, 300 U.S. 608, 612 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself."); *Cohens v. State of Virginia*, 19 U.S. 264, 313, 5 L. Ed. 257 (1821) ("All the powers not granted are retained by the States"). For instance, Florida recently enacted HB 833 – Unlawful Use of DNA[106] (HB 833) which among other things, prohibits the collection and disclosure of DNA analysis results without the persons' expressed, authorized consent. United, therefore, cannot break or usurp Florida's laws with their mandatory Covid vaccines and required PCR testing when Florida is exercising its general police powers entrusted to it by the Constitution.

267. Here, however, the unprecedented Federal mandates and PCR test have been or will be enacted solely through administrative action, without authorization from Congress and over the strong objections from dozens of State governors which is historically where these issues always belonged. *Marbury v. Madison*, 5 U.S. 137, 138, 2 L. Ed. 60 (1803) ("An act of congress repugnant to the constitution cannot become a law… The courts of the United States are bound to take notice of the constitution.").

---

[106] https://flsenate.gov/Session/Bill/2021/833/BillText/er/PDF

WHEREFORE, Plaintiffs respectfully ask this Court to:

A. Issue a declaratory judgment that the Federal Mandate is unlawful and in violation federal and international laws governing informed consent;

B. Enjoin implementation of the Federal Mandate by any Federal government entity, agency, or private sector surrogate and to stay the effective date thereof;

C. Declare unlawful, vacate and remand the FDA Comirnaty Approval to the FDA for reconsideration consistent with appliable laws and regulations, and any additional guidance this Court may provide, and stay the effective date thereof;

D. Issue a declaratory judgment that the FDA may not simultaneously treat the same product as an EUA product and licensed product for the same indication and use, and that the licensed Comirnaty Vaccine and the EUA BioNTech Vaccine can be used "interchangeably" or "substituted" for each other is unlawful;

E. Issue a declaratory judgment the Federal Mandate infringes upon Plaintiffs' constitutional rights to refuse unwanted, unneeded, and unproven medical treatment, imposes unconstitutional conditions, and violates equal protection;

F. Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT VI
### U.S.C. §§2201-02
*Declaratory Judgmnet EUA Mandated Covid-19 Vaccines and PCR Test Violate Rights of Informed Consent*

268. Plaintiffs reallege and incorproate paragraphs 1 through 267 above as fully set forth in this count.

269. United has mandated that all its employees must take an experimental, EUA Covid-19 vaccine to keep their jobs and Plaintiffs do not desire to take it.

270. Likewise, Plaintiffs have been required to take EUA PCR Test against their will; and has suggested that regular, PCR testing is a likely requirement in the future for those who are unvaccinated and with the new variants arising.

271. Pursuant to and in accordance with 28 U.S.C. §§2201-02, and Rule 57, Federal Rule of Civil Procedure, Plaintiffs seeks declaratory and injunctive relief to resolve this actual, active controversy between employees and employers regarding whether the mandated EUA Vaccines and PCR test violate Federal law.

272. On August 06, 2021, United announced a Covid vaccine mandate for its employees which directly impacts and effects Plaintiffs and their colleagues. United is requiring that all its employees be vaccinated no later than five weeks after FDA vaccine approval, or five weeks after September 20, 2021, whichever comes first. Employees not vaccinated by October 25, 2021, will be terminated.

153

273. Section 564 directs the FDA to impose conditions "designed to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks" which "only has legal effect on a person who carries out an activity for which an authorization…is issued." [107] *Id*.

274. Similarly, The Nuremberg Code, Universal Declaration on Bioethics and Human Rights, and Helsinki Accords outlined further below have provisions which state that those persons subjected to medical experiments or treatment must be provided informed consent.

275.  In light of the statutory language[108], the first question to be determined is whether United is a person authorized to administer an EUA product which

---

[107] The statute does not appear to define what it means to "carry out an activity" under an EUA. Two things, however, are clear. First, not all employers "carry out an activity" under an EUA, and thus Section 564 does not restrict all employers from mandating receipt of an EUA product; section 564 restricts only those employers carrying out an EUA activity. Second, there is no question that actual administration of an EUA vaccine constitutes carrying out an EUA activity. Thus, an employer administering an EUA vaccine to employees, like the COVID-19 vaccine, cannot also mandate that employees receive an EUA vaccine.

[108] "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Boisdore 's Heirs*, 8 How. 113, 122, 12 L.Ed. 1009 (1849) (Taney, C.J.,); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956); *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962); *Dandridge v. Williams*, 397 U.S. 471, 517 (1970).

Plaintiffs contend United is not. Assuming arguendo United was a person permitted to carry out an EUA activity, the central, more pertinent question is can the administration of an EUA Covid-vaccine or PCR test be made mandatory? They unequivocally cannot.

276. The statute is clear that the Secretary of HHS (and now FDA) must ensure that United, as one who is carrying out an activity under an EUA, informs its employees like Plaintiffs receiving an EUA vaccine "the option to accept or refuse administration of the product." This statutory language evinces congressional intent that those carrying out an activity under an EUA refrain from making receipt of EUA products mandatory. Nothing in the statutory language refers to any option – it refers to "the" option to accept or refuse, indicating that Congress intended to create and preserve the option to reject EUA products-rather than merely protecting an option should those carrying out an EUA activity later choose to offer one. Moreover, Section 564 requires that individuals receiving an EUA product be informed of "the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available."

277. Here, United's all-or-nothing, vaccine mandate does not give Plaintiffs and their colleagues an option to refuse which is required by law. Likewise, United

does not inform Plaintiffs and their colleagues of the consequences of refusing administration of the product, nor the alternatives to the vaccines (i.e., regimens of ivermectin, zinc, and hydroxychloroquine) as the law requires. Therefore, United's mandate and all employer-mandates across the county whereby employees (1) are not provided an option to refuse, (2) the consequences of refusing administration of the product, and (3) alternatives to the product that are available are unlawful and unconstitutional.

278. Plaintiffs' assertions that United's mandate is unlawful and unconstitutional is buttressed by corroborating legislation which supports that United who carries out an activity under an EUA cannot make the administration of the Covid vaccines mandatory; including the penalization of potential recipients like Plaintiffs if they choose to do so like United is doing here. In the legislation first creating Section 564, Congress also added the following provision to title 10 U.S.C. § 1107a(a)(l) of the United States Code:

> In the case of the administration of [an EUA] product ... to members of the armed forces, the condition described in section 564(e)(l)(A)(ii)(III) ... and required under paragraph (l)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

Thus, even with respect to the military where administration of EUA products where it could* be deemed necessary and where it was required in the past, Congress granted members an option to accept or refuse them which can only be waived by the President and only where inconsistent with national security. In short: United, Kirby, and all other employers do not have the authority to mandate vaccines without allowing their employees the option to refuse. This is a non-delegable duty; and a health and safety issues reserved for the states.

279. Indeed, as FDA explained on its website, it must "ensure that recipients of the vaccine under an EUA are informed, to the extent practicable given the applicable circumstances…that they have the option to accept or refuse the vaccine.[109]" And in October 2020, Dr. Amanda Cohn, Senior Advisor for Vaccines at the Centers for Disease Control and Prevention ("CDC"), "reminded everyone that under an EUA, vaccines are not allowed to be mandatory. Therefore, early in the vaccination phase individuals will have to be consented and cannot be mandated to be vaccinated.[110]" She reiterated that "the federal government would not be mandating use of these vaccines," and "in the setting of an EUA, patients

---

[109] https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained (last visited October 3, 2021).
[110] https ://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf.

and individuals will have the right to refuse the vaccine." *FDA Center for Biologics Evaluation and Research 161st Vaccines and Related Biological Products Advisory Committee Meeting*, Open Session, at 156: 7-8, 13-15 (Oct. 22, 2020).

WHEREFORE, Plaintiffs respectfully ask the Court:

A. Enter a declaratory judgment United's vaccine mandate is unlawful and unconstitutional as Plaintiffs and their colleagues must be afforded an opportunity to refuse and be made aware of other alternatives to the product that are available; and enjoin United from continuing this practice;

B. Declare United's current and intended EUA PCR testing unlawful and unconstitutional as Plaintiffs and their colleagues must be afforded an opportunity to refuse and made aware of other alternatives to the product that are available; and enjoin United from continuing this practice;

C. Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may find just and proper under the circumstances.

## COUNT VII

### U.S.C. §§2201-02

### *United's Mask Policies from Covid-19 are Violative of Equal Protection under Fourteenth Amendment, Rights to Privacy, Fundamental Human Rights*

280. Plaintiffs restate and incorporate paragraphs 1 through 279 as if fully set forth in this count.

281. Plaintiffs are persons who are forced to wear mask unjustifiably and they do not want to do so. The masks are unrelated and unnecessary for the job; and does not provide the protection United proclaims or remedies the issue they allegedly seek to resolve. Untied is forcing Plaintiffs and their colleagues to wear these masks as they are penal in nature.

282. Pursuant to and in accordance with 28 U.S.C. §§2201-02, and Rule 57, Federal Rule of Civil Procedure, Plaintiffs seeks declaratory and injunctive relief to resolve this actual, active controversy between employees and employers regarding whether the discriminatory mask policies violate the Constitution, as well as, violative of fundamental humans rights.

283. On May 05, 2020, United imposed a mask mandate policy expressly stating that "unvaccinated individuals or employees without a digital Vaccine Pass through Flying Together: Must always wear a face mask except when actively eating or drinking."

284. In a directive sent to Plaintiffs and other United employees, it explicitly describes discriminatory, mask-wearing policies for the unvaccinated: "You may remove your mask only when you are actively eating or drinking and you must put your mask back on in between bites and sips. To the extent possible, please only eat or drink outdoors or in rooms alone or when socially distanced from others. Failure to comply with this mask requirement is subject to disciplinary action as outlined in the <u>mask policy</u> (hyperlink) in the Working Together Guidelines." In respect to those working areas including hangars, United required that in all outdoor areas or when working in a hangar, masks/face coverings are not required. Those employees who are not fully vaccinated and cannot socially distance from others are encouraged to wear a mask or face covering.

285. The effectiveness of masks in stopping the spread of SARS-COV-2 and/or COVID-19 is unsupported by scientific data; and studies have shown that wearing a mask for extended periods of time can actually be injurious to overall health.

286. Plaintiffs' and other United employees' privacy rights are also being infringed as a direct and proximate result of United's discriminatory mask policies. Plaintiffs and their colleagues are forced to disclose their private, medical decisions and information by literally wearing it on their face as United has

mandated that those who are unvaccinated must wear a mask whereas those who are vaccinated do not. This demonstrates the unequal treatment between the vaccinated vs. the unvaccinated; but also serves to harass unvaccinated employees, segregate one group of people from another, publicly humiliate unvaccinated employees. Presently, those who are unvaccinated are not even permitted to take their masks off outside so long as they are on United property; which means these employees cannot even step outside to remove their mask to get fresh air. Forcing employees to wear these N95 masks for 10+ hour shifts cause among other things: nausea, light headedness, brain fog, and severe headaches. Since wearing masks do not serve a necessary business interest or any purpose for that matter, it can be reasonably concluded that these United policies' sole purposes are to discriminate, harass, and coerce employees into compliance.

287. In light of all the studies showing the strength of natural immunity, anti-bodies, and the ineffectiveness of vaccines; as well as, the futility of masks as it relates the prevention and transmission of Covid, the only reason United is imposing the latest mask mandate above is penal and malicious in nature.

288. Coincidingly, as Plaintiffs have the right to control the nature and extent of information released about them under the United violates Plaintiffs

fundamental right to privacy under the Fourth, Fifth, Ninth, and Fourteenth Amendment of the U.S. Constitution when they make only those who are unvaccinated wear mask. Plaintiffs have God given, inherent rights to enjoy life uninfringed which includes breathing freely, eating and drinking, and taking a break from work with their colleagues without having to wear a mask.

WHEREFORE, Plaintiffs respectfully ask the Court to:

A. Enter a declaratory judgment that United's mask practices are violative of Plaintiffs rights to equal protection, right to privacy, and fundamental human rights (*see* Counts XIII and XIV below), and enjoin United from continuing same;

B. Order those employees who were unlawfully terminated, forced to quit, or coerced into retirement be reinstated if they choose; and award Plaintiffs damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, and any other damages applicable if proper;

C. Issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining United from terminating or placing on indefinite, unpaid leave to any employee who has been discriminated against for failing to adhere to United's mask policies;

D. Award Plaintiffs damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages;

E. Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may deem just and proper under the circumstances.

## COUNT VIII

### U.S.C. §§2201-02

*Declaratory Judgment Vaccine Passports are Unconstitutional as Violative of the Commerce Clause and Equal Protection*

289. Plaintiffs restate and incorporate paragraphs 1 through 288 as if fully set forth in this count.

290. United requires Plaintiffs and their colleagues to carry proof of vaccination or vaccine passports and they do not want to do it.

291. Pursuant to and in accordance with 28 U.S.C. §§2201-02, and Rule 57, Federal Rule of Civil Procedure, Plaintiffs seek a declaratory judgment that these vaccine passports are unconstitutional and violative of the Commerce Clause, Right to Privacy, and Equal Protection, and seeks injunctive relief to enjoin these ongoing practices. Irreparable harm will result as Plaintiffs will be terminated if they do not provide proof of vaccination within 2 weeks of this filing; and will continue to be precluded from opportunities if relief is not granted.

292. The Commerce Clause provides that "Congress shall have Power... to regulate Commerce with foreign Nations, and among the several States..." U.S. Const., Art. I, § 8, cl. 3. While the language speaks only of Congress' power over commerce, the Supreme Court "has recognized that it also limits the power of the States to erect barriers against interstate trade." *Lewis v. BT Investment Managers,*

*Inc.*, 447 U.S. 27, 35 (1980). The Commerce Clause purpose was to prevent trade

barriers and to provide consumers' confidence that they may look to the market

from every producing area and be protected from exploitation. *See H.P. Hood &*

*Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949). In implementing and interpreting

the Commerce Clause, the Supreme Court:

> Has adhered strictly to the principle that the right to engage
> in interstate commerce is not the gift of a state, and that a state
> cannot regulate or restrain it. It flows from this principle that
> the negative or dormant implication of the Commerce Clause
> prohibits regulation that discriminates against or unduly
> burdens interstate commerce and thereby impedes free
> private trade in the national marketplace.

*Selevan v. New York Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (alteration added,

citations quotations omitted).

293.  United's vaccine passports are violative of the commerce clause because

states like Florida and Texas where many Plaintiffs work and reside are harmed

in protecting their reputation as a state which provides equal protection. *Pioneer*

*Mil. Lending, Inc. v. Manning*, 2 F.3d 280, 284 (8th Cir. 1993). For instance, on April

02, 2021, Florida Governor Ron DeSantis signed Executive Order 21-81 regarding

the prohibition of businesses from requiring that patrons and customers show

proof of vaccination to enter or receive service from a business; and on October 11,

2021, Governor Greg Abbott, used his powers and issued Executive Order No. GA-40 relating to the prohibition of vaccine mandates. Plaintiffs fly in and out of both of these states with many residing in each; and United's vaccine passport practices cannot conflict with these state laws and executive orders of the like which negatively impact commerce. This would also innately provide a competitive advantage and/or disadvantage for those states and employees which do not have proof of vaccination or vaccine passports. *Pioneer Mil. Lending* at 284.

294. Also, Plaintiffs are treated differently from those who are unvaccinated and/or those who carry proof of vaccination or vaccine passports. Plaintiffs, unlike similarly situated others, are forced to show proof of vaccination in order to have certain privileges, opportunities, schedules/trips (which impact their pay scale and future earning capacity), and are prevented from having certain freedoms or rights than those who are vaccinated have in the workplace; which is violative of their rights to equal protection of the law under the Fourteenth Amendment.

WHEREFORE, Plaintiffs respectfully ask the Court to:

A. Enter a declaratory judgment that United's vaccine passports, proof of vaccination, and/or maintaining any vaccination database are violative of the

Constitution including the Commerce Clause and equal protection, and enjoin United from continuing these practices;

B.  Order that those employees who were unlawfully terminated, forced to quit, or coerced into retirement be reinstated if they choose;

C.  Issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction, enjoining United from terminating or placing on indefinite, unpaid leave to any employee who has been discriminated against for failing to produce proof of vaccination;

D.  Award Plaintiffs all damages if and where proper including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, and compensatory damages;

E.  Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs, attorneys' fees, and any other relief this Court may deem just and proper under the circumstances.

## COUNT IX
### 42 U.S.C. § 1983
### *Violation of Right to Privacy and/or Conspiracy to Violate Right to Privacy*

295. Plaintiffs restate and incorporate paragraphs 1 through 294 above as if fully set forth in this count.

296. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action.

297. At all times material, Plaintiffs are citizens of the United States.

298. At all times material, United was a State Actor and a person acting under the color of state law for the reasons provided throughout this complaint. That is, United has taken decisive, employment actions and made decisions (i.e., mandated vaccines, implemented incentives/disincentives, vaccine passports, and discriminatory PCR testing and mask policies) that have caused Plaintiffs' harms where the State is sufficiently involved or "so impregnated with a governmental character[111]" that it can be regarded as government action. The government is compelling United's actions; and whether forced upon by incentive or threat, United as a strictly private entity has ceased to exist and become a State Actor or acting under the color of state law as evidenced herein. *See e.g.* paragraphs 2-5.

---

[111] *Evans v. Newton*, 382 U.S. 296, 86 S. Ct. 486 (1966).

299. United is also acting under the color of state law as they have conspired[112] with government officials to leverage Plaintiffs' Constitutional right to privacy against them in effort to achieve universal inoculation and acquire Plaintiffs personal, genetic information. United and the federal government have acted in lockstep and set in motion a series of acts by which both entities knew would inflict constitutional harms. Through private and public meetings, executive orders, and unlawful coercion and duress, United has acted in concert with the federal government for nefarious purposes including greater power and control, illicit favors, undue harm, and pecuniary or financial gain at the expense of Plaintiffs, their colleagues, and the American people.

300. While the U.S. Constitution does not explicitly mention any right of privacy, the Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy do exist under the Constitution including the First Amendment, in the Fourth and Fifth Amendments, in the penumbras of the Bill of Rights, in the Ninth Amendment, or in the concept of

---

[112] For similar reasons provided in *Tower v. Glover*, 467 U.S. 914, 920 (1984); *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980); *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010); *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002); *DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000); *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1231 (9th Cir. 1996) (per curiam); *Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996); *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983).

liberty guaranteed by the first section of the Fourteenth Amendment. *See Roe v. Wade*, 410 U.S. 113 (1973); *Cruzan ex rel. Cruzan v. Dir. Mo. Dep 't of Health*, 497 U.S. 261, 269 (1990) ("The Court today reaffirms the long-recognized rights of privacy and bodily integrity."). These lines of cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty and included in this Constitutional, unalienable right and guarantee is that of personal privacy.

301. Applicable here, Plaintiffs fundamental right to privacy includes the reasonable expectation to not to be coerced or put under duress by United or any other governmental entity to inject an unwanted, experimental, foreign gene therapy or EUA vaccine into their body.

302. This privacy right also includes Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent their information is shared and released. As a means of coercion through ostracization and humiliation, United violates Plaintiffs' and their colleagues' privacy rights when they unlawfully broadcast their private information on internal memos:



public television



and even to employees' Unions as evidence by the ALPA MEC and SVP of flight

operations stating that the LOA 21-02 resulted in more than 90% of pilots being

fully vaccinated.

303. United violates Plaintiffs right to privacy when without legal

justification, uses coercion, threats, and duress to require Plaintiffs to disclose their

vaccination status; genetic information[113]; and other personal intimate medical

---

[113] The genetic information or data obtained from United employees inherently necessitates an invasion into their bodies to acquire this information.

171

history including whether they have received a Covid vaccine and those vaccines Plaintiffs have received in the past; and using unopened postcards as "reminders" to those employees who are unvaccinated that they need to be.

304. Plaintiffs' and other United employees' privacy rights are also being infringed as a direct and proximate result of United's discriminatory mask policies. Plaintiffs and their colleagues are forced to disclose their private, medical decisions and information by literally wearing it on their face as United has mandated that those who are unvaccinated must wear a mask whereas those who are vaccinated do not.

305. Coincidingly, as Plaintiffs have the right to control the nature and extent of information released about them, United violates Plaintiffs fundamental right to privacy when they spread employees' intimate, medical information on company-wide emails; convey this information to the public on interviews via television, internet, or magazines; and forcing its employees to wear their medical information on their face as described above.

306. Furthermore, as the Supreme Court has held "the right of personal privacy includes the abortion decision," by logical and natural extension, such personal and private decisions must also include the right to choose whether to

take one of the Covid vaccines. Put in context: it would be beyond the pale for United to suggest that a woman must have an abortion to maintain employment; likewise here, United cannot force its employees to take an EUA vaccine – which data shows has and continues to causes death and serious bodily injury.

307.  Similarly, forcing Plaintiffs and their colleagues to repeatedly take PCR, genetic test because they are not vaccinated and disclose this information directly to United and their vaccination status on their portal is violative of United's employees right to privacy.

308.  United's mandated vaccines and PCR testing; along with their mask policies only for the unvaxed to induce physical harm and psychological harms violate Plaintiffs fundamental right to privacy. United's actions alone and those acting in concert with the government constitute willful, purposeful, and an otherwise intentionally reckless violation of Plaintiffs' rights to privacy.

309.  As a direct and proximate result of United's policies, practices, regulations, and conduct, Plaintiffs have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, loss of promotion and other career opportunities,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount to be determined at trial; and have violated their constitutional right to privacy.

310.  The conduct of United as described represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that was malicious and purposeful such that punitive damages are warranted and demanded against United according to proof.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.  Declares United's vaccination mandate unconstitutional and violative of Plaintiffs' right to privacy, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require Covid-19 inoculation as a condition of employment;

B.  Declares United's mask policies are unconstitutional and violate employees' constitutionally protected right to privacy, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin

United from continuing to require the wearing of mask or requiring that only those who are not inoculated wear mask;

C.   Declares United's requirement to take a PCR test is unconstitutional and violate Plaintiffs' rights of privacy, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require that its employees take PCR test or only the unvaccinated;

D.   Enjoins United from disseminating personal, intimate, or private medical information through any medium whether to large public audiences or within the company; and require United protects this confidential information in accordance with all applicable laws relevant to same;

E.   Enjoins United from requiring that unvaccinated employees wear some form of insignia that identifies status of any type;

F.   Award Plaintiffs all damages afford by law, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages;

G.   Pursuant to 42 U.S.C. § 1988 and related statutes, award Plaintiffs' reasonable fees and costs; and any other relief this Court deems just, proper, and equitable under the circumstances.

## COUNT X
### 42 U.S.C. § 1983
### *Denial of Equal Protection and/or Conspiracy to Violate Equal Protection*

311. Plaintiffs restate and incorporate paragraphs 1 through 310 above as if fully set forth in this count.

312. All conditions precedent or antecedent have been satisfied or waived; or are unnecessary or not required prior to bringing this action.

313. At all times material, Plaintiffs were citizens of the United States.

314. At all times material, United was a state actor and a person acting under the color of state law for the reasons provided throughout this complaint. United is also acting under the color of law as they have conspired with federal government officials and agencies to leverage Plaintiffs' Constitutional right of equal protection before the law by erroneously discriminating against Plaintiffs through shame, ostracization, and discomfort in effort to achieve a common objective of universal inoculation and acquire Plaintiffs personal, genetic information. *See e.g.,* paragraphs 2 – 5; 171 – 176.

315. United and the federal government have acted in lockstep and set in motion a series of acts by which both entities knew would inflict such constitutional harms. This common objective or meeting of the minds was

176

achieved through private and public meetings, executive orders, and unlawful

coercion and duress. United has acted in concert with the government for

nefarious purposes including greater power and control, illicit favors, undue

harm, and pecuniary or financial gain at the expense of Plaintiffs, their colleagues,

and the American people.

316.  The Fourteenth Amendment, Section 1, to the U.S. Const. provides:

> No state shall make or enforce any law which shall abridge
> the privileges or immunities of citizens of the United States;
> nor shall any state deprive any person of life, liberty, or
> property, without due process of law; nor deny to any person
> within its jurisdiction the equal protection of the laws.

317. Prior to the August 06, 2021, mandate, those vaccinated were treated

superior to and provided more preferential treatment than those who were not

which included increase in pay, scheduling, benefits, and privileges including not

having to wear a mask.

318.  United knowingly and willfully discriminated against those who are

unvaccinated; and treated persons who are vaccinated different from those who

are not without lawful justification.

319. Allowing similarly situated Plaintiffs (those who are vaccinated) to retain

their jobs, be paid more, have greater privileges/schedules, and not be required to

wear mask, is a facial deprivation of equal protection and "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *In re Abbott*, 2.956 F.3d at 705.

320. While the mandate appears natural on its face, in practice or how its implemented and promulgated deny Plaintiffs and other United employees equal protection under the law. For instance, the mandates deny Plaintiffs and all other United employees who have closely-held religious beliefs that prevent them from being inoculated in good conscience, good faith, or good health. Because of United's practices, Plaintiffs and other employees who are religious have and continue to suffer significant stress and psychological harm caused by the impending threats to their employment which afford them their livelihoods that feed, house, and clothe their families.

321. Additionally, Plaintiffs and others who have natural immunity or are unvaccinated have been unlawfully excluded and will be terminated from their jobs at United if they do not receive one of the Covid vaccinations which is unjustified since those with natural immunity have at least (and many studies show better) the same level of immunity to SARS-COV-2 as the fully vaccinated.

Similarly, those who are unvaccinated are forced to wear mask and are required to undergo PCR testing when those who are vaccinated do not.

322. As mandated vaccinations, masks, and repeated PCR testing (collectively "employment practices") are substantial burdens; and as referenced throughout this complaint, these employment practices do not have any significant health or safety benefit; thus, there is no legitimate interest promoted. To the contrary, the Covid vaccines can cause death and permanent injury; and evidence suggests the vaccines are actually prolonging the pandemic and making it worse. Further, natural immunity is more effective and last longer lasting than a vaccine; and SARS-COV-2 which leads to Covid is no different.

323. As United's employment practices treat those fully vaccinated different from Plaintiffs who are similarly situated, United's actions are violative of the Equal Protection Clause and no legitimate basis for the difference in treatment.

324. United's actions constitute willful, purposeful, or otherwise intentionally reckless violation of Plaintiffs' denial to equal protection. As a direct and proximate result of United's policies, practices, regulations, and conduct, Plaintiffs have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they

and their dependents rely, loss of access to medically necessary care, loss of promotion and other career opportunities, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount to be determined at trial; and have violated their constitutional right to equal protection.

325. The conduct of United as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to equal protection; and their actions shock the conscience of the average person and constitute an abuse of power that was malicious and purposeful such that punitive damages are warranted and demanded against United.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.  Issues a declaratory judgment that the vaccine mandates, mask mandates, and PCR mandates violate the equal protection component of the Fifth Amendment to the U.S. Constitution and/or unlawful per-se;

B.  Declares that United's vaccination mandate is unconstitutional or violative of employees' right to equal protection, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require inoculation to maintain employment;

C.   Declares United's mask policies are unconstitutional and violate employees' constitutionally protected right to equal protection, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require only those who are not inoculated wear mask;

D.   Declares that United's requirements to take PCR tests are unconstitutional and violate employees' constitutionally protected right of equal protection, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require that its employees take PCR test;

E.   Award Plaintiffs all damages afford by law, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, actual damages, punitive damages, and compensatory damages;

F.   Pursuant to 42 U.S.C. § 1988 and related statutes, award Plaintiff reasonable fees and costs and;

G.   Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT XI
### 42 U.S.C. § 1983
*Violation of Substantive Due Process and/or Conspiracy to Violate Substantive Due Process*

326. Plaintiffs reallege and incorporate paragraphs 1-325 above as though fully set forth in this count.

327. All conditions precedent or antecedent have been satisfied, waived, or are unnecessary/not required to bring this action.

328. At all times material, Plaintiffs are citizens of the United States.

329. At all times material, United is a person acting under the color of state law for the reasons provided throughout this complaint. *See e.g.,* paragraphs 2 – 5; 171 – 176. United is also acting under the color of state law as they have conspired with government officials in the federal government to leverage Plaintiffs' Constitutional right of substantive due process against them in effort to achieve universal inoculation and acquire Plaintiffs personal, genetic information. United and the federal government have acted in lockstep and set in motion a series of acts by which both entities knew would inflict constitutional harms. Through private and public meetings, executive orders, and unlawful coercion and duress, United has acted in concert with the government for nefarious purposes including

greater power and control, illicit favors, undue harm, and pecuniary or financial gain at the expense of Plaintiffs, their colleagues, and the American people.

330. The Fourteenth Amendment's due process clause provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental, human rights implicit in structured liberty.

331. Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent – the latter of which is also statutorily provided for in 21 U.S.C. § 360bbb-3 et seq; *See Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) ("The due process clause of the Fourteenth Amendment substantively protects a person's rights to be free from unjustified intrusions to the body"). This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.

332. The United States Constitution guarantees that state governments shall not "deprive any person of life, liberty, or property without due process of law," and precludes United from infringing certain fundamental liberty interests no

matter the process provided, unless the infringement is narrowly tailored to serve a compelling state interest.

333.  Here, United's actions are those of a state actor who lack a compelling interest to impede or infringe upon on Plaintiffs' fundamental rights and fails under any level of scrutiny. Plaintiffs have constitutional and fundamental liberty interests in bodily integrity and informed consent, and the substantive due process rights to liberty and to life; and a constitutional and fundamental liberty interest in not being compelled to provide private medical information to United which is also being infringed by United's employment practices.

334.  United cannot show that the mandate serves a legitimate, compelling state interest. While courts have found a compelling state interest to control the spread of infection from person-to-person can trump certain constitutional rights in some instances[114], this is inapplicable here since these vaccines/gene therapies and masks do not prevent Plaintiffs from dying, being infected, or transmitting the virus SARS-COV-2 or the disease Covid.

335.  As supported by Dr. Smith's affidavit, the majority of Americans are not at a meaningful risk for severe disease. Statistically speaking, healthy adults under

---

[114] *See e.g., Whitlow v. Cal. Dep't of Educ.*, 203 F. Supp. 3d 1079, 1089 (S.D. Cal. 2016)

age of 40 are at 0% risk for hospitalization or death from SARS-COV-2. Moreover, the Covid vaccines cannot prevent infection or transmission; or were not designed to induce sterilizing immunity. Notably too, the vaccinated and unvaccinated are equally capable of being infected and transmitting the virus. The solution must be proportionate to the actual (not perceived) risk posed by the disease. The vaccine mandates are not reasonable for COVID.

336. The Vaccine Mandates do not serve the compelling governmental interest of preserving public health because vaccination has been, and continues to be, a direct and proximate cause of death, permanent injury, life-threatening injury, and other losses of life or damages; and the Covid vaccines themselves are responsible for the emergence of SARS-COV-2 variants and prolonging the pandemic.

337. During the 1976 Swine Flu vaccine campaign 25% of the U.S. population at that time, 55 million Americans, were vaccinated. The Swine Flu vaccine was deemed dangerous and unsafe, and removed from the market, even though the vaccine resulted in only 53 deaths. There have been in excess of 16,000 deaths resulting from the Covid Vaccine, yet there seems to be no threshold of pain regarding the discontinuation of this vaccine. This vaccine is at least 300 times

more deadly than the swine flu vaccine that was removed because it was dangerous and unsafe.

338.  Likewise, the masks United forces its employees to wear do not serve a compelling interest of preserving public health because they cannot prevent infection or transmission of SARS-COV-2 or Covid as noted in the studies referenced and even confirmed by Dr. Anthony Fauci. These mask policies are merely punitive for those who sought an exemption, or just another coercive practice employed by United to force its employees into inoculation.

339.  And finally, just like the vaccines and mask, the PCR test required by United do not serve a compelling interest of preserving public health as the PCR tests are well-known and documented to be an unreliable, medical tests for detection of active viral infection; and assuming arguendo the PCR was reliable, the detection of genetic material does not necessarily mean that a person is infectious or contagious.

340. Therefore, there is no legitimate, compelling interest in requiring the Covid vaccines, mask, or PCR test.

341.  Assuming arguendo the vaccines could be said to satisfy the interest of preserving the public health, United's mandate is not narrowly tailored since as it

is not "the least restrictive means necessary" as numerous, less restrictive means than vaccination exist that serve public interest of protecting the public's health against Covid. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has shown to be as equal to or provide greater protection than the Covid vaccines. And safer, less restrictive treatments, preventatives, or medications exists like the use of hydroxychloroquine, zinc, and ivermectin which does serve the public's interests.

342.  United's actions constitute willful, purposeful, or otherwise intentionally reckless violations of Plaintiff's right to substantive due process.

343.  As a direct and proximate result of United's policies, practices, regulations, and conduct, Plaintiffs have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, loss of promotion and other career opportunities, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses in an amount to be determined at trial; and have violated their constitutional right to substantive due process.

344. The conduct of the United as described represents a willful and conscious disregard for the treatment of private citizens under the law; and their actions shock the conscience of the average person and constitute an abuse of power that was malicious and purposeful such that punitive damages are warranted under the law and demanded against United according to proof.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.  Declares that United's vaccination mandate unconstitutional and violative of employees' rights of substantive due process, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require inoculation to maintain employment;

B.  Declares that United's mask policies are unconstitutional and violate employees' constitutionally protected right of substantive due process, and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require that its employees wear mask to maintain employment;

C.  Declares that United's requirement to take PCR test is unconstitutional and violate employees' constitutionally protected right of substantive due process, and

issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require that its employees take PCR test;

D.   Orders that those employees who were unlawfully terminated or coerced into resigning or into retirement be reinstated if they choose;

E.   Award Plaintiffs all damages afford by law, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, actual damages; punitive damages, and compensatory damages;

F.   Pursuant to 42 U.S.C. § 1988 and related statutes, award Plaintiff reasonable fees and costs and;

G.   Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT XII
### 42 U.S.C. § 1983
*Denial of Due Process Under the Fifth and Fourteenth Amendments and/or*
*Conspiracy to Violate Same*

345. Plaintiffs reallege and incorporate paragraphs 1-347 above as though fully set forth herein and further states:

346. All conditions precedent or antecedent have been satisfied, waived, or are unnecessary/not required to bring this action.

347. At all times material, Plaintiffs are citizens of the United States.

348. At all times material, United was a state actor and a person acting under the color of state law for the reasons provided throughout this complaint. United is also acting under the color of law as they have conspired with government officials to leverage Plaintiff's Constitutional right to work and make a living against them in efforts to achieve universal inoculation and acquire Plaintiffs personal, genetic information. United and the federal government have acted in lockstep and set in motion a series of acts by which both entities knew would inflict such constitutional harms. Through private meetings, executive orders, and unlawful coercion and duress, United has acted in concert with the government for nefarious purposes including greater power and control, illicit favors, undue

harm, and pecuniary or financial gain at the expense of Plaintiffs, their colleagues, and the American people.

349. United's Mandates and other employment practices violate the Equal Protection Clause under the Fifth and Fourteenth Amendments of the United States Constitution.

350. These provisions establish a fundamental right to individual liberty, which includes the right to pursue a lawful occupation; or as described in *Truax*, "the right to earn a living by a calling for one's choice," without undue government interference. *Truax v. Raich*, 239 U.S. 33, 41 (1915); *See also Allgeyer v. Louisiana*, 165 U.S. 578, 589 (1897) (liberty means "not only the right of the citizen to be free from mere physical restraint of his person…, but the term is deemed to embrace the right of the citizen… to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned."); *see also Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (finding that "liberty" under the Fourteenth Amendment Due Process Clause "without doubt…denotes not merely freedom

from bodily restraint but also the right of the individual…to engage in any of the common occupations of life…").

351. Presently, with both implied and expressed support of the Biden administration, and with the full power and backing of the Federal government, United has an implemented an unlawful vaccine mandate; which data shows and Plainitffs have witnessed in the workplace actually puts their lifes at risk – it can kill them. Effectively then, United is forcing Plainitffs and their colleauges to play roulette with their lives and take the experimental vaccines, or lose their livelihoods which afford them the ability to feed, clothe, and house their families.

352. Likewise with the accomodation process, United is forcing Plaintiffs to choose between renouncing their Christian faith, or lose their jobs. In this process, however, United is discriminating and choosing which religions or beliefs it favors or deems "acceptable." United has also implemented discriminatory practices regarding PCR Testing and mask policies for only for those who are unvaccinated for no legitamate reason given the futility and ineffectivness of both. United has imposed unreasonable, work conditions for employees who are not vaccinated like having to wear masks inside and only do so while they eat or drink. United ostricizes unvaccinated employees by making them take breaks outside rather

than break rooms; and continue to betlitte, chastize, and harrass "unvaccinated employees" through various mediums ranging from United's internal communication systems to public televation.

353. These practices are not justifable under any level of scrutiny given the vaccines are not only proving harmful to the general population, but pose specific risks to those in the airline industry. Other reasons include that employees from other countries are not required to be vaccinated, those who fly "jumpseat" from other airlines do not have to be vaccinated, and nothing about United's employees' jobs are germane or relate to the vaccine or any potential benefit it may serve.

354. United's actions constitute willful, purposeful, or otherwise intentionally reckless violations of Plaintiff's constitutional rights of equal protection under the Fifth and Fourteenth amendments of the United States Constitution.

355. As a direct and proximate result of United's policies, practices, regulations, and conduct, Plaintiffs have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, loss of promotion and other career opportunities, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary

losses in an amount to be determined at trial; and have violated their constitutional rights as stated.

356. The conduct of the United as described represents a willful and conscious disregard for the treatment of private citizens under the law; and their actions shock the conscience of the average person and constitute an abuse of power that was malicious and purposeful such that punitive damages are warranted under the law and demanded against United according to proof.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.   Declares that United's vaccination mandate unconstitutional and violative of employees' rights of equal protection under the Fifth and Fourteenth amendments of the United States Constitution; and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require inoculation to maintain employment;

B.   Declares that United's mask policies are unconstitutional and violate employees' rights of equal protection under the Fifth and Fourteenth amendments of the United States Constitution; and issue a temporary restraining order and/or

preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require that its employees wear mask to maintain employment;

C.   Declares that United's requirement to take PCR test is unconstitutional and violate employees' constitutionally protected rights under the Fifth and Fourteenth amendments of the United States Constitution; and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to require its employees take PCR test;

D.   Orders that those employees who were unlawfully terminated or coerced into resigning or into retirement be reinstated if they choose;

E.   Award Plaintiffs all damages afford by law, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, actual damages; punitive damages, and compensatory damages;

F.   Pursuant to 42 U.S.C. § 1988 and related statutes, award Plaintiff reasonable fees and costs and;

G.   Award any other relief this Court may deem just and proper, including but not limited to an award of plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

## COUNT XIII

### Violations of the Nuremberg Code and/or Conspiracy to Violate Same[115]

357. Plaintiffs reallege and incorporate paragraphs 1-359 above and the paragraphs below as though set forth in this count.

358. Following the Doctors' Trial (the "Medical Case")[116], "The Nuremberg Code" was issued as a summary of the legal requirements for experimentation on humans. Therein, it is maintained, and for good reason, in light of the atrocities committed by the Nazi regime, that the rights of the individual cannot be denied for the desire of the collective. United themselves, and acting in concert with their co-conspirators including the States violated Nuremberg's Code against Plaintiffs.

---

[115] For the proposition corporations can be held accountable under Nuremberg and/or Helsinki Accords, *see generally Sosa v. Alvarez–Machain*, 542 U.S. 692, 724 (2004); *Abdullahi v. Pfizer*, 562 F.3d 163, 172 (2d Cir. 2009); *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242 (11th Cir.2005); *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008) ("[t]he text of the Alien Tort Statute provides no express exception for corporations, see 28 U.S.C. § 1350, and the law of this Circuit is that this statute grants jurisdiction from complaints of torture against corporate defendants."); *Aldana v. Del Monte Fresh Produce, N.A. Inc.*, 416 F.3d 1242 (11th Cir. 2005); *The Nuremberg Trial*, 6 F.R.D. 69, 110 (1946)("crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced."); *see also* Article 9 of the Charter of the International Military Tribunal at Nuremberg authorizing the Tribunal to designate any group or organization as a criminal organization, and in fact did so. The Nuremberg Trial, 6 F.R.D. at 190-246.

[116] Twenty of the 23 defendants were doctors, charged chiefly with "crimes against humanity" through the "killing or maiming of vast numbers of persons through medical experimentation." J. Appleman, Military Tribunals and International Crimes 141 (1954).

359. The Nuremberg Code, like the Helsinki Accords, establish universally recognized norms for international law[117] or jurisdiction permitting Plaintiffs to aver violations of same against United[118].

360. The First Nuremberg Code states:

> The voluntary consent of the human subject is absolutely essential. This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion; and should have sufficient knowledge and comprehension of the elements of the subject matter involved as to enable him to make an understanding and enlightened decision. This latter element requires that before the acceptance of an affirmative decision by the experimental subject there should be made known to him the nature, duration, and purpose of the experiment; the method and means by which it is to be conducted; all inconveniences and hazards reasonably to be expected; and the effects upon his health or person which may possibly come from his participation in the experiment.

---

[117] *See generally Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980); *The Paquete Habana*, 175 U.S. 677, 708 (1900) (describing a rule of international law as one reached by "general consent of the civilized nations of the world" and "founded on considerations of ... the mutual convenience of belligerent states"); *see also* influences apparent in the passing of the U.N. Charter, U.N. Declaration of Human Rights, and establishing a framework for various international criminal tribunals such as the International Criminal Tribunal for the Former Yugoslavia and the International Criminal Tribunal for Rwanda.

[118] Preamble: The great weight of the evidence before us to effect that certain types of medical experiments on human beings, when kept within reasonably well-defined bounds, conform to the ethics of the medical profession generally. The protagonists of the practice of human experimentation justify their views on the basis that such experiments yield results for the good of society that are unprocurable by other methods or means of study. All agree, however, that certain basic principles must be observed in order to satisfy moral, ethical and legal concepts:

For the reasons stated throughout this complaint, United themselves and in collusion or acting in concert with the manufactures and federal government, have violated every bit of the First Nuremberg Code.

361. With the mandates, Plaintiffs and their colleagues are not afforded the "essential voluntary consent" as required when United forces its employees to choose between their livelihoods and families' well-being; or take the EUA vaccine (and PCR test). United has and continues to use incentives and disincentives, as well as, fraudulent statements and deceit, to coerce Plaintiffs and their colleagues to take the Covid vaccines and PCR test.

362. Many of Plaintiffs' colleagues succumbed to taking the experimental drug because of United's fraud, deceit, and duress; and none of the employees (Plaintiffs included) have been supplied the requisite or sufficient knowledge or information as to what the vaccines do, what they are comprised of, and whether there are reasonable alternatives.

363. The Vaccines are being pushed at the expense of other effective solutions.

364. United has wielded this unconscionable ultimatum with conjured data and statistics to unlawfully promote the vaccines and PCR test on behalf of the manufactures, and the federal government has provided United the mantle of

authority to do through President Biden and other government agencies. Robust amount of private and public data exists that show the vaccines can cause significant harms including death; yet United, the federal government, and the vaccine manufactures themselves wholly refuse or inadequately disclose the possible inconveniences, hazards, or effects upon the United's employees' health.

365. The Second Nuremberg Code states: "The experiment should be such as to yield fruitful results for the good of society, unprocurable by other methods or means of study, and not random and unnecessary in nature." United themselves and in collusion or acting in concert with the vaccine manufactures and federal government have violated this code for the reasons provided in the complaint.

366. By way of further illustration and example, this code was violated as there are other numerous other methods that have been found to be significantly more effective in treating Covid (i.e., ivermectin, hydroxychloroquine, zinc, etc…) than the vaccines but none of these other methods or options were advanced or proposed to combat the virus. Rather, these safer, more efficient options have and continue to be suppressed by United, the manufactures, and government; clearly violative of the second code.

367. The Third Nuremberg Code states: "The experiment should be so designed and based on the results of animal experimentation and a knowledge of the natural history of the disease or other problem under study that the anticipated results justify the performance of the experiment." United themselves and in collusion or acting in concert with the vaccine manufactures and federal government, have violated this code for the reasons provided in the complaint.

368. For instance, this code was violated as the knowledge and origin of SARS-COV-2/Covid was and is still debated ranging from the illness arising from bats via wet-markets in China to a bio-weapon emanating from same – yet the EUA products were forced upon the American people and Plaintiffs. As detailed and described by Dr. Smith, these animal trials were not completed and her study of the disease clearly states that the natural history of the disease was never considered or willfully ignored; which Plaintiffs allege is to further coerce and unlawfully promote this harmful experiment.

369. The Fourth Nuremberg Code states: "The experiment should be so conducted as to avoid all unnecessary physical and mental suffering and injury." United themselves and in collusion or acting in concert with the vaccine

manufactures and federal government, have violated this code for the reasons provided throughout this complaint.

370. For example, forcing Plaintiffs and their colleagues to choose between their livelihoods and taking experimental EUA vaccines and forcing employees to repeatedly take EUA PCR test cause unnecessary physical and mental suffering and injury. The VAERS data coupled with Lieutenant Colonel Long's experience in the U.S. Armed Forces and Plaintiffs' witnessing pilots becoming incapacitated mid-flight evidences unnecessary physical and mental suffering and injury consider there is roughly a 99.6% survival rate; and alternative, available medicines which prove more effective and less harmful than the vaccines.

371. Additionally, Plaintiff-Thomas Anderson has witnessed his colleague-pilot forced into taking the J&J shot; and conveyed that he has since been under severe, mental distress because he is scared and uncertain what may happen to him in the near future or long term as the side effects and impact is unknown and undefined. Like many employees, those who were inoculated did not want to but felt coerced into doing so, and now that they have taken the EUA vaccine, it has compounded the stress and angst. This is particularly alarming as this is just one

of many pilots who are now flying airplanes with hundreds of passengers on board who are feeling so stressed, they are struggling to focus.

372. The Fifth Nuremberg Code states: "No experiment should be conducted where there is an a priori reason to believe that death or disabling injury will occur; except, perhaps, in those experiments where the experimental physicians also serve as subjects." United themselves and in collusion or acting in concert with the vaccine manufactures and federal government, have violated this code for the reasons provided in the complaint.

373. For instance, the VAERS data and numerous, public reports show that death and disabling injury is far too frequent and occur; and yet United has and continues to convey false information like persons are more likely to die if they do not take the vaccine when that is demonstrably untrue. Likewise, the "physicians" or in this case, United, the government, and vaccine manufactures are expressly not requiring themselves or those working for them to take the vaccine in violation of the Fifth Nuremberg Code.

374. The Sixth and Seventh Nuremberg Codes read respectively: "The degree of risk to be taken should never exceed that determined by the humanitarian importance of the problem to be solved by the experiment;" and the "Proper

preparations should be made and adequate facilities provided to protect the experimental subject against even remote possibilities of injury, disability or death." United themselves and in collusion or acting in concert with the vaccine manufactures and federal government, have violated these codes for the reasons provided throughout the complaint.

375. For instance, it has been proven that the survivability of Covid is over 99% for Plaintiffs and for most of humanity; yet United and Kirby have lied to their employees with false facts designed to coerce and force unneeded vaccination and testing while suppressing medications that could cause this pandemic to cease in existence. To the contrary, the vaccines have exacerbated and prolonged the problem as explained by Dr. Smith and studies across the world. And no preparations have been made or adequate facilities provided to protect United's employees against even remote possibilities of injury, disability or death; instead for example, the information that could save their lives has been supplanted with misinformation or suppressed.

376. The Eighth Nuremberg Codes states: "The experiment should be conducted only by scientifically qualified persons. The highest degree of skill and care should be required through all stages of the experiment of those who conduct

or engage in the experiment." United themselves and in collusion or acting in concert with the vaccine manufactures and federal government, have violated this code for the reasons provided throughout the complaint.

377. Those at United, for instance, who are forcing and promoting the Covid vaccines and PCR testing on its employees like Kirby, the unions, chief pilots, direct supervisors, etc… are not qualified to render these experiments or advice. In fact, many of Plaintiffs' and their colleagues' treating physicians (along with the affiants attached hereto) and doctors have recommended they <u>not</u> take the vaccine and repeated tests; which is what makes this so troubling as United and its co-conspirators are effectively attempting to take the place of its employees' doctors. Even with the caveat of, "per the CDC", this is a clear violation of this Code.

378. The Nineth and Tenth Nuremberg Codes state:

> During the course of the experiment the human subject should be at liberty to bring the experiment to an end if he has reached the physical or mental state where continuation of the experiment seems to him to be impossible.

> During the course of the experiment the scientist in charge must be prepared to terminate the experiment at any stage, if he has probable cause to believe, in the exercise of the good faith, superior skill and careful judgment required of him, that a continuation of the

> experiment is likely to result in injury, disability, or
> death to the experimental subject.

379. United themselves and in collusion or acting in concert with the vaccine manufactures and federal government have violated these codes for the reasons provided throughout the complaint.

380. For instance, the fact the EUA vaccines (and PCR tests in the past and likely in the future) have been mandated and that United will not allow any accommodations or exemptions is violated of the code. United's "option" is no option at all: take the vaccine or be fired. To the extent United claims it is accepting "accommodations," this is misleading as United's acceptance is effectively the same as termination: it's a distinction without a material difference. Even President Biden states "this is not about freedom or personal choice".  As both an employer and state actor, United has prayed on the physical and mental well-being of its employees through unlawful coercion and duress on Plaintiffs and their colleagues who do not want to participate in this experiment. based on the mental distress and state of people who do not want to participate.

381. United clearly violates these Nuremberg tenets by ignoring the VAERS data, the numerous public and private studies (see attached affidavits and sworn statement), and even its own employees reported first-hand accounts of issues on

the job of pilots losing consciousness and inability to concentrate. Nothing what United and its co-conspirators are doing in respect to this pandemic and EUA products is in good faith or being carried out with careful, professional judgment.

382. In light of the overwhelming scientific and medical evidence/data demonstrating the EUA products do not serve the purpose which they espouse and/or do more harm than good, Plaintiffs begrudgingly submit that the reason United, the vaccine manufactures, and the federal government/agencies are unlawfully promoting and mandating these EUA products is for malevolent and nefarious purposes. Bluntly, Plaintiffs surmise these entities are intentionally trying to harm/kill them and the American people for profit or both.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.   Declares that the Court has jurisdiction or authority to adjudicate this Count and hear violations of international law and crimes against humanity;

B.   Declares that United's actions and practices including the vaccination mandate, PCR test policies, vaccine passports, misinformation/disinformation, invasions of privacy, discrimination, threats, and/or mask practices violate the Nuremberg Codes, common law, and/or constitute crimes against humanity; and

206

issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to violate same and order the immediate cessation of these employment practices;

C.   Orders that those employees who were unlawfully terminated or coerced into resigning or into retirement be reinstated if they choose;

D.   Award Plaintiffs all damages afforded by law, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, actual damages; general damages; punitive damages, and compensatory damages;

E.   Award Plaintiffs all reasonable fees and costs;

F.   Award relief this Court may deem just and proper, including but not limited to an award of Plaintiffs' costs, fees, attorneys' fees and any other relief this Court may find appropriate.

## COUNT XIV

**Engaging in, Conspiracy to Commit, and Aiding and Abetting in Torture in Violation of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("TVPA")[119] *or alternatively*, Cruel, Inhuman, or Degrading Treatment[120]**

383. Plaintiffs reallege and incorporate paragraphs 1-385 above as if fully set forth in this count.

384. The Torture Convention establishes universally recognized norms for international law[121] for which Plaintiffs seek redress against United for their violations of same. *See* TVPA § 2(a).

---

[119] G.A. Res. 39/46, 39 U.N. GAOR, Supp. No. 51, at 197, U.N. Doc A/39/51 (Dec. 10, 1984) (entered into force June 26, 1987) (ratified by the United States Oct. 21, 1994).

[120] The Eleventh Circuit and other courts have recognized cruel, inhuman, or degrading treatment as a violation of customary international law, at least to the extent that the conduct also would be prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the U.S. Constitution. *See e.g., Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1345 (11th Cir. 2011); *Cabello v. Fernandez–Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005); *See also Al Shimari v. CACI Premier Tech., Inc.*, 263 F. Supp. 3d 595, 603 (E.D. Va. 2017) *citing Roe I v. Bridgestone Corp.*, 492 F.Supp.2d 988, 1023 (S.D. Ind. 2007) (recognizing a "general international norm against cruel, inhuman and degrading treatment"); *Tachiona v. Mugabe*, 234 F.Supp.2d 401, 437 (S.D.N.Y.2002) ("[T]he infliction of cruel, inhuman or degrading treatment ... is universally condemned and renounced as offending internationally recognized norms of civilized conduct."); *Jama v. United States Immigration and Naturalization Serv.*, 22 F.Supp.2d 353, 363 (D.N.J. 1998) (holding that "[t]he mental and physical abuses which are alleged to have been inflicted upon plaintiffs violate the international human rights norm of the right to be free from cruel, unhuman and degrading treatment"); *Xuncax v. Gramajo*, 886 F.Supp. 162, 186 (D. Mass. 1995) (observing that "the major international agreements on human rights generally treat the norm proscribing cruel, inhuman, or degrading treatment in parity with the prohibition against official torture").

[121] *See e.g., Universal Declaration of Human, G.A. Res.* 217A (III), U.N. GAOR, at 71, art. 5, U.N. Doc. A/810 (1948) ("No one shall be subjected to torture...."); S.Rep. No. 249–102, at 3 (1991)S.Rep. No. 249–102, at 3 (1991) ("Official torture and summary execution violate standards accepted by virtually every nation. This universal consensus condemning these practices has assumed the status of customary international law"); International Covenant on Civil and Political Rights, G.A.

385. United has clearly and unambiguously violated the tenets of the Torture Convention when they perpetrated, conspired, or were complicit in acts:

> which severe pain or suffering, _whether physical or mental_, [was] intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, _or for any reason based on discrimination of any kind_, when pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity;

Or alternatively, cruel, inhuman, or degrading treatment when United:

a) Gave Plaintiffs an unconscionable ultimatum of having to choose between their livelihoods which feed, house, and clothe their families; or take an experimental vaccine which United knows or is aware can cause death or life-long injuries;

b) Coercing Plaintiffs with incentives to take a vaccine which United knows or is aware can cause death or permanent injury;

---

Res. 2200 A(xx1), 21 U.N. GAOR, Supp. No.16, at 52, art. 7, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 717 (Dec. 16, 1966) (entered into force Mar. 23, 1976) (ratified by the United States Sept. 1992); European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, Nov. 26, 1987, 27 I.L.M. 1154 (entered into force Feb. 1, 1989); European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, art. 3, 213 U.N.T.S. 222 (entered into force Sept. 3, 1953).

c)  Calls were continuously made from management and schedulers, to employees, to inquire as to whether or not they would be taking the shot, so the company could plan accordingly for the employee's departure;

d)  The company allowed pilots' vaccine status information to be supplied to ALPA (Airline Pilots Association), resulting in ALPA reps calling pilots and stating, "You are a threat to yourselves and others", by being unvaccinated;

e) Continuously harassed employees, sending emails, postcards, and visual reminders on employees' FLYING TOGETHER (United's employee web portal) profile pages, instructing employees to upload their vaccine cards, of face termination on September 27, 2021;

f) Failed to address persistent harassment of non-vaccinated employees, by co-workers, who easily identified the unvaccinated by their masks.  The unvaccinated have been verbally harassed in the Training Center, on the Fight Deck, in the Cabin, Maintenance facilities, other company property, and even United's social media pages, with threats, and "Just get the shot" comments;

g) Perpetrated, instigated, and acquiesced, by persons acting in an official capacity, carried out their actions, motives, and intents on their behalf with the intent to do the bidding of the state actors;

h) Persons unvaxed were forced to wear N95 masks and were injured on the job in Denver while walking to a gate because of passing out due to lack of oxygen;

i) Flight crew members were under constant duress and mental anguish while bidding for trips. They had to avoid the many and constantly changing restricted segments because any trip with a restricted segment would be dropped without pay and no way to get it back.  Constant thought of loss of income was excruciating for those who provide for their families.

386. United has also violated the TVPA when they have and continue to engaged in Corporate Stockholm Syndrome[122] against Plaintiffs and their colleagues. That is, Kirby continuously threatened furloughs and layoffs throughout the pandemic, whilst partnering with various entities to promote the

---

[122] "A key aspect of inducing Stockholm Syndrome is the more powerful party providing both threats and kindness to the less powerful party. When these come from the same source, the psychological welfare of the lesser party can be more easily controlled." Psychology Today, The Modern Time Crunch, "Corporate Stockholm Syndrome", by James Ullrich, March 14, 2014. Available at: https://www.psychologytoday.com/us/blog/the-modern-time-crunch/201403/corporate-stockholm-syndrome

vaccines, as *the way* for United to return to a financially healthy position and get things "back to normal." United, while acknowledging its loyal employee group, promoted and held job fairs at the same time requiring present loyal employees to get the vaccine, or face termination.

WHEREFORE, Plaintiffs respectfully request the Court enter judgment in its favor and pray the Court:

A.   Declares that the Court has jurisdiction or authority to adjudicate this Count and hear violations of international law and crimes against humanity;

B.   Declares that United's practices including the vaccination mandate, PCR test policies, vaccine passports, and mask practices violates the TVPA or alternatively, Cruel, Inhuman, or Degrading Treatment; and issue a temporary restraining order and/or preliminary injunction, followed by a permanent injunction to enjoin United from continuing to violate same and order the immediate cessation of these employment practices;

C.   Orders that those employees who were unlawfully terminated or coerced into resigning or into retirement be reinstated if they choose;

D.   Award Plaintiffs all damages afford by law, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, actual damages, general damages, compensatory damages, and punitive damages.

E.   Award any other relief this Court may deem just and proper including but not limited to an award of Plaintiffs' costs, fees, and attorneys' fees and any other relief the Court may find appropriate under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.   Declare the Court has jurisdiction or authority to hear this case;

B.   Enter judgment in Plaintiffs' favor and grant all declaratory and injunctive relief sought in Counts I through XIV;

C.   General damages in an amount determined;

D.   Actual and compensatory damages in the sum of salaries that would be earned until natural retirement of approximately four-hundred and nine million, two-hundred thousand dollars ($409,200,000); or things of value equivalent as justice requires;

E.   Punitive damages in the amount of two million dollars ($2,000,000) per Plaintiff; or things of equal value equivalent as the interests of justice requires;

F.   Award Plaintiffs all reasonable fees and costs any other relief this Court may deem just and proper, including but not limited to an award of Plaintiffs' costs, attorneys' fees, expected taxes owed, and any other relief this Court deems just and proper under the circumstances.

Respectfully Submitted,

**FERGUSON LAW, P.A**.
Attorney for Plaintiffs
1 East Broward Blvd. Suite 700
Fort Lauderdale, Florida 33301
T – (954) 256 – 5646
F – (954) 256 – 5655
Service: Service@FergusonLawPA.com
E-Mail: Wayne@FergusonLawPA.com

*/s/ Kenneth W. Ferguson*
Kenneth W. Ferguson, Esq.
Fla Bar No.: 98950

~Psalm 23~